E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

# COVER SHEET

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF HARRISON COUNTY WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

**First Plaintiff:** ☑ Business ☐ Individual ☐ Government ☐ Other

**First Defendant:** ☑ Business ☐ Individual ☐ Government ☐ Other

**Judge:** James A. Matish

## COMPLAINT INFORMATION

**Case Type:** Civil

**Complaint Type:** Contract

**Origin:** ☑ Initial Filing ☐ Appeal from Municipal Court ☐ Appeal from Magistrate Court

**Jury Trial Requested:** ☑ Yes ☐ No

**Case will be ready for trial by:** 12/2/2024

**Mediation Requested:** ☐ Yes ☑ No

**Substantial Hardship Requested:** ☐ Yes ☑ No

☐ Do you or any of your clients or witnesses in this case require special accommodations due to a disability?

- ☐ Wheelchair accessible hearing room and other facilities
- ☐ Interpreter or other auxiliary aid for the hearing impaired
- ☐ Reader or other auxiliary aid for the visually impaired
- ☐ Spokesperson or other auxiliary aid for the speech impaired
- ☐ Other: ____________________

☐ I am proceeding without an attorney

☑ I have an attorney: Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

State of West Virginia
County of Harrison, Circuit and Family Court
I, Albert F. Marano, Clerk of said county and in said state, do hereby certify that the foregoing is a true copy from the records of said court given under my hand and seal this 4th day of December 2023

By ____________________
Deputy Clerk

# SERVED PARTIES

**Name:** Spinnaker Insurance Company

**Address:** 209 West Washington Street, Charleston WV 25302

**Days to Answer:** 30 **Type of Service:** Secretary of State - Certified - Including Copy Fee

---

**Name:** Cowbell Cyber, Inc.

**Address:** P.O. Box 7775, # 44808, San Francisco CA 94120

**Days to Answer:** 30 **Type of Service:** Secretary of State - Certified - Including Copy Fee

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

**IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA**

ABRAHAM LINC CORPORATION,
A West Virginia Corporation,

Plaintiff,

v.

Civil Action No.:________________

The Honorable:________________

SPINNAKER INSURANCE COMPANY,
An Illinois Stock Company, and
COWBELL CYBER, INC.,
A Delaware Corporation,

Defendants.

## COMPLAINT

Now comes the Plaintiff, Abraham Linc Corporation, ("Abraham Linc"), by and through its attorneys, Simmerman Law Office, PLLC, and for its Complaint states as follows:

### PARTIES

1. Abraham Linc is a West Virginia corporation with a local office address of 519 West Main Street, Bridgeport, West Virginia, 26330. At all relevant times, Abraham Linc was engaged in the wholesale flooring business.

2. Defendant Spinnaker Insurance Company, ("Spinnaker"), is an Illinois based insurance company with a notice of process address of: Corporation Service Company, 209 West Washington Street, Charleston, West Virginia 25302. At all times relevant hereto, Spinnaker conducted insurance business throughout the State of West Virginia, including in Harrison County, West Virginia.

3. Defendant Cowbell Cyber, Inc., ("Cowbell"), is Delaware Corporation and a California based insurance claims administrator/adjuster entity which, at all relevant times, handled/adjusted the claim at issue on behalf of Spinnaker under Prime 100 Commercial Cyber

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

Insurance Policy No. FLY-CB-TXU1TZQEM-002, effective January 29, 2023 to January 29, 2024, ("the Policy"). Upon information and belief, Cowbell's principal office address is 6800 Koll Center Parkway, Suite 250, Pleasanton, California, 94566, and its mailing address is P.O. Box 7775, # 44808, San Francisco, California 94120.

**JURISDICTION AND VENUE**

4. This Court has jurisdiction over the Defendants in accordance with W.Va. Code § 56-3-33 because the Defendants transacted business in this State; contracted to supply services or things in this State; and caused injury and/or tortious injury in this State.

5. Venue is appropriate in the Circuit Court of Harrison County because certain events giving rise to the causes of action occurred in Harrison County, West Virginia and because the Defendants transact business in and throughout Harrison County, West Virginia.

**COMMON ALLEGATIONS/BACKGROUND FACTS**

6. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

7. This Complaint seeks damages and other relief against the Defendants for violations of the West Virginia Unfair Trade Practices Act relating to insurance companies and insurance claims adjustment, as well as for breach of the contractual and common law duties owed to Abraham Linc.

8. On October 26, 2022, Abraham Linc was advised that its cyber liability coverage was set to expire on 1/29/2023. See **Ex. 1**, Email from Blue Ridge Risk Partners, with Short Form Application.

9. Accordingly, on October 28, 2022, Abraham Linc submitted a Cyber Liability Insurance Short Form Application to its insurance agent. See **Ex. 1**, Short Form Application.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

10. In its Cyber Liability Short Form Application, Abraham Linc plainly indicated that its employees do not complete social engineering training. See **Ex. 1**, Question 9. Phishing Controls.

11. Through its insurance agent, Blue Ridge Risk Partners, and insurance broker, Burns & Wilcox, Abraham Linc was ultimately able to procure a Cyber Insurance Policy through Spinnaker, with an effective date of January 29, 2023, the Policy. See **Ex. 2**, Cyber Insurance Policy – Abraham Linc Corporation.

12. The Policy contains a social engineering endorsement which provides for $100,000.00 in insurance coverage for social engineering losses, as defined in the Policy. See **Ex., 2**, pgs. 31-32, Social Engineering Endorsement.

13. Prior to Spinnaker issuing the Policy and binding insurance coverage for social engineering losses, Spinnaker did not request that Abraham Linc create formal, written policies and procedures related to social engineering incidents, occurrences or transfer verification(s).

14. Prior to Spinnaker issuing the Policy and binding insurance coverage for social engineering losses, Spinnaker did not request that Abraham Linc complete additional training or social engineering updates.

15. At Abraham Linc, the historic, documented and established protocol related to ACH transfer verification(s) was to verify the transfer via email with known vendors/contacts – as many of Abraham Linc's vendors were in distant markets and time zones, such as China, and thus were unavailable to verify transfers by way of phone.

16. Abraham Linc's established and documented procedure was wholly consistent with the Policy language and was never questioned by Spinnaker, or at any time prior to issuance of the Policy.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

17. Within this context, beginning on or about April 20, 2023, a known and long-standing vendor of Abraham Linc's, BBL Flooring's, email accounts were hacked by a third party.

18. Stepping back, BBL Flooring is a flooring manufacture and a wholesale flooring company which manufactures and sells flooring product(s) to Abraham Linc whom Abraham Linc had a long-standing and established relationship with – which included numerous, prior verification(s) by email correspondence between Abraham Linc and BBL Flooring employees.

19. More specifically, in late April/early May, a later confirmed fictitious BBL Flooring employee posing as "Kris Yin" interacted with various Abraham Linc employees related to due and owing invoices. See **Ex. 3**, Social Engineering Checklist and Email Compilation, April/May 2023, with historic emails/documents.

20. "Kris Yin" appeared as a purported BBL Flooring employee, whom Abraham Linc has frequently worked with out of BBL Flooring's Changzou City, Jiangsu, Province, China office. Id.

21. To clarify, there is a real "Kris Yin" at BBL Flooring, with whom Abraham Linc had been transacting business and order confirmations/verifications via email since at least 2017.

22. Thus, consistent with Abraham Linc's practice and procedures, Abraham Linc followed its procedures and engaged in numerous email confirmations/verifications with "Kris Yin", which spanned several weeks in April/May of 2023.

23. After following Abraham Linc's long-standing vendor verification procedures, which involved numerous emails to the fictitious "Kris Yin" wherein amounts outstanding were verified and discussed at length, Abraham Linc ultimately sent, via ACH Transfer, a substantial sum of money, which well exceeds the social engineering policy limit of $100,000.00, consistent

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

with the directives sent to Abraham Linc by the fictitious "Kris Yin" on behalf of fake "BBL Flooring" letterhead.

24. Following this ACH Transfer, which in all contexts was an ordinary transaction in the context of Abraham Linc and BBL Flooring's working relationship, Abraham Linc later learned that BBL Flooring's internal system had been hacked.

25. Further, on or about May 11, 2023, Abraham Linc discovered that the account to which Abraham Linc's funds were sent via ACH Transfer was a scam/fake BBL Flooring account – as the bank account had actually only been in existence for two months, and was registered in the name of Sabrina Damore, not BBL Flooring.

26. After learning of the foregoing issues, Abraham Linc immediately attempted to work with its financial institution and Regions Bank (where the fictitious account was housed) to stop the ACH Transfer/to recoup funds – but the ACH Transfer could not be stopped.

27. After learning of the foregoing issues, Abraham Linc has also worked with various government authorities to attempt to stop the ACH Transfer/to recoup funds – but only de minimis funds have been recouped as of the filing of this litigation.

28. Additionally, on May 11, 2023, Abraham Linc contacted its insurance agent/broker and put them on notice of Abraham Linc's social engineering loss/claim under the Policy.

29. After tendering notice, Abraham Linc was advised by its insurance agent/broker that this is the very reason social engineering insurance was procured, and that Abraham Linc would be paid $100,000.00 in insurance proceeds, the social engineering policy limit.

30. Notwithstanding the clarity of the insurance agent/broker's representations, after the claim was tendered and without any investigation, on May 11, 2023, Spinnaker and Cowbell

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

verbally advised that they were going to deny Abraham Linc's social engineering claim due to a lack of verification on the part of the insured.

31. On and following May 11, 2023, Abraham Linc provided all materials requested by the Defendants, and Abraham Linc also provided both historic and current emails which demonstrated proof of verification and that Abraham Linc has verified transactions in the same manner for not less than seven (7) years – without incident or concern.

32. Similarly, on and after May 11, 2023, the Policy agent/broker repeatedly told the Defendants that their coverage position was wrong and that it was their collective position that coverage is owed to Abraham Linc under the insuring agreement. See **Ex. 4**, Email compilation of communications between the insurance agent/broker and the Defendants.

33. For example, on May 15, 2023 and May 25, 2023, Sheri O'Donoghue, the Director of Claims at Blue Ridge Risk Partners stated via email as follows (see **Ex. 4**):

> **May 15, 2023**:
>
> Jenna,
>
> The method of verification utilized by the insured is their continual relationship they have with the vendor and communications completed by email and specifically Kris Yin, the same individual they have communicated with over the years.
>
> Abraham Linc attached multiple email samples supporting this trusted communication. At no point did the fraudulent email exchange show different contact information (Email or telephone numbers) in the body of Mr. Yin's email. The ease of doing business with this client and the exchanges they have had over the years has always been legitimate. There were also offers to ACH or wire a payment in the past. There was no reason to question this verification with the request for the ACH based on the documents supplied by the bank and DDCC.
>
> We appreciate your anticipated thorough review of all documents supplied and any further information needed to move this forward.
>
> Thanks again.
>
> Sheri

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

**<u>May 22, 2023</u>**:

Good Afternoon Jenna & Robert,

Checking in to see if the legal breach coach and forensic I.T. is lined up for the conference call with Robert.

My apologies if this took place already- last I heard it would be either Friday or today for the parties to get together. I did not need to be included, but want to make sure we are on track.

Also, please let me know when you expect to have documents reviewed to finalize social engineering portion of the loss. **It remains our expectation the coverage limit of $100,000 will be released to the client**. (emphasis added).

Thank you,
Sheri

34. Following the May correspondence, the insurance agent/broker continued to advocate for coverage with the Defendants, making it clear to the Defendants that their coverage position was wrong, and that both the issuing insurance agent, Blue Ridge Risk Partners, and the insurance broker, Burns & Wilcox, disagreed with the position taken by the Defendants, as evidenced in, for example, in the email text below:

Good morning Robert,

The insurer has notified us that they intend to uphold their coverage denial and will be sending you correspondence indicating that this week.

**We are sorry that you are dealing with this, as we do not agree with the insurer's position and have protested it to the full extent of our ability with the insurer. I am also contacting the WV Insurance Commissioner's office today to let them know of this situation and that we don't agree with the insurer's handling of your claim.**[1]

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

[1] It is similarly telling that the insurance agent on the Policy directly contacted the WV Insurance Commissioner's office to report the conduct of the insurer/Defendants.

**We placed your coverage through one of the largest and most credible insurance brokerages in the country, Burns & Wilcox, and they also do not agree with the insurer's position. They have also objected and asked for the insurer to reconsider to no avail.**

Please let me know if you want me to come to your office to discuss, or set up a call to do so. Again, I apologize that you are dealing with this situation and will assist you in any way I am able to at this point. (emphasis added)

Regards,

Adam Dyer, Blue Ridge Risk Partners, See **Ex. 5**, 7/17/2023 Email.

35. Notwithstanding the clarity of both the insurance agent and the insurance broker's coverage position, which is an uncommon event in the insurance industry, the Defendants continued to fail to investigate or evaluate Abraham Linc's social engineering claim.

36. The Defendants' omissions and failures are glaring, particularly as under West Virginia law, it is clear that "[a]ny person who shall solicit within this state an application for insurance shall, in any controversy between the insured or his or her beneficiary and the insurer issuing any policy upon such application, be regarded as the agent of the insurer and not the agent of the insured." W.Va. Code 33-12-22.

37. Thus here, in the context of the present coverage dispute, the Defendants' agents have plainly admitted that there is coverage such that Abraham Linc's social engineering loss claim is valid and should be paid.

38. Specifically, the actions, admissions and statements of Blue Ridge Risk Partners, the insurance agent which solicited and issued the policy at issue, and Burns & Wilcox, the insurance broker, bind coverage.

39. Notwithstanding the foregoing, and despite the Defendants' glaring misunderstanding of West Virginia statutory and common law, by letter dated July 21, 2023, the

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

Defendants fully denied coverage related to the social engineering loss. See **Ex. 6**, 7/21/2023 Denial Letter.

40. On information and belief, the Defendants' denial is contrary to Blue Ridge Risk Partners and Burns & Wilcox's prior express admissions, concessions and declarations, as well as contrary to the express language of the insuring agreement, West Virginia common and statutory law.

41. The Defendants' actions/omissions have forced Abraham Linc into unwanted and unnecessary litigation related to the Policy.

42. At this time, Abraham Linc expressly reserves the right to amend this Complaint and pursue other claims which may yet arise and/or to add additional parties, as Defendant Cowbell's internal business structure is not yet known.

**COUNT I: BAD FAITH – COMMON LAW AND STATUTORY (ALL DEFENDANTS)**

43. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

44. The Defendants, and their employees, agents and servants, were engaged/employed to adjust/investigate Abraham Linc's loss under the Policy.

45. At all times relevant hereto, Abraham Linc cooperated with the Defendants, and their employees, agents and servants.

46. The Defendants, and their agents, servants and/or employees, have negligently, willfully and intentionally breached the statutory and regulatory requirements governing insurance companies and insurance adjusters doing business in West Virginia, as well as the insuring agreement.

47. At all times relevant hereto, the Defendants were subject to the laws of West Virginia, both the common law and certain statutory and regulatory laws, governing the insurance

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

business in West Virginia, including but not limited to, those statutory sections and attendant regulations known as the West Virginia Unfair Trade Practices Act.

48. The Defendants had a legal obligation and duty to make a prompt, full and fair investigation of Abraham Linc's claim, and to effectuate a prompt, fair and equitable settlement of Abraham Linc's claim/insured loss.

49. Further, the Defendants had a duty of good faith and fair dealing in all transactions with Abraham Linc under the insuring agreement and within the insurer/insured relationship.

50. The Defendants knew or should have known that their conduct, actions and omissions were reckless, willful and malicious and would cause Abraham Linc to sustain and endure economic and emotional harm.

51. The Defendants' violations and unlawful acts include, but are not limited to, the following:

a. Refusing to pay claims without conducting a reasonable investigation based upon all available information and known facts;

b. Compelling Abraham Linc to institute litigation to recover amounts due under an insurance policy by making no offer or unfair offers of resolution or compromise;

c. Failing to promptly provide a commercially reasonable explanation of the basis for the insurer's position in relation to the facts where applicable law and facts support an insured's stated position;

d. Placing the financial interests of the insurer above those of the insured;

e. Disregarding the admissions of the Defendants' agents/brokers that the claim is covered, and that the social engineering loss was plainly an insured risk; and

f. Other such violations of the law that may become known or identified as this matter progresses.

52. As a direct and proximate result of the conduct of the Defendants, Abraham Linc has sustained substantial compensable losses including specifically the benefits of its contractual relationship with the Defendants, certain consequential damages, and attorney fees and costs – as further set forth below.

53. Because the Defendants' actions/omissions were malicious, willful, wanton and/or in reckless disregard of Abraham Linc's rights, Abraham Linc is entitled to punitive damages.

**COUNT II: BREACH OF CONTRACT/BREACH OF THE CONTRACTUAL DUTY OF GOOD FAITH AND FAIR DEALING (DEFENDANT SPINNAKER)**

54. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

55. Defendant Spinnaker owed, and owes, express contractual duties to Abraham Linc and a contractual duty of good faith and fair dealing.

56. Defendant Spinnaker has breached both the express language of the insuring agreement and the contractual duty of good faith and fair dealing.

57. To expand, Defendant Spinnaker, through its agents, servants and/or employees, knowing that Abraham Linc's claim is wholly valid, has refused the same in violation of the express language of the insuring agreement and West Virginia common law.

58. As a direct and proximate result of the conduct of Defendant Spinnaker, Abraham Linc has suffered compensable loss – specifically Abraham Linc has lost a substantial benefit of the insuring agreement, for which Abraham Linc paid a substantial insurance premium.

59. Because Defendant Spinnaker's actions/omissions were malicious, willful, wanton and/or in reckless disregard of Abraham Linc's rights, Abraham Linc is entitled to punitive damages.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

**COUNT III: CONSTRUCTIVE FRAUD**
**(ALL DEFENDANTS)**

60. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

61. The State of West Virginia has a substantial public policy prohibiting insurers from deceiving, oppressing, and/or taking unfair advantage of policy holders.

62. Such public policy is embodied within West Virginia case law, legislative enactments and insurance commissioner rules and regulations. Examples of such embodiments of this policy include, but are not limited to: W.Va. Code §33-1-1, *et seq.*, §33-11-1, *et seq.*, W.Va. Legislative Rule Insurance Commissioner, Series 14 Unfair Trade Practices, W.Va. Code §46(a)-6-104, *et seq.*, and the W.Va. Code §36-8-1, *et seq*.

63. As noted above, the Defendants have violated substantial public policies and provisions set forth in the W.Va. Legislative Rule Insurance Commissioner, Series 14 Unfair Trade Practices, W.Va. Code §46(a)-6-104, *et seq.*, and the W.Va. Code §36-8-1, *et seq*. and the common law of West Virginia.

64. These breaches and unlawful acts/omissions constitute breaches of legal and equitable duties which give rise to tort liability for constructive fraud.

65. Further, as a direct and proximate result of the conduct of the Defendants, Abraham Linc has suffered compensable loss – specifically the full benefits of its insuring agreement.

66. Because the Defendants' actions/omissions were malicious, willful, wanton and/or in reckless disregard of Abraham Linc's rights, Abraham Linc is entitled to punitive damages.

**COUNT IV: REASONABLE EXPECTATIONS**
**(ALL DEFENDANTS)**

67. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

68. Abraham Linc had a reasonable expectation of coverage under the Policy.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

69. Further, Abraham Linc had a reasonable expectation of coverage under the Policy because it relied upon the representations of the Defendants and their agents/employees that the Policy would provide coverage and pay in the event of a social engineering loss.

70. Abraham Linc, in reliance upon the representations of the Defendants and their agents, reasonably expected the Policy and claim to be correctly processed and policy proceeds to be paid for the social engineering loss.

71. The Defendants have acted intentionally, with actual malice and/or gross negligence by failing to honor the Policy and pay the social engineering loss, consistent with the reasonable expectations of the insured and the Defendants' agents/broker(s).

72. Alternatively, the social engineering provisions of the Policy are ambiguous such that coverage plainly exists for the social engineering loss at hand.

73. Finally, as a direct and proximate result of the conduct of the Defendant, Abraham Linc has suffered compensable loss – specifically the full benefits of its insurance agreement.

**COUNT V: VICARIOUS LIABILITY**
**(ALL DEFENDANTS)**

74. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

75. Upon information and belief, the above-named Defendants are also liable to Abraham Linc based upon theories of vicarious liability, respondeat superior, master/servant, principle/agent and/or employer/employee based upon the acts of, including, but not limited to, Defendants' adjusters and agents/representatives.

**WHEREFORE** Abraham Linc hereby demands judgment against the Defendants, as follows:

(a) Compensatory, special and general damages for the damage(s) caused to Abraham Linc;

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

(b) All damages, compensatory or general, allowed by law under Hayseeds v. State Farm Fire and Casualty Company, and its progeny, including, but not limited to, all attorneys' fees and costs, all expenses incurred in this matter, and damages for aggravation and inconvenience in an amount to be determined by a jury;

(c) All damages, general and compensatory, for aggravation, emotional distress, inconvenience, humiliation, expenses and attorneys' fees, and such other damages in an amount to be determined by a jury;

(d) Pre-judgment and post judgment interest;

(e) Punitive damages;

(f) Attorneys' fees and costs expended herein; and

(g) Such other further general and specific relief as may become apparent as this matter proceeds to trial.

**PLAINTIFF REQUESTS**
**A JURY TRIAL AS TO ALL COUNTS SO TRIABLE**

Respectfully submitted,

SIMMERMAN LAW OFFICE, PLLC

By: */s/ Frank E. Simmerman, III*

Frank E. Simmerman, Jr.
(W. Va. Bar #3403)
Chad L. Taylor
(W. Va. Bar #10564)
Frank E. Simmerman, III
(W. Va. Bar #11589)

254 East Main Street
Clarksburg, WV 26301
Phone: (304) 623-4900

*Counsel for the Plaintiff Abraham Linc Corporation*

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

**Robert Marra**

**From:** Rosanna Funk <Rose.Funk@BlueRidgeRiskPartners.com>
**Sent:** Wednesday, October 26, 2022 12:25 PM
**To:** Robert Marra
**Subject:** ABRAHAM LINC CORPORATION - Policy #BLUCBTXU1TZQEM
**Attachments:** IR_NAS-CY-221007-200812-EMPTY_APPLICATION.pdf110003.PDF; IR_NON-RENEWAL_NOTICE110003.PDF; SKM_C45822102612450.pdf

Hi Robert,

The Cyber Liability is due to expire 1/29/2023. We received an email from the broker advising the carrier is non-renewing due to change in their writing company; see copy attached. They do have another carrier who be offering renewal terms.

I am attaching an application we can use to approach additional markets that will need completed. I have also attached the application that was completed last year for you to use as a guideline.

Should you have any questions, please don't hesitate to let us know.

Thank you so much and enjoy your afternoon!!!

Blue Ridge
RISK PARTNERS

**Rosanna Funk**
*SR. Commercial Lines Account Manager*
325 White Oaks Blvd
Bridgeport, WV 26330
Tel: 304-848-6463
Email: Rose.Funk@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

# NON-RENEWAL NOTICE

**Date:** Oct 22, 2022

**Spinnaker Insurance Company**
**Agency Name:** Cowbell Insurance Agency LLC
**Agency Address:** 6800 Koll Center Pkwy, Suite 250, Pleasanton, CA 94566

**Policyholder:** Abraham Linc Corporation
**Address:** 519 West Main Street, Bridgeport, WV 26330
**Policy Number:** BLU-CB-TXU1TZQEM

Dear Paul Schlieper,

Please be advised that this letter represents formal notice of non-renewal of your Commercial Cyber Liability Policy referenced above due to a change in the writing company. You will be issued a quote for a policy written by Spinnaker Insurance Company, in place of a renewal quote by National Specialty Insurance Company. National Specialty Insurance Company and Spinnaker Insurance Company are not affiliated.

If you would like to request additional information regarding the reason this Policy is being non-renewed and you are receiving a quote for a policy written by Spinnaker Insurance Company instead of National Specialty Insurance Company, please forward any questions you may have to the following address:

Cowbell Insurance Agency LLC
6800 Koll Center Pkwy, Suite 250, Pleasanton, CA 94566

Regards,

David Alff

Secretary
Spinnaker Insurance Company

TOKIO MARINE
HCC

**Cyber & Professional Lines Group**
16501 Ventura Blvd. Suite 200, Encino, CA 91436
main (818) 382-2030

# NetGuard® Plus Cyber Liability Insurance Short Form Application

**THIS IS AN APPLICATION FOR A CLAIMS MADE AND REPORTED POLICY. THIS APPLICATION IS NOT A BINDER.**

*This application for NetGuard® Plus Cyber Liability Insurance is intended to be used for the preliminary evaluation of a submission. When completed in its entirety, this application will enable the Underwriter to decide whether or not to authorize the binding of insurance. Please type or print clearly and answer all questions. If space is insufficient to answer any question fully, attach a separate sheet. Complete all required supplemental forms/applications. "You" and "Your", as used in this application, means the Applicant.*

**1. GENERAL INFORMATION**

| | | | |
|---|---|---|---|
| Name of Applicant: | ABRAHAM LINC CORPORATION | | |
| Street Address: | 519 WEST MAIN STREET | | |
| City, State, Zip: | BRIDGEPORT, WV 26330 | Phone: | 304-848-7427 |
| Website: | www.abrahamlinc.com | Fax: | 304-842-8703 |
| Primary Contact Name: | ROBERT A. MARRA II | Primary Contact E-Mail: | rmarra@abrahamlinc.com |

**2. FORM OF BUSINESS**

a. Applicant is a(n): ☐ Individual ☒ Corporation ☐ Partnership ☐ Other: ______

| | |
|---|---|
| b. Date established: | 1988 |
| c. Description of operations: | Home Furnishings Merchant Wholesalers - Flooring Distributor |
| d. Total number of employees: | 93 |

e. Please attach a list of all subsidiaries, affiliated companies or entities owned by the Applicant. Please describe (1) the nature of operations of each such subsidiary, affiliated company or entity, (2) its relationship to the Applicant and (3) the percentage of ownership by the Applicant. N/A

**3. REVENUES**

Gross Revenues Forecast for the Current Fiscal Year: [redacted]

**4. COVERAGE DESIRED**

| | |
|---|---|
| a. Proposed Effective Date: | 1-29-2023 |
| b. Retroactive Date: | |
| c. Limit(s): | $2,000,000.00 |
| d. Deductible(s): | $10,000.00 |

**5. RECORDS**

a. Do you collect, store, host, process, control, use or share any private or sensitive information* in either paper or electronic form? ☐ Yes ☒ No

**If "Yes", please provide the approximate number of unique records:**

**Paper records:** ______ **Electronic records:** ______

***Private or sensitive information includes any information or data that can be used to uniquely identify a person, including, but not limited to, social security numbers or other government identification numbers, payment card information, drivers' license numbers, financial account numbers, personal identification numbers (PINs), usernames, passwords, healthcare records and email addresses.**

b. Do you collect, store, host, process, control, use or share any biometric information or data, such as fingerprints, voiceprints, facial, hand, iris or retinal scans, DNA, or any other biological, physical or behavioral characteristics that can be used to uniquely identify a person? ☐ Yes ☒ No

**If "Yes", have you reviewed your policies relating to the collection, storage and destruction of such information or data with a qualified attorney and confirmed compliance with applicable federal, state, local and foreign laws?** ☐ Yes ☐ No

**6. CLOUD PROVIDER**

Do you use a cloud provider to store data or host applications? ☒ Yes ☐ No

**If "Yes", please provide the name of the cloud provider:** DROP BOX

**If you use more than one cloud provider to store data, please specify the cloud provider storing the largest quantity of sensitive customer and/or employee records (e.g., including medical records, personal health information, social security numbers, bank account details and credit card numbers) for you.**

**7. INFORMATION AND NETWORK SECURITY CONTROLS**

Do you use anti-virus software and a firewall to protect your network? ☒ Yes ☐ No

| | | |
|---|---|---|
| **8.** | **RANSOMWARE CONTROLS** | |
| a. | Do you allow remote access to your network?<br>**If "Yes", do you use 2-factor authentication to secure all remote access to your network, including any remote desktop connections?** | ☒ Yes ☐ No<br>☒ Yes ☐ No |
| b. | Do you use 2-factor authentication to secure remote access to your email accounts? | ☒ Yes ☐ No |
| c. | Do you use Endpoint Detection and Response (EDR) or a Next-Generation Antivirus (NGAV) software (e.g., CrowdStrike, Cylance, Carbon Black) to secure all system endpoints?<br>**If "Yes", please list your provider:** CISCO SECURE ENDPOINT | ☒ Yes ☐ No |
| d. | Do you use an email filtering solution designed to prevent phishing or ransomware attacks (in addition to any filtering solution(s) provided by your email provider)?<br>**If "Yes", please provide the name of your filtering solution provider:** BASIC OFFICE 365 | ☒ Yes ☐ No |
| e. | Do you use a data backup solution for all critical data?<br>**If "Yes":**<br>**(1) How frequently does it run?** ☒ **Daily** ☐ **Weekly** ☐ **Monthly**<br>**(2) Is your data backup solution:**<br>**(a) physically disconnected from your network?**<br>**(b) segregated with 2-factor authentication access control?** | ☒ Yes ☐ No<br><br><br><br>☒ Yes ☐ No<br>☐ Yes ☒ No |
| **9.** | **PHISHING CONTROLS** | |
| | Do any of the following employees at your company complete social engineering training:<br>(1) Employees <u>with</u> financial or accounting responsibilities?<br>(2) Employees <u>without</u> financial or accounting responsibilities?<br>**If "Yes" to question 9.a.(1) or 9.a.(2) above, does your social engineering training include phishing simulation?** | <br>☐ Yes ☒ No<br>☐ Yes ☒ No<br>☐ Yes ☐ No |
| **10.** | **LOSS HISTORY** | |
| | **If the answer to any question in 10.a. through 10.c. below is "Yes", please complete a Claim Supplemental Form for each claim, allegation or incident.** | |
| a. | In the past 3 years, has the Applicant or any other person or organization proposed for this insurance:<br>(1) Received any complaints or written demands or been a subject in litigation involving matters of privacy injury, breach of private information, network security, defamation, content infringement, identity theft, denial of service attacks, computer virus infections, theft of information, damage to third party networks or the ability of third parties to rely on the Applicant's network?<br>(2) Been the subject of any government action, investigation or other proceedings regarding any alleged violation of privacy law or regulation?<br>(3) Notified customers, clients or any third party of any security breach or privacy breach?<br>(4) Received any cyber extortion demand or threat?<br>(5) Sustained any unscheduled network outage or interruption for any reason?<br>(6) Sustained any property damage or business interruption losses as a result of a cyber-attack?<br>(7) Sustained any losses due to wire transfer fraud, telecommunications fraud or phishing fraud? | <br>☐ Yes ☒ No<br>☐ Yes ☒ No<br>☐ Yes ☒ No<br>☐ Yes ☒ No<br>☐ Yes ☒ No<br>☐ Yes ☒ No<br>☐ Yes ☒ No |
| b. | Do you or any other person or organization proposed for this insurance have knowledge of any security breach, privacy breach, privacy-related event or incident or allegations of breach of privacy that may give rise to a claim? | ☐ Yes ☒ No |
| c. | In the past 3 years, has any service provider with access to the Applicant's network or computer system(s) sustained an unscheduled network outage or interruption lasting longer than 4 hours?<br>**If "Yes", did the Applicant experience an interruption in business as a result of such outage or interruption?** | ☐ Yes ☒ No<br>☐ Yes ☐ No |
| **11.** | **ADDITIONAL QUESTIONS** | |
| a. | Does the Applicant use regularly updated anti-virus software and firewall? | ☒ Yes ☐ No |
| b. | Does the applicant accept payment card (credit/debit card) transactions? | ☒ Yes ☐ No |
| c. | Does the backup solution include all the following characteristics: runs daily, is either physically disconnected from the network (air-gapped) or access control is protected by MFA, has been tested in the last 6 months, and can be used to recover essential operations within three days? | ☒ Yes ☐ No |

**12. NETWORK SECURITY CONTACT PERSON DETAILS**

| | | | |
|---|---|---|---|
| Name: | Mike OLDAKER | Title: | IT Manager |
| Email: | moldaker@abrahamlinc.com | Phone number: | 304-848-7425 |

**NOTICE TO APPLICANT**

**The insurance for which you are applying will not respond to incidents about which any person proposed for coverage had knowledge prior to the effective date of the policy nor will coverage apply to any claim or circumstance identified or that should have been identified in questions 10.a. through 10.c of this application.**

**NOTICE TO NEW YORK APPLICANTS: ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE CONTAINING ANY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIAL THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME.**

**The Applicant hereby acknowledges that he/she/it is aware that the limit of liability shall be reduced, and may be completely exhausted, by claim expenses and, in such event, the Insurer shall not be liable for claim expenses or any judgment or settlement that exceed the limit of liability.**

**I HEREBY DECLARE that, after inquiry, the above statements and particulars are true and I have not suppressed or misstated any material fact, and that I agree that this application shall be the basis of the contract with the Underwriters.**

**CERTIFICATION AND SIGNATURE**

The Applicant has read the foregoing and understands that completion of this application does not bind the Underwriter or the Broker to provide coverage. It is agreed, however, that this application is complete and correct to the best of the Applicant's knowledge and belief, and that all particulars which may have a bearing upon acceptability as a NetGuard® Plus Cyber Liability Insurance risk have been revealed.

It is understood that this application shall form the basis of the contract should the Underwriter approve coverage, and should the Applicant be satisfied with the Underwriter's quotation. It is further agreed that, if in the time between submission of this application and the requested date for coverage to be effective, the Applicant becomes aware of any information which would change the answers furnished in response to any question of this application, such information shall be revealed immediately in writing to the Underwriter.

This application shall be deemed attached to and form a part of the Policy should coverage be bound.

**Must be signed by an officer of the company.**

| | |
|---|---|
| Print or Type Applicant's Name<br>Robert A. Marra III | Title of Applicant<br>CFO |
| Signature of Applicant<br>[signature] | Date Signed by Applicant<br>10-28-2022 |

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

# CYBER INSURANCE POLICY

Abraham Linc Corporation



Burns & Wilcox

**POLICY EFFECTIVE DATE**
01/29/2023

cowbell

*All information in this document was created by the insurer.*

# DECLARATIONS
# COMMERCIAL CYBER INSURANCE POLICY

**THIS INSURANCE POLICY PROVIDES COVERAGE ON A CLAIMS-MADE AND REPORTED BASIS AND APPLIES ONLY TO CLAIMS FIRST MADE AND REPORTED TO THE INSURER DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED PERIOD.**

**DEFENSE EXPENSES, WHERE APPLICABLE, ARE INCLUDED IN THE LIMITS OF INSURANCE, AND PAYMENT THEREOF WILL ERODE, AND MAY EXHAUST THE LIMITS OF INSURANCE.**

**PLEASE READ YOUR POLICY CAREFULLY.**

The words "You" and "Your" refer to the Named Insured shown in the Declarations. The words "We", "Us" and "Our" refer to the Company providing this insurance.

In return for the payment of premium, and subject to all the terms and conditions of this Policy, We agree with You to provide the insurance as stated in this Policy.

| | |
|---|---|
| Company Name: | Spinnaker Insurance Company, a stock company |
| Producer Name: | Cowbell Insurance Agency LLC<br>6800 Koll Center Pkwy, Suite 250<br>Pleasanton, CA 94566 |
| Named Insured:<br>*Abraham Linc Corporation* | |
| Policy Number:<br>*FLY-CB-TXU1TZQEM-002* | |
| Mailing Address:<br>*519 West Main Street*<br>*Bridgeport, WV 26330* | |
| Policy Period:<br>From: *Jan 29, 2023*<br>To: *Jan 29, 2024*<br>12:01 AM standard time at the Insured's mailing address shown above | |
| Web Site Address(es): | |
| Type Of Business Organization (Check appropriate box):<br>☑ Private ☐ Public<br>☐ Investment Fund ☐ Not for Profit<br>☐ Government | |

| | | |
|---|---|---|
| Annual Premium: | *$13,809* Fees: $625 Total Fees | |
| Fees/Assessments:<br>(included in total Annual Premium, unless otherwise noted) | *$100* | |
| Policy Aggregate Limit of Insurance: | *$2,000,000* | |
| Policy Deductible Amount: | *$10,000*<br>*Per Cyber Incident, Extortion Threat, Security Breach, Wrongful Act, Interrelated Wrongful Acts, or Claim* | |
| Business Income and Extra Expense Time Deductible: | *6 Hours* | |
| Social Engineering Coverage Limit: | *$100,000* | |
| Social Engineering Deductible: | *$10,000* | |
| Retroactive Date: | *Full Prior Acts* | |
| Aggregate Sublimit(s) of Insurance: | Percentage | Coverage Limit Dollars |
| Insuring Agreement 1. Public Relations Expense | *5%* | *$100,000* |
| Insuring Agreement 2. Extortion Threat – Ransom Payments | *5%* | *$100,000* |
| Insuring Agreement 4. Business Income and Extra Expense | *50%* | *$1,000,000* |
| Insuring Agreement. Ransom Payments | *50%* | *$1,000,000* |
| Endorsements: | Effective | Premium |
| *West Virginia Amendatory Endorsement*<br>*SP WV 01 05 22* | *Jan 29, 2023* | |
| *OFAC*<br>*SP CW 96 05 22* | *Jan 29, 2023* | |
| *Computer and Funds Transfer Fraud*<br>*SP CW 80 05 22* | *Jan 29, 2023* | *$2,431* |
| *Increase of or Elimination of Business Income and Extra Expense Sublimit Endorsement*<br>*SP CW 95 05 22* | *Jan 29, 2023* | *$818* |
| *Social Engineering Endorsement*<br>*SP CW 91 05 22* | *Jan 29, 2023* | *$79* |
| *Ransom Payment Endorsement*<br>*SP CW 84 05 22* | *Jan 29, 2023* | *$2,142* |
| *Hardware Replacement Costs Endorsement*<br>*SP CW 86 05 22* | *Jan 29, 2023* | *$389* |
| *Website Media Content Liability*<br>*SP CW 83 05 22* | *Jan 29, 2023* | *$1,168* |

Claims Information:

To report Claims, please use the contact information below:

| | |
|---|---|
| Phone Number: | 833-633-8666 |
| Email: | claims@cowbellcyber.ai |

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

# COMMERCIAL CYBER INSURANCE POLICY

**THIS POLICY IS A CONTRACT OF INSURANCE BETWEEN YOU AND US. YOUR POLICY CONTAINS ALL THE DETAILS OF THE COVERAGE THAT WE PROVIDE. THIS POLICY CONSISTS OF AND MUST BE READ TOGETHER WITH THE DECLARATIONS PAGE AND ANY ENDORSEMENTS.**

**THE INSURANCE PROVIDED UNDER THIS POLICY FOR CLAIMS MADE AGAINST YOU IS ON A CLAIMS MADE AND REPORTED BASIS, AND APPLIES TO CLAIMS ONLY IF THEY ARE FIRST DISCOVERED BY YOU DURING THE POLICY PERIOD AND REPORTED TO US DURING THE POLICY PERIOD OR ANY APPLICABLE EXTENDED REPORTING PERIOD.**

**THE SECURITY BREACH LIABILITY INSURING AGREEMENT CONTAINED IN THIS POLICY PROVIDES COVERAGE FOR DEFENSE EXPENSES WHICH ARE PAYABLE WITHIN, AND NOT IN ADDITION TO, THE LIMIT OF INSURANCE. PAYMENT OF DEFENSE EXPENSES UNDER THIS POLICY WILL REDUCE THE LIMIT OF INSURANCE.**

**PLEASE READ THE ENTIRE POLICY CAREFULLY.**

Various provisions in this Policy restrict coverage. Read the entire Policy carefully to determine rights, duties and what is and is not covered.

Throughout this Policy, the words "You" and "Your" refer to the **Named Insured** shown in the Declarations. The words "We," "Us," and "Our" refer to the company providing this insurance.

All terms that appear in bold print are defined terms and have special meaning as set forth in Section I – Insuring Agreements and Section VII – Definitions.

## SECTION I – INSURING AGREEMENTS

Coverage is provided under the following Insuring Agreements up to the Limits of Insurance shown in the Declarations.

Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** that arises out of the same facts or circumstances and results in **Loss** under one or more of the following Insuring Agreements will be deemed to be related and, as such, will be deemed to have been **Discovered** during the earliest policy period that any such related **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** was **Discovered**.

### 1. Security Breach Expense

We will pay for **Loss** resulting directly from a **Security Breach** or **Cyber Incident Discovered** during the Policy Period or any extended reporting period, if applicable.

With respect to this Insuring Agreement 1, **Loss** means:

**a. Forensics Expenses**

The costs incurred with Our approval to establish whether a **Security Breach** or **Cyber Incident** has occurred or is occurring.

If a **Security Breach** has occurred, the following costs are also included:

i. costs to investigate the cause, scope and extent of a **Security Breach** and to identify any affected parties; and

ii. costs to determine any action necessary to remediate the conditions that led to or resulted from a **Security Breach** including, but not limited to, fees paid for legal and other professional advice on how to respond to the **Security Breach.**

b. **Notification Expenses**

Costs to notify all parties affected by a **Security Breach** including, but not limited to, notice to be transmitted through media:

i. as required by Privacy Regulations; or
ii. subject to Our prior approval, as appropriate on a voluntary basis.

c. **Overtime Salaries**

Reasonable overtime salaries paid to **Employees** assigned to handle inquiries from the parties affected by a **Security Breach.**

d. **Call Center Expenses**

Fees and costs of a company hired by You with Our prior approval for the purpose of operating a call center to handle inquiries from the parties affected by a **Security Breach.**

e. **Post-event Monitoring Expenses**

Costs to provide credit and identity monitoring services to the affected parties of a **Security Breach** for up to one year, or longer if required by applicable law, from the date of notification to those affected parties of such **Security Breach**.

f. **Public Relations Expense**

Fees and costs of a public relations firm and any other reasonable expenses incurred by You with Our prior written consent to protect or restore Your reputation solely in response to "negative publicity".

As used in this provision, "negative publicity" means information which has been made public that has caused, or is reasonably likely to cause, a decline or deterioration in the reputation of the **Named Insured** or of one or more of its products or services.

g. **Other Expenses**

Any other reasonable expenses incurred by You with Our prior written consent.

With respect to this Insuring Agreement 1, **Loss** does not include any costs or expenses associated with upgrading or improving a **Computer System** as a result of a **Security Breach.**

2. **Extortion Threats**

We will pay for **Loss** resulting directly from an **Extortion Threat** that is **Discovered** during the Policy Period or any extended reporting period, if applicable.

With respect to this Insuring Agreement 2, **Loss** means:

a. Fees and costs of:

i. a security firm; or
ii. a person or organization;

hired with Our consent to determine the validity and severity of an **Extortion Threat** made against You.

**b.** Interest costs paid by You for any loan from a financial institution taken by You to pay a ransom demand.

**c.** Reward payments paid by You to an "informant" which lead to the arrest and conviction of parties responsible for **Loss**.

As used in this provision, "informant" means a person, other than an **Employee**, providing information not otherwise obtainable, solely in return for a reward offered by You.

**d.** Any other reasonable expenses incurred by You with Our written consent, including, but not limited to:

**i.** fees and costs of independent negotiators; and
**ii.** fees and costs of a company hired by You, upon the recommendation of the security firm, to determine how to protect Your **Electronic Data** from further threats.

**e.** Ransom payments made in the form of cash or virtual currency, including, but not limited to, Bitcoin.

**3. Replacement or Restoration of Electronic Data**

We will pay for **Loss** of Your **Electronic Data** or "computer programs" stored within a **Computer System** resulting directly from a **Cyber Incident** that is **Discovered** during the Policy Period or any extended reporting period, if applicable.

With respect to this Insuring Agreement 3, **Loss** means the costs to replace or restore Your **Electronic Data** or "computer programs" as well as the cost of data entry, reprogramming and computer consultation services.

With respect to this Insuring Agreement 3, **Loss** does not include the cost to duplicate research that led to the development of Your **Electronic Data** or "computer programs". To the extent that any of Your **Electronic Data** cannot be replaced or restored, We will pay the cost to replace the media on which such **Electronic Data** was stored with blank media of substantially identical type.

As used in this Insuring Agreement 3, "computer programs" means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enables the computer or devices to receive, process, store or send Your **Electronic Data**.

**4. Business Income and Extra Expense**

We will pay for **Loss** due to an **Interruption** resulting directly from a **Cyber Incident** or an **Extortion Threat** that is **Discovered** during the Policy Period or during any extended reporting period, if applicable.

With respect to this Insuring Agreement 4, **Loss** means the actual **Loss** of "business income" You sustain and/or "extra expense" You incur.

As used in this Insuring Agreement 4:

**a.** "Business income" means the:

**i.** net income (net profit or loss before income taxes) that would have been earned or incurred; and
**ii.** continuing normal operating expenses incurred, including payroll.

**b.** "Extra expense" means necessary and reasonable expenses You incur:

**i.** during an **Interruption** that You would not have incurred if there had been no interruption; or

**ii.** to avoid or minimize the suspension of Your **E-Commerce Activities.**

"Extra expense" does not include:

**(1)** any costs or expenses associated with upgrading, maintaining, repairing, remediating or improving a **Computer System** as a result of a **Cyber Incident** or **Extortion Threat**; or

**(2)** **Extortion Expenses** covered under Insuring Agreement 2 – Extortion Threats.

**5.** **Security Breach Liability** Including Payment Card Industry (PCI) Fines and Penalties

We will pay for:

**a.** **Loss** that the **Insured** becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period or any extended reporting period, if applicable, for a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

**b.** **Loss** and **Defense Expenses** as a result of a **Claim** in the form of a **Regulatory Proceeding** that is **Discovered** during the Policy Period or any extended reporting period, if applicable, in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

**c.** **Loss** and **Defense Expenses** as a result of a **Claim** in the form of an action by a **Card Company** for non-compliance with the Payment Card Industry (PCI) Data Security Standards that is **Discovered** during the Policy Period or any extended reporting period, if applicable, shown in the Declarations in response to a **Wrongful Act** or a series of **Interrelated Wrongful Acts** taking place on or after Your first date of continuous coverage with Us and before the end of the Policy Period.

With respect to this Insuring Agreement 5:

**i.** **Loss** means:

**(1)** compensatory damages, settlement amounts and costs awarded pursuant to judgments or settlements;

**(2)** punitive and exemplary damages to the extent such damages are insurable by law; or

**(3)** fines or penalties assessed against the **Insured** to the extent such fines or penalties are insurable by law.

**Loss** does not include:

**(a)** civil or criminal fines or penalties imposed by law, except civil fines or penalties as provided under Paragraph i.(3) above;

**(b)** the multiplied portion of multiplied damages;

**(c)** taxes;

**(d)** royalties;

**(e)** the amount of any disgorged profits; or

**(f)** matters that are uninsurable pursuant to law.

**ii.** **Defense Expenses** means the reasonable and necessary fees (attorneys' and experts' fees) and expenses incurred in the defense or appeal of a **Claim**, including the cost of

appeal, attachment or similar bonds (without any obligation on Our part to obtain such bonds) but excluding wages, salaries, benefits or expenses of Your **Employees**.

iii. **Wrongful Act** means any actual or alleged:

(1) **Security Breach;**
(2) failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing identity information;
(3) failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or
(4) failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

by, or asserted against, an **Insured**.

iv. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any i) fact, circumstance, situation, event, transaction or cause; or ii) series of causally connected facts, circumstances, situations, events, transactions or causes.

v. **Regulatory Proceeding** means an investigation, demand or proceeding brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission, the Department of Health and Human Services or other administrative or regulatory agency, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity.

## SECTION II – LIMITS OF INSURANCE

### 1. Policy Aggregate Limit of Insurance

The most We will pay for all covered **Loss** and **Defense Expenses** is the Policy Aggregate Limit of Insurance shown in the Declarations. The Policy Aggregate Limit of Insurance shall be reduced by any payment, including **Defense Expenses**, made under the terms of this Policy. Upon exhaustion of the Policy Aggregate Limit of Insurance by such payments, We will have no further obligations or liability of any kind under this Policy.

### 2. Aggregate Sublimit(s) of Insurance

Subject to the Policy Aggregate Limit of Insurance, the most We will pay for all **Loss** covered under:

**a.** Paragraph f. of Insuring Agreement 1 – Security Breach Expense, is the Public Relations Expense Aggregate Sublimit of Insurance, if any, shown in the Declarations.

**b.** Insuring Agreement 2 – Extortion Threats, is the Ransom Payments Aggregate Sublimit Of Insurance, if any, shown in the Declarations; and

**c.** Insuring Agreement 4 – Business Income and Extra Expense, is the Business Income and Extra Expense Aggregate Sublimit Of Insurance, if any, shown in the Declarations.

The Aggregate Sublimit(s) of Insurance described in Paragraphs 2.a., 2.b and 2.c. above are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Any such Aggregate Sublimit(s) of Insurance shall be reduced by any payment for **Loss** and, if applicable, **Defense Expenses**, under the Insuring Agreement to which such Aggregate Sublimit of Insurance applies. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** or **Defense Expenses**, subject to such Sublimit of Insurance.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

## SECTION III – DEDUCTIBLE

Subject to Section II – Limits of Insurance:

**1.** Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats and 3 – Replacement or Restoration of Electronic Data, We will pay only the amount of **Loss** which is in excess of the Policy Deductible amount shown in the Declarations.

**2.** Under Insuring Agreement 4 – Business Income and Extra Expense:

We will pay only the amount of **Loss** which exceeds the greater of the following deductible amounts:

**a.** The Policy Deductible Amount shown in the Declarations; or
**b.** The amount of **Loss** incurred during the Time Deductible shown in the Declarations.

**3.** Under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties:

We will pay only the amount of **Loss** and **Defense Expenses**, which is in excess of the Policy Deductible Amount shown in the Declarations, resulting from the same **Wrongful Act** or **Interrelated Wrongful Acts**. Such Policy Deductible Amount will be borne by You, self-insured, and at Your own risk.

**4.** The Policy Deductible applies separately to each **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, **Interrelated Wrongful Acts**, or **Claim.** In the event a **Loss** is covered under more than one Insuring Agreement, only the single highest deductible amount applicable to the **Loss** shall be applied.

## SECTION IV – DEFENSE AND SETTLEMENT

The provisions contained within this section apply only to Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties:

We shall have the right and duty to select counsel and defend the **Insured** against any **Claim** covered under Paragraph 5.a of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, even if the allegations of such **Claim** are groundless, false or fraudulent. However, We shall have the right but not the duty to defend the **Insured** against a **Claim** covered under Paragraph 5.b of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties and We shall have no duty to defend the **Insured** against any **Claim** which is not covered under such Insuring Agreement.

We may, upon the written consent of the **Insured**, make any settlement of a **Claim** which We deem reasonable. If the **Insured** withholds consent to such settlement, Our liability for all **Loss** resulting from such **Claim** will not exceed the amount for which We could have settled such **Claim**, plus **Defense Expenses** incurred, as of the date We proposed such settlement in writing to the Insured. Upon refusing to consent to a settlement We deem reasonable, the **Insured** shall, at its sole expense, assume all further responsibility for its defense, including all additional **Defense Expenses**, costs associated with the investigation, defense and/or settlement of such **Claim.**

## SECTION V – EXCLUSIONS

We will not be liable for **Loss** or **Defense Expenses** directly or indirectly based upon, attributable to or arising out of:

**1.** Lightning, earthquake, hail, volcanic action or any other act of nature. However, this exclusion shall not apply to **Loss** under Insuring Agreement 1 - Security Breach Expense or Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

**2.** Any of the following:

a. War, including undeclared or civil war or civil unrest;
b. Warlike action by military force, including action hindering or defending against an actual or expected attack, by any government, sovereign or other authority using military personnel or other agents; or
c. Insurrection, rebellion, revolution, usurped power or action taken by government authority in hindering or defending against any of these.

**3.** The dispersal or application of pathogenic or poisonous biological or chemical materials, nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident, however caused.

**4.** **Bodily Injury** or physical damage to or destruction of tangible property, including loss of use thereof.

**Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. It also means mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person.

However, **Bodily Injury** does not mean mental anguish or emotional distress resulting directly from a **Security Breach**.

**5.** Any disruption in normal computer function or network service or function due to insufficient capacity to process transactions or due to an overload of activity on a **Computer System** or network. However, this exclusion shall not apply if such disruption is caused by a **Cyber Incident**.

**6.** Any disruption of i) internet service; or ii) any external telecommunication network; regardless of the cause. However, this exclusion shall not apply if such disruption is caused by a denial of service attack under Paragraph b. of Definition 5. **Cyber Incident**.

**7.** Any failure of, reduction in or surge of power, regardless of the cause.

**8.** Any actual or alleged violation of the Racketeer Influenced and Corrupt Organizations Act (RICO) and its amendments, or similar provisions of any federal, state or local statutory or common law.

**9.** Any malfunction or failure of any satellite.

**10.** Any oral or written publication of material, if done by an **Insured** or at an **Insured's** direction with knowledge of its falsity.

**11.** An **Insured's** assumption of liability by contract or agreement, whether oral or written. However, this exclusion shall not apply to any liability that an **Insured** would have incurred in the absence of such contract or agreement.

**12.** Any actual or alleged patent or trade secret violation, including any actual or alleged violation of the Patent Act, the Economic Espionage Act of 1996 or the Uniform Trade Secrets Act and their amendments.

**13.** Any of the following:

a. The actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** at any time;
b. Any request, demand, order or statutory or regulatory requirement that any **Insured** or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, **Pollutants**; or
c. Any **Claim** or **Suit** brought by, or on behalf of, any governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, **Pollutants**.

14. Any **Claim**, **Suit** or other proceeding against an **Insured** which was pending or existed prior to the Policy Period or arising out of the same or substantially the same acts, facts, circumstances or allegations which are the subject of, or the basis for, such **Claim**, **Suit** or other proceeding.

15. Any actions or activities related to an **Insured's** practices as an employer including, but not limited to, refusal to employ, termination of employment, coercion, demotion, evaluation, reassignment, discipline, defamation, harassment, humiliation, discrimination or malicious prosecution. This exclusion applies:

    **a.** Whether the injury-causing event described above occurs before employment, during employment or after employment of that person;
    **b.** Whether the **Insured** may be liable as an employer or in any other capacity; and
    **c.** To any obligation to share damages with or repay someone else who must pay damages because of the injury.

    However, this exclusion will not apply to any **Claim** resulting directly from a **Privacy Breach** related to the **Personal information** of an **Employee**.

16. Any **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** that any **Insured** became aware of prior to the effective date of the Policy.

17. The same facts, **Cyber Incident**, **Extortion Threat**, **Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any insurance policy of which this Policy is a renewal or replacement.

18. Any criminal, dishonest, malicious or fraudulent act, error or omission or any willful violation of any statute or regulation committed by an **Insured**, acting alone or in collusion with others. However, with the exception of **Claims** excluded under Exclusion 12., this exclusion shall not apply to any dishonest, malicious or fraudulent act, error or omission committed by an **Employee** which gives rise to a **Claim** or **Loss** covered under Insuring Agreement 1 – Security Breach Expense or Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

    With the exception of **Claims** excluded under Exclusion 12, We will defend the Insured against any **Claim** alleging such acts or violations until final adjudication is rendered against that **Insured**. Final adjudication rendered against one **Insured** shall not be imputed to any other **Insured**.

    We will not provide indemnification for any **Claim** to which any **Insured** enters a guilty plea or pleads no contest and We will not provide a defense from the time We become aware that any **Insured** intends to so plead.

19. Any action or proceeding brought by, or on behalf of, any governmental authority or regulatory agency including, but not limited to:

    **a.** The seizure or destruction of property by order of a governmental authority; or
    **b.** Regulatory actions or proceedings brought by, or on behalf of, the Federal Trade Commission, Federal Communications Commission or other regulatory agency, except when covered under Paragraph c. a of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

    However, this exclusion shall not apply to actions or proceedings brought by a governmental authority or a regulatory agency acting solely in its capacity as a customer of the **Named Insured** or of a **Subsidiary**.

20. Any costs or expenses associated with upgrading or improving a **Computer System** regardless of the reason.

21. Any **Claim** brought or alleged by one **Insured** against another, except for a **Claim** brought or alleged by an **Employee** against an **Insured** as a result of a **Security Breach**.

**22.** Fines, penalties or assessments imposed pursuant to contract or agreement, whether oral or written, including, but not limited to, Payment Card Industry (PCI) fines, penalties or assessments. This exclusion shall not apply to the coverage provided under Paragraph c. of Insuring Agreement 5 - Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties.

**23.** Any costs related to loss of any virtual currency.

**24.** Any actual or alleged restraint of trade, monopolization, unfair trade, price fixing, violation of the Federal Trade Commission Act, the Sherman Antitrust Act, the Clayton Act, including any amendment thereto or any rule or regulation promulgated under any such statute, or any similar foreign, federal, state or local statute, rule or regulation. However, this exclusion shall not apply to a **Claim** alleging unfair or deceptive acts or practices in or affecting commerce under Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)).

**25.** **a.** The purchase or sale of or offer to purchase or sell any securities or any violation of the Securities Exchange Act of 1934 or the Securities Act of 1933 and any amendments thereto or any other foreign, federal, state or local statute, or any rule or regulation promulgated under such statutes, that regulates the offering, sale or purchase of securities.

**b.** Any **Claim** brought by any security holder of the **Insured**, in their capacity as such, whether directly, by class action, or derivatively on behalf of the **Insured**.

**26.** Any **Claim** arising out of, caused by or related to a "Technology Errors & Omissions Wrongful Act."

For purposes of this exclusion, the following definitions apply:

**a.** "Technology Errors & Omissions Wrongful Act" means any negligent act, error or omission, including any negligent act, error or omission resulting in a breach of contract or in a failure of "Technology Products" to perform the function or serve the purpose intended by an **Insured** or by a person or entity for whom the **Insured** is legally liable, in the performance of "Technology Services."

**b.** "Technology Services" means the following services performed for others for compensation by an **Insured** or by any other person or entity for whom the **Insured** is legally liable:

**i.** analysis, design, integration, wiring, cabling, or conversion of computer and electronic technology systems or networks;

**ii.** designing, developing, programming, servicing, distributing, licensing, installing, maintaining and repairing computer software, computer code and computer firmware or hardware;

**iii.** education and training in the use of computer hardware or software;

**iv.** information services;

**v.** computer consulting;

**vi.** computer and network security services, including but not limited to providing content filtering, patch administration and security audits;

**vii.** internet services; or

**viii.** data processing in connection with any of the above listed services, including but not limited to storing, collecting, compiling, processing, mining, conversion, encryption, recording or analysis of data.

**c.** "Technology Products" means any computer hardware, firmware, software, or related electronic product, equipment or device, specifically designed or intended for use in connection with any "Technology Services," telecommunication systems or telecommunication service that is created, manufactured, developed, distributed, licensed, leased or sold by the **Insured** or for any **Insured** by others acting under the **Insured's** trade name.

## SECTION VI – CONDITIONS

**1. Cancellation**

**a.** The first **Named Insured** shown in the Declarations may cancel this Policy by mailing or delivering to Us advance written notice of cancellation.

**b.** We may cancel this Policy by mailing or delivering to the first **Named Insured** written notice of cancellation at least:

**i.** 10 days before the effective date of cancellation if We cancel for nonpayment of premium; or
**ii.** 30 days before the effective date of cancellation if We cancel for any other reason.

**c.** We will mail or deliver Our notice to the first **Named Insured's** last mailing address known to Us.

**d.** Notice of cancellation will state the effective date of cancellation. The Policy Period will end on that date.

**e.** If this Policy is canceled, We will send the first **Named Insured** any premium refund due. If We cancel, the refund will be prorated. If the first **Named Insured** cancels, the refund may be less than pro rata. The cancellation will be effective even if We have not made or offered a refund.

**f.** If notice is mailed, proof of mailing will be sufficient proof of notice.

**2. Changes**

This Policy contains all the agreements between You and Us concerning the insurance afforded. The first **Named Insured** shown in the Declarations is authorized to make changes in the terms of this Policy with Our consent. This Policy's terms can be amended or waived only by endorsement issued by Us and made a part of this Policy.

**3. Examination of Your Books and Records**

We may examine and audit Your books and records as they relate to this Policy at any time during the Policy Period shown in the Declarations and up to three years afterward.

**4. Inspections and Surveys**

We have the right to i) make inspections and surveys at any time; ii) give You reports on the conditions We find; and iii) recommend changes.

We are not obligated to make any inspections, surveys, reports or recommendations, and any such actions We do undertake relate only to insurability and the premiums to be charged. We do not make safety inspections. We do not undertake to perform the duty of any person or organization to provide for the health or safety of workers or the public. And We do not warrant that conditions i) are safe or healthful; or ii) comply with laws, regulations, codes or standards.

Paragraph 2 of this condition applies not only to Us, but also to any rating, advisory, rate service or similar organization which makes insurance inspections, surveys, reports or recommendations.

**5. Premiums**

The first **Named Insured** shown in the Declarations: i) is responsible for the payments of all premiums; and ii) will be the payee for any return premiums We pay.

**6. Transfer of Your Rights and Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without Our written consent, except in the case of death of an individual **Named Insured**.

If You are a sole proprietor and You die, Your rights and duties will be transferred to Your legal representative but only while acting within the scope of duties as Your legal representative. Until Your legal representative is appointed, anyone having proper temporary custody of Your property will have Your rights and duties but only with respect to that property.

**7. Subrogation**

With respect to any payment made under this Policy, We shall be subrogated to the **Insureds** rights of recovery to the extent of such payment. The **Insured** shall execute all papers required and shall do everything necessary to secure and preserve such rights, including the execution of such documents necessary to enable Us to bring suit in the **Insured's** name. Any recoveries, less the cost of obtaining them, will be distributed as follows:

**a.** To You, until You are reimbursed for any **Loss** You sustain that exceed the sum of the Policy Limit of Insurance and the Deductible Amount, if any;
**b.** Then to Us, until We are reimbursed for the payment made under this Policy; and
**c.** Then to You, until You are reimbursed for that part of the payment equal to the Deductible Amount, if any.

**8. Bankruptcy**

Your bankruptcy, or the bankruptcy of Your estate if You are a sole proprietor, will not relieve Us of Our obligations under this Policy.

**9. Representations**

You represent that all information and statements contained in the **Application** are true, accurate and complete. All such information and statements are the basis for Our issuing this Policy. Misrepresentation of any material fact may be grounds for the rescission of this Policy.

**10. Changes in Exposure**

**a. Acquisition or Creation of Another Organization**

If before or during the Policy Period:

**i.** You acquire securities or voting rights in another organization or create another organization which, as a result of such acquisition or creation, becomes a **Subsidiary**; or
**ii.** You acquire any organization through merger or consolidation;

then such organization will be covered under this Policy but only with respect to **Wrongful Acts** or **Loss** which occurred after the effective date of such acquisition or creation provided, with regard to Paragraphs a.(i) and a.(ii) above, You:

**(1)** give Us written notice of the acquisition or creation of such organization within ninety (90) days after the effective date of such action;
**(2)** obtain Our written consent to extend the coverage provided by this Policy to such organization; and
**(3)** upon obtaining Our consent, pay Us an additional premium.

**b. Acquisition of Named Insured**

If during the Policy Period:

**i.** the **Named Insured** merges into or consolidates with another organization, such that the **Named Insured** is not the surviving organization; or

**ii.** another organization, or person or group of organizations and/or persons acting in concert, acquires securities or voting rights which result in ownership or voting control by the other organization(s) or person(s) of more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees or managers (if a limited liability company) of the **Named Insured**;

then the coverage afforded under this Policy will continue until the end of the Policy Period, but only with respect to **Claims** arising out of **Wrongful Acts** or **Loss** which occurred prior to the effective date of such merger, consolidation or acquisition.

The full annual premium for the Policy Period will be deemed to be fully earned immediately upon the occurrence of such merger, consolidation or acquisition of the **Named Insured**.

The **Named Insured** must give written notice of such merger, consolidation or acquisition to Us as soon as practicable, together with such information as We may reasonably require.

**c.** If, before or during the Policy Period, an organization ceases to be a **Subsidiary**, the coverage afforded under this Policy with respect to such **Subsidiary** will continue until the end of the Policy Period but only with respect to **Claims** arising out of **Wrongful Acts** or **Loss** which occurred prior to the date such organization ceased to be a **Subsidiary**.

**11. Other Insurance**

Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats or 3 – Replacement or Restoration of Electronic Data:

**a.** If any covered **Claim** or **Loss** is insured by any other valid policy, then this Policy shall apply as primary only in excess of the amount of any deductible, whether such other policy is stated to be primary, contributory, excess, contingent or otherwise, unless such other policy is written specifically excess of this Policy by reference in such other policy to this Policy's policy number.

**b.** When this Policy is excess, We shall have no duty under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties to defend the **Insured** against any **Suit** if any other insurer has a duty to defend the **Insured** against that **Suit**.

**12. Legal Action Against Us**

No person or organization has a right: i) to join Us as a party or otherwise bring Us into a **Suit** asking for damages from an **Insured**; or ii) to sue Us under this Policy unless all of its terms have been fully complied with.

A person or organization may sue Us to recover on an agreed settlement or on a final judgment against an **Insured**, but We will not be liable for damages that are not payable under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, or that are in excess of the Policy Aggregate Limit of Insurance. An agreed settlement means a settlement and release of liability signed by Us, the first **Named Insured** and the claimant or the claimant's legal representative.

You may not bring any legal action against Us involving **Loss**: i) unless You have complied with all the terms of this Policy; ii) until ninety (90) days after You have filed proof of loss with Us; and iii) unless brought within two (2) years from the date You reported the **Loss** to Us.

If any limitation in this condition is prohibited by law, such limitation is amended so as to equal the minimum period of limitation provided by such law.

**13. Separation of Insureds**

Except with respect to the Policy Aggregate Limit of Insurance, and any rights or duties specifically assigned in Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties to the first **Named Insured**, this Policy applies separately to each **Insured** against whom a **Claim** is made.

**14. Duties in the Event of Claim or Loss**

After a situation that results in, or may result in, a **Loss** covered under this Policy is **Discovered**, You must notify Us in writing as soon as practicable, but not to exceed thirty (30) days from the date **Discovered**, and cooperate with Us in the investigation and settlement of the **Claim** or **Loss**. Additionally:

**a.** Under Insuring Agreements 1 – Security Breach Expense, 2 – Extortion Threats, 3 – Replacement or Restoration of Electronic Data, and 4 – Business Income and Extra Expense, You must:

**i.** notify local law enforcement officials;
**ii.** submit to examination under oath at Our request and give Us a signed statement of Your answers; and
**iii.** At Our request give Us a detailed, sworn proof of loss within one hundred twenty (120) days.

In addition, under Insuring Agreement 2 – Extortion Threats, You must also:

**(1)** determine that the **Extortion Threat** has actually occurred; and
**(2)** with respect to **Ransomware**, make every reasonable effort to access Your **Electronic Data** from backup, if any, and to remediate the cause of the **Ransomware**; and
**(3)** make every reasonable effort to immediately notify Us before making any ransom payment based upon the **Extortion Threat**; and
**(4)** approve any ransom payment based upon the **Extortion Threat**.

**b.** Under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, You must:

**i.** immediately record the specifics of the **Claim** and the date **Discovered**;
**ii.** immediately send Us copies of any demands, notices, summonses or legal papers received in connection with the **Claims**;
**iii.** authorize Us to obtain records and other information; and
**iv.** assist Us, upon Our request, in the enforcement of any right against any person or organization which may be liable to You because of a **Loss** to which this Policy may also apply.

You will not, except at Your own cost, voluntarily make a payment, assume any obligation or incur any expense without Our consent.

**15. Extended Period to Discover Loss**

We will pay for **Loss** (and **Defense Expenses** under Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties Or Penalties) resulting directly from any covered **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** taking place prior to the effective date of cancellation of this Policy, which is **Discovered** no later than sixty (60) days from the date of that cancellation. However, this extended period to **Discover** such **Loss** terminates immediately upon the effective date of any other insurance obtained by You, whether from Us or another insurer, replacing in

whole or in part the coverage afforded under this Policy, whether or not such other insurance provides coverage for **Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** taking place prior to its effective date.

**16. Valuation – Settlement**

All premiums, limit(s) of insurance, deductible amounts, **Loss** and any other monetary amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is agreed to or another component of **Loss** under this Policy is expressed in any currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is entered, settlement amount is agreed upon or the other component of **Loss** is due, respectively.

**a.** With respect to **Loss** covered under Insuring Agreement 4 – Business Income and Extra Expense, the amount of "business income" will be determined based on consideration of:

**i.** the net income generated from Your **E-commerce Activities** before the **Interruption** occurred;
**ii.** the likely net income generated by Your **E-commerce Activities** if no **Interruption** had occurred, but not including any net income that would likely have been earned as a result of an increase in the volume of business due to favorable business conditions caused by the impact of the **Cyber Incident** on customers or on other businesses;
**iii.** the operating expenses, including payroll, necessary to resume Your **E-commerce Activities** with the same quality of service that existed before the **Interruption**; and
**iv.** other relevant sources of information, including Your financial records and accounting procedures, bills, invoices and other vouchers, and debts, liens and contracts.

However, the amount of "business income" will be reduced to the extent that the reduction in the volume of business from the affected **E-commerce Activities** is offset by an increase in the volume of business from other channels of commerce such as via telephone, mail or other sources.

**b.** With respect to Loss covered under Insuring Agreement 4 – Business Income and Extra Expense, the amount of "extra expense" will be determined based on:

**i.** necessary expenses that exceed the normal operating expenses that would have been incurred in the course of Your **E-commerce Activities** during the period of coverage if no **Interruption** had occurred. We will deduct from the total of such expenses the salvage value that remains of any property bought for temporary use during the period of coverage once Your **E-commerce Activities** are resumed; and
**ii.** necessary expenses that reduce the "business income" **Loss** that otherwise would have been incurred during the period of coverage.

**17. Confidentiality**

Under Insuring Agreement 2 – Extortion Threats, **Insureds** must make every reasonable effort not to divulge the existence of this coverage.

**18. Territory**

This Policy covers **Wrongful Acts** which occurred anywhere in the world. However, **Suits** must be brought in the United States of America (including its territories and possessions), Puerto Rico or Canada.

**19. Policy Bridge – Discovery Replacing Loss Sustained**

If this Policy replaces insurance that provided You with an extended period of time after cancellation or nonrenewal in which to **Discover Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**,

**Security Breach**, or **Claim** and which did not terminate when this Policy became effective:

We will not pay for any **Loss** resulting directly from any **Cyber Incident**, **Extortion Threat**, **Security Breach**, or **Claim** that occurred during the Policy Period of that prior insurance which is **Discovered** during such extended period of time, unless the amount of that **Loss** exceeds the Limit of Insurance and Deductible Amount of that prior insurance. In that case, We will pay for the excess **Loss** subject to the terms and conditions of this Policy.

Condition 11 – Other Insurance does not apply to this condition.

**20. Nonrenewal**

If We decide not to renew this Policy, We will mail or deliver to the first **Named Insured** written notice of the nonrenewal not less than thirty (30) days before the expiration date.

If notice is mailed, proof of mailing will be sufficient proof of notice.

## SECTION VII – DEFINITIONS

1. **Application** means the signed application for this Policy, including any attachments and other materials submitted in conjunction with the signed application, digital or otherwise.

2. **Card Company** means American Express, Discover Financial Services, JCB International, MasterCard Worldwide, Visa Inc. or any other credit card company that requires its merchants to adhere to the Payment Card Industry (PCI) Data Security Standards.

3. **Claim** means:

   **a.** A written demand for monetary or nonmonetary damages, including but not limited to injunctive relief;
   **b.** A civil proceeding commenced by the service of a complaint or similar proceeding;
   **c.** Under Paragraph b. of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties, a **Regulatory Proceeding** commenced by the filing of a notice of charges, formal investigative order, service of summons or similar document; or
   **d.** Under Paragraph c. of Insuring Agreement 5 – Security Breach Liability Including Payment Card Industry (PCI) Fines and Penalties an action brought by a **Card Company** of the Payment Card Industry (PCI);

   against any **Insured** for a **Wrongful Act**, including any appeal therefrom.

4. **Computer System** means any computer, including transportable or handheld devices, electronic storage devices and related peripheral components; any systems and applications software, or any related telecommunications networks connected to or used in connection with such computer or devices: i) which collects, transmits, processes, stores or retrieves Your **Electronic Data**; and ii) which is:

   **a.** Owned by You;
   **b.** Leased by You and operated by any **Insured**;
   **c.** Owned and operated by an **Employee** who has agreed in writing to Your personal device use policy; or
   **d.** Operated by an authorized **Third Party**, but only with respect to Your **Electronic Data**.

5. **Cyber Incident** means:

   **a.** Any i) **Hacker** attack; ii) malicious code; or iii) **Virus** that is directed at, enacted upon or introduced into a **Computer System** (including Your **Electronic Data**) and is designed to access, alter, corrupt, damage, delete, destroy, disrupt, encrypt, use or prevent or restrict access to or the use of

any part of a **Computer System** (including Your **Electronic Data**) or otherwise disrupt its normal functioning or operation.

Recurrence of the same **Virus** after a **Computer System** has been restored shall constitute a separate **Cyber Incident**.

**b.** Any denial of service attack specifically directed at You which disrupts, prevents or restricts access to or use of a **Computer System** or otherwise disrupts the normal functioning or operation of a **Computer System**.

**6.** **Discovery** or **Discovered** means the time when any **Insured** first becomes aware of facts which would cause a reasonable person to believe that a **Loss** covered by this Policy has been or will be incurred, regardless of when the act or acts causing or contributing to such **Loss** occurred, even though the exact amount or details of **Loss** may not then be known.

**Discovery** or **Discovered** also means the time when any **Insured** first receives notice of an actual or potential **Claim** in which it is alleged that You are liable to a third party under circumstances which, if true, would constitute a **Loss** under this Policy.

**7.** **E-commerce Activities** means those activities conducted by You in the normal conduct of Your business via Your web site or Your e-mail system.

**8.** **Electronic Data** means information, facts, images or sounds stored as or on, created or used on, or transmitted to or from computer software (including systems and applications software) on electronic storage devices including, but not limited to, hard or floppy disks, CD-ROMs, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment. **Electronic Data** is not tangible property.

**Electronic Data** does not include Your **Electronic Data** that is licensed, leased, rented or loaned to others.

**9.** **Employee** means any natural person who was, now is, or will be:

**a.** Employed on a full- or part-time basis;
**b.** Furnished temporarily to You to substitute for a permanent employee on leave or to meet seasonal or short-term workload conditions;
**c.** Leased to You by a labor leasing firm under an agreement between You and the labor leasing firm to perform duties related to the conduct of Your business but does not mean a temporary employee as defined in Paragraph 9.b. above;
**d.** An officer;
**e.** A director, trustee or manager (if a limited liability company);
**f.** A volunteer worker; or
**g.** A partner or member (if a limited liability company),

of the **Named Insured** and those of any organization qualifying as a **Subsidiary** under the terms of this Policy, but only while acting within the scope of their duties as determined by the **Named Insured** or such **Subsidiary**.

**10.** **Extortion Threat** means a threat or series of related threats:

**a.** To perpetrate a **Cyber Incident**;
**b.** To disseminate, divulge or utilize: i) Your proprietary information; or ii) weakness in the source code within a **Computer System** by gaining unauthorized access to a **Computer System**;
**c.** To destroy, corrupt or prevent normal access to a **Computer System** (including Your **Electronic Data**) by gaining or having gained unauthorized access to a **Computer System**;
**d.** To inflict **Ransomware** on a **Computer System**; or
**e.** To publish Your client's or **Employee's Personal Information**.

**Extortion Threat** does not include a threat or series of threats to any **Third Party**.

11. **Hacker** means a person who accesses a **Computer System** (including Your **Electronic Data**) who is: i) not authorized to have such access; or ii) authorized to have such access but who uses such access in an unauthorized manner.

12. **Insured** means any **Named Insured** and its **Employees**.

13. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any: i) fact, circumstance, situation, event, transaction or cause; or ii) a series of casually connected facts, circumstances, situations, events, transactions or causes.

14. **Interruption** means:

    a. With respect to a **Cyber Incident**:

        i. an unanticipated cessation or slowdown for Your **E-Commerce Activities**; or
        ii. Your suspension of Your **E-Commerce Activities** for the purpose of avoiding or mitigating the possibility of transmitting a **Virus** or malicious code to another person or organization;

        and, with regard to Paragraphs 14.a.i and 14.a.ii. above, shall be deemed to begin when Your **E-Commerce Activities** are interrupted and ends at the earliest of:

        (1) ninety (90) days after the **Interruption** begins;
        (2) the time when Your **E-Commerce Activities** are resumed; or
        (3) the time when service is restored to You.

    b. With respect to an **Extortion Threat**, Your voluntary suspension of Your **E-Commerce Activities**:

        i. based upon clear evidence of a credible threat; or
        ii. based upon the recommendation of a security firm, if any;

        and, with regard to Paragraphs 14.b.i and 14.b.ii. above, shall be deemed to begin when Your **E-Commerce Activities** are interrupted and ends at the earliest of:

        (1) fourteen (14) days after the Interruption begins;
        (2) the time when Your **E-Commerce Activities** are resumed; or
        (3) the time when service is restored to You.

15. **Loss** means the definitions set forth in each of the respective Insuring Agreements of this Policy.

16. **Named Insured** means the entity or entities shown in the Declarations and any **Subsidiary**.

17. **Personal Information** means any information not available to the general public for any reason through which an individual may be identified including, but not limited to, an individual's:

    a. Social security number, driver's license number or state identification number;
    b. Protected health information;
    c. Financial account numbers;
    d. Security codes, passwords, PINs associated with credit, debit or charge card numbers which would permit access to financial accounts; or
    e. Any other nonpublic information as defined in **Privacy Regulations**.

18. **Pollutants** means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned

or reclaimed.

19. **Privacy Regulations** means any of the following statutes and regulations, and their amendments, associated with the control and use of personally identifiable financial, health or other sensitive information including, but not limited to:

**a.** The Health Insurance Portability and Accountability Act of 1996 (HIPAA) (Public Law 104-191);
**b.** The Health Information Technology for Economic and Clinical Health Act (HITECH) (American Recovery and Reinvestment Act of 2009);
**c.** The Gramm-Leach-Bliley Act of 1999;
**d.** Section 5(a) of the Federal Trade Commission Act (15 U.S.C. 45(a)), but solely for alleged unfair or deceptive acts or practices in or affecting commerce;
**e.** The Identity Theft Red Flags Rules under the Fair and Accurate Credit Transactions Act of 2003; or
**f.** Any other similar local, state, federal or foreign identity theft or privacy protection statute or regulation.

20. **Ransomware** means any software that is used to demand a ransom payment by: i) restricting access to a **Computer System**; or ii) encrypting Your **Electronic Data** held within a **Computer System.**

21. **Security Breach** means a privacy breach that includes the acquisition of **Personal Information** held within a **Computer System** or in non-electronic form at or while in the care, custody or control of the **Insured** or authorized **Third Party** by a person: i) not authorized to have access to such information; or ii) authorized to have access to such information but whose access results in the unauthorized disclosure of such information.

22. **Subsidiary** means any organization in which more than fifty percent (50%) of the outstanding securities or voting rights representing the present right to vote for the election of directors, trustees, managers (if a limited liability company) or persons serving in a similar capacity is owned, in any combination, by one or more **Named Insureds.**

23. **Suit** means a civil proceeding in which damages to which this Policy applies are claimed against the **Insured**. **Suit** includes:

**a.** An arbitration proceeding in which such damages are claimed and to which the **Insured** submits with Our consent; or
**b.** Any other alternative dispute resolution proceeding in which such damages are claimed and to which the **Insured** submits with Our consent.

**Suit** does not include a civil proceeding seeking recognition and/or enforcement of a foreign money judgment.

24. **Third Party** means any entity that You engage under the terms of a written contract to perform services for You.

25. **Virus** means any kind of malicious code designed to damage or destroy any part of a **Computer System** (including Your **Electronic Data**) or disrupt its normal functioning.

26. **Wrongful Act** means any actual or alleged:

**a.** **Security Breach**;
**b.** Failure to prevent unauthorized access to, or use of, electronic or non-electronic data containing identity information;
**c.** Failure to prevent the transmission of a **Virus** through a **Computer System** into a computer network, any application software, or a computer operating system or related network that is not rented, owned, leased by, licensed to or under the direct operational control of the **Insured**; or

**d.** Failure to provide notification of any actual or potential **Security Breach** if such notification is required by any security breach notification law;

by, or asserted against, an **Insured.**

Policy Number: FLY-CB-TXU1TZQEM-002
Issued Date: Jan 20, 2023
Effective Date: Jan 29, 2023

# SIGNATURE PAGE

In Witness Whereof, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

Peter T. Maloney

(signature)

Peter Maloney -

Secretary

Torben Ostergaard

(signature)

Torben Ostergaard -

President

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEST VIRGINIA AMENDATORY ENDORSEMENT

This endorsement modifies insurance provided under the following: **COMMERCIAL CYBER INSURANCE POLICY**

**I.** Paragraph **3.** in **SECTION V – EXCLUSIONS** is replaced by the following:

**3.** Nuclear reaction, nuclear radiation or radioactive contamination, or any related act or incident, however caused.

**II.** Paragraph **f.** of **SECTION VI – CONDITIONS**, Condition **1. Cancellation** is deleted without replacement.

**III. SECTION VI – CONDITIONS**, Condition **9. Representations** is replaced by the following:

**9. Representations**
You represent that all information and statements contained in the **Application** are true, accurate and complete. All such information and statements are the basis for Our issuing this Policy and shall be considered as incorporated into and shall constitute a part of this Policy. Misrepresentations, omissions, concealment of facts and incorrect statements shall not prevent a recovery under the Policy, unless:

**a.** Fraudulent;

**b.** Material either to the acceptance of the risk, or to the hazard assumed by the **Insurer**; or

**c.** The **Insurer** in good faith would either not have issued the Policy, or would not have issued a Policy in as large an amount, or would not have provided coverage with respect to the hazard resulting in the **Loss**, if the true facts had been made known to the **Insurer** as required either by the **Application** for the Policy or otherwise.

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# TRADE OR ECONOMIC SANCTIONS

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

This insurance does not provide any coverage, and We shall not make payment of any claim or provide any benefit hereunder, to the extent that the provision of such coverage, payment of such claim or provision of such benefit would expose us to a violation of any applicable trade or economic sanctions, laws or regulations, including but not limited, to those administered and enforced by the United States Treasury Department's Office of Foreign Assets Control (OFAC).

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# COMPUTER AND FUNDS TRANSFER FRAUD

**Computer And Funds Transfer Fraud Coverage Limit:** *$2000000.00*
**Computer And Funds Transfer Fraud Deductible:** *$10000.00*

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

With regard to this Computer And Funds Transfer Fraud endorsement, the provisions of the Policy to which this endorsement is attached remain unchanged and apply, unless modified by this endorsement.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS:**

**Computer And Funds Transfer Fraud**

**a.** Subject to the Computer and Funds Transfer Fraud Coverage Limit and Deductible set forth above, We will pay for:

**i.** **Loss** resulting directly from a fraudulent:

**1.** Entry of **Electronic Data** or **Computer System** into; or
**2.** Change of **Electronic Data** or **Computer System** within

a **Computer System**, by a person or organization without authorization to access such **Computer System**, provided the fraudulent entry or fraudulent change causes, with regard to Paragraphs **a.i.(1)** and **a.i.(2):**

**a.** **Your** money, securities or other property to be transferred, paid or delivered; or
**b.** Your account at a financial institution to be debited or deleted, or

**ii.** **Loss** resulting directly from a **Fraudulent Instruction** directing a financial institution to debit your **Transfer Account** and transfer, pay or deliver money or securities from that account

that is first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**.

**b.** As used in Paragraph **a.i.,** "fraudulent entry" or "fraudulent change" of **Electronic Data** or **Computer Program** shall include such entry or change made by an **Employee** acting, in good faith, upon a **Fraudulent Instruction** received from a computer software contractor who has a written agreement with You to design, implement or service **Computer Programs** for a **Computer System** covered under this Insuring Agreement.

**II.** Solely with respect to the coverage afforded under this endorsement:

**a.** **Computer Program** means a set of related electronic instructions, which direct the operation and function of a computer or devices connected to it, which enables the computer or devices to receive, process, store or send your **Electronic Data**.

**b.** **Loss** means:

**1.** In Paragraph **I.a.i.:**

**(a)** **Your** money, securities or other property fraudulently transferred, paid or delivered; or

**(b)** Money or securities fraudulently debited or deleted from Your account at a financial institution.

**2.** In Paragraph **I.a.ii.,** transferring, paying or delivering money or securities from Your **Transfer Account**.

**c.** **Fraudulent Instruction** means:

(1) With regard to Paragraph **I.a.ii.:**

**(a)** A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instruction directing a financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, which instruction purports to have been issued by You, but which in fact was fraudulently issued by someone else without Your knowledge or consent.

**(b)** A written instruction issued to a financial institution directing the financial institution to debit Your **Transfer Account** and to transfer, pay or deliver money or securities from that **Transfer Account**, through an electronic funds transfer system at specified times or under specified conditions, which instruction purports to have been issued by You, but which in fact was issued, forged or altered by someone else without your knowledge or consent.

**(c)** A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic or written instruction initially received by You, which instruction purports to have been issued by an **Employee**, but which in fact was fraudulently issued by someone else without Your or the **Employee's** knowledge or consent.

(2) With regard to Paragraph **I.b.:**

A computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic, written or voice instruction directing an **Employee** to enter or change **Electronic Data** or **Computer Programs** within a **Computer System** covered under this Insuring Agreement, which instruction in fact was fraudulently issued by Your computer software contractor.

**d.** **Transfer Account** means an account maintained by you at a financial institution from which You can initiate the transfer, payment or delivery of **Money** and **Securities**:

**(1)** By means of computer, telegraphic, cable, teletype, telefacsimile, telephone or other electronic instructions; or

**(2)** By means of written instructions establishing the conditions under which such transfers are to be initiated by such financial institution through an electronic funds transfer system.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**III.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**:
The most We will pay for all Loss covered under the Computer and Funds Transfer Fraud Insuring Agreement is the Computer and Funds Transfer Fraud Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

**IV.** Paragraph **1.** of **Section III – Deductible** is deleted in its entirety and replaced with the following:

**1.** Under Insuring Agreements **1.** Security Breach Expense, **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data, and Paragraph **I.a.** of this endorsement:

We will pay only the amount of **Loss** which is in excess of the Policy Deductible Amount shown above.

**V.** The following is added to **SECTION V – EXCLUSIONS:**

**1.** We will not be liable for **Loss** based upon, attributable to, arising out of or resulting from:

i. A fraudulent:

1. Entry of **Electronic Data** or **Computer Program** into; or
2. Change of **Electronic Data** or **Computer Program** within

a **Computer System**, by a person or organization with authorized access to such **Computer System**, except when covered under Paragraph **I.b.**

ii. The use or purported use of credit, debit, charge, access, convenience, identification, stored-value or other cards or the information contained on such cards.

iii. The giving or surrendering of property in any exchange or purchase.

iii. An **Employee** or financial institution acting upon any instruction to:

1. Transfer, pay or deliver money, securities or other property; or
2. Debit or delete Your account;

which instruction proves to be fraudulent, except when covered under Paragraph **I.b.**

**2.** We will not be liable for **Loss**, or that part of any **Loss**, the proof of which as to its existence or amount is dependent upon:

i. An inventory computation; or
ii. A profit and loss computation.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**VI.** The introductory statement to paragraph **a**. of Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS** is deleted in its entirety and replaced with the following:

**a.** Under Insuring Agreements **2.** Extortion Threats, **3.** Replacement Or Restoration Of Electronic Data and this Computer Funds Transfer Fraud Insuring Agreement, you must:

All other terms and conditions remain unchanged.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# INCREASE OF OR ELIMINATION OF BUSINESS INCOME AND EXTRA EXPENSE SUBLIMIT

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

**SCHEDULE**

| | |
|---|---|
| **Effective Date of Endorsement:** | Jan 29, 2023 |
| **Business Income and Extra Expense Sublimit:** | $1,000,000.00 |
| **Premium:** | $818.00 |

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

Paragraph (c) of **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**, is deleted in its entirety and replaced with the following:

**c.** Insuring Agreement 4 – Business Income and Extra Expense: is the Business Income and Extra Expense Aggregate Sublimit of Insurance, if any, shown in the Schedule of this endorsement.

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SOCIAL ENGINEERING ENDORSEMENT

**Social Engineering Coverage Limit:** $100000.00
**Social Engineering Deductible:** $10000.00

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Social Engineering Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Social Engineering**

Subject to the Social Engineering Coverage Limit and Deductible set forth above, We will pay for **Social Engineering Loss** resulting directly from a **Social Engineering Incident** that is first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS.**

With respect to this Social Engineering Insuring Agreement:

**a.** **Money** means currency, coins or bank notes in current use and having a face value, travelers' checks, register checks and money orders held for sale to the public. The term **Money** does not include digital currency or other negotiable and nonnegotiable instruments or contracts representing either **Money** or property.

**b.** **Securities** mean negotiable and non-negotiable instruments or contracts representing either Money or property.

**Securities** does not include **Money**.

**c.** **Social Engineering Incident** means the intentional misleading of an **Insured** to transfer **Money** to a person, place or account beyond the **Named Insured's** control resulting directly from the **Named Insured's** employee's good faith reliance upon an instruction transmitted via email, purporting to be from:

**i.** a natural person or entity who exchanges, or is under contract to exchange, goods or services with the **Named Insured** for a fee (other than a financial institution, asset manager, broker-dealer, armored motor vehicle "named insured" or any similar entity); or
**ii.** an employee of the **Named Insured**;

but which contained a fraudulent and material misrepresentation and was sent by an imposter. As a condition precedent to coverage, the **Insured's** established and documented verification procedure must have been followed before acting upon such instruction.

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**d.** **Social Engineering Loss** means the loss of **Money** as a result of a **Social Engineering Incident**.

**Social Engineering Loss** does not include indirect and/or consequential loss.

**II.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

The most We will pay for all Loss covered under the Social Engineering Insuring Agreement is the Social Engineering Aggregate Sublimit of Insurance, if any, shown above or in the Declarations., which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

**III.** The following is added to **SECTION III – DEDUCTIBLE**:

Under the Social Engineering Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown above, or in the Declarations.

**IV. SECTION V – EXCLUSIONS** is amended to include:

We will not be liable for **Social Engineering Loss** resulting from a **Social Engineering Incident** based upon, attributable to or arising out of:

1. An actual or alleged infringement of, violation of, misappropriation of or assertion of any right to or interest in any:

   **a.** Patent, copyright, trademark, trade dress, certification mark, collective mark, service mark, expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade secret or other intellectual property right by or on behalf of any **Insured**; or

   **b.** Software or computer code or its source content or material by or on behalf of any **Insured**.

2. A fraudulent, dishonest or criminal act by any **Employee** or authorized representative of the **Named Insured**, whether acting alone or in collusion with others.

3. The establishment of any credit or similar promise to pay, or to any party's use of or acceptance of any credit card, debit card or similar instrument, whether or not genuine.

4. Any investment or ownership in any corporation, partnership, real property, or similar instrument, whether or not such investment is genuine.

5. A kidnap, ransom or other extortion payment surrendered as a result of a threat to do bodily harm to any natural person or a threat to harm, take, or transfer property.

6. **Money** or other property being transferred, paid or delivered as a result of **Security Breach** or **Cyber Incident.**

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RANSOM PAYMENTS ENDORSEMENT

**Ransom Payments Coverage Limit:** $1000000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Ransom Payments Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Ransom Payments:**

Subject to the Ransom Payments Coverage Limit set forth above and any Deductible specified in the Declarations to this Policy, We will reimburse the monetary value of any **Ransom Payment** made by **You** to a third party in response to a **Ransom Demand** to resolve an **Extortion Threat** that is **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**.

With respect to this Ransom Payments Insuring Agreement:

a. **Loss** means monetary value of any **Ransom Payments** made by **You** to a third party for **Ransom Demands**.

b. **Ransom Demand** means a demand by a third-party attacker communicated in an electronic format to **You** as a request for payment in any form, including virtual currency, to rectify an **Extortion Threat** that is **Discovered** during the Policy Period.

c. **Ransom Payment** means a monetary payment made during the Policy Period in any form, including virtual currency, to a third-party attacker with Our prior written consent to resolve an **Extortion Threat.**

**II.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**:

The most We will pay for all Loss covered under the Ransom Payments Insuring Agreement is the Ransom Payments Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**III.** The following is added to **SECTION III – DEDUCTIBLE**:

Under the Ransom Payments Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible amount shown in the Declarations.

**IV.** Exclusion **16.** in **SECTION V – EXCLUSIONS** is deleted in its entirety and replaced with the following:

**16.** Any **Cyber Incident**, **Extortion Threat**, **Ransom Demands, Ransom Payments, Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** that any **Insured** became aware of prior to the effective date of the Policy.

**V.** Exclusion **17.** in **SECTION V – EXCLUSIONS** is deleted in its entirety and replaced with the following:

**17.** The same facts, **Cyber Incident**, **Extortion Threat**, **Ransom Demands, Ransom Payments, Security Breach**, **Wrongful Act**, or **Interrelated Wrongful Acts** alleged or contained in any **Claim** which has been reported, or in any circumstances of which notice has been given, under any insurance policy of which this Policy is a renewal or replacement.

All other terms and conditions remain unchanged.

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# HARDWARE REPLACEMENT COSTS ENDORSEMENT

**Hardware Replacement Costs Coverage Limit:** $50000.00

This endorsement modifies insurance provided under the following:

**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Hardware Replacement Costs Endorsement, all provisions of the Policy to which this endorsement is attached, as all terms and conditions, remain unchanged and applicable.

This endorsement extends certain coverages. The headers in this endorsement are only for convenience. Read the entire policy carefully to determine rights, duties and what is and is not covered.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Hardware Replacement Costs:**

Subject to the Hardware Replacement Costs Coverage Limit set forth above and any Deductible specified in the Declarations to this policy, We will pay for **Loss** directly resulting from a **Cyber Incident** first **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**, to mitigate the potential of a future **Cyber Incident** or **Security Breach.**

With respect to this Hardware Replacement Costs Insuring Agreement:

a. **Loss** means the cost to replace hardware, including but not limited to, computers or any associated devices or equipment operated by, and either owned by or leased to, the **Insured** that are unable to function as intended due to corruption or destruction of software or firmware.

b. **Loss** does not include any sums related to labor costs associated with installing, connecting or setting up the hardware.

**II.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance:**

The most We will pay for all Loss covered under the Hardware Replacement Costs Insuring Agreement is the Hardware Replacement Costs Aggregate Sublimit of Insurance, if any, shown above or in the Declarations, which are part of, and not in addition to, the Policy Aggregate Limit of Insurance. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations of liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

**III.** The following is added to **SECTION III – DEDUCTIBLE:**

Under the Hardware Replacement Costs Insuring Agreement, We will pay only the amount of **Loss** which is in excess of the Policy Deductible shown in the Declarations.

**IV.** Exclusion 4 in **SECTION V – EXCLUSIONS** is deleted in its entirety and replaced with the following:

**4. Bodily Injury**

**Bodily Injury** means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time. It also means mental injury, mental anguish, mental tension, emotional distress, pain or suffering or shock sustained by any person.

However, **Bodily Injury** does not mean mental anguish or emotional distress resulting directly from a **Security Breach**.

All other terms and conditions remain unchanged.

 Includes copyrighted material of Insurance Services Office, Inc., with its permission 

Policy Number: FLY-CB-TXU1TZQEM-002
Endorsement Issued Date: Jan 20, 2023
Endorsement Effective Date: Jan 29, 2023

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# WEBSITE MEDIA CONTENT LIABILITY ENDORSEMENT

**Website Media Content Liability Coverage Limit:** $1000000.00
**Website Media Content Liability Deductible:** $10000.00

This endorsement modifies insurance provided under the following:
**COMMERCIAL CYBER INSURANCE POLICY**

Unless modified by this Website Media Content Liability Endorsement, all provisions of the Policy to which this endorsement is attached, as well as all terms and conditions, remain unchanged and applicable.

In consideration of the premium charged for the Policy, it is hereby understood and agreed that:

**I.** The following Insuring Agreement is added to **SECTION I – INSURING AGREEMENTS**:

**Website Media Content Liability**

Subject to the Website Media Content Liability Coverage Limit and Deductible set forth above, We will pay for **Loss** that the Insured becomes legally obligated to pay and **Defense Expenses** as a result of a **Claim** that is **Discovered** during the Policy Period and reported in accordance with Condition **14. Duties in the Event of Claim or Loss** in **SECTION VI – CONDITIONS**, for one or more of the following acts first committed on or after the retroactive date and before the end of the Policy Period in the course of Your display of **Media Material** on Your website or on social media web pages created and maintained by or on behalf of You:

**a.** invasion of or interference with an individual's right of publicity, including commercial appropriation of name, persona, voice or likeness; or

**b.** plagiarism, piracy or misappropriation of ideas under implied contract; or

**c.** infringement of copyright; or

**d.** infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, service name; or

**e.** improper deep-linking or framing within electronic content.

With respect to this Website Media Content Liability Insuring Agreement:

**a.** **Media Material** means any information in electronic form, including words, sounds, numbers, images, or graphics and shall also include advertising, video, streaming content, webcasting, online forums, bulletin boards and chat room content, but does not mean computer software or the actual goods, products or services described, illustrated or displayed in such **Media Material**.

**II.** Exclusions Applicable to the Website Media Content Liability Insuring Agreement:


Includes copyrighted material of Insurance Services Office, Inc., with its permission

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

We will not be liable for any **Claim** resulting from an act based upon, attributable to or arising out of:

**1.** An actual or alleged infringement of, violation of, misappropriation of or assertion of any right to or interest in any:

**a.** Patent, copyright, trademark, trade dress, certification mark, collective mark, service mark, expression, idea, likeness, name, slogan, style of doing business, symbol, title, trade secret or other intellectual property right by or on behalf of any **Insured,** provided that this Exclusion does not apply to a claim resulting from an act based upon, attributable to or arising out of infringement of copyright, or infringement of domain name, trademark, trade name, trade dress, logo, title, metatag, slogan, service mark, service name in the course of Your display of **Media Material** on Your website or on social media web pages created and maintained by or on behalf of You; or

**b.** Software or computer code or its source content or material by or on behalf of any **Insured.**

**III.** The following is added to **SECTION II – LIMITS OF INSURANCE, 2. Aggregate Sublimit(s) of Insurance**:

The most We will pay for all Loss covered under the Website Media Content Liability Insuring Agreement is the Website Media Content Liability Sublimit of Insurance shown above, which is part of, not in addition to the Policy Aggregate Limit of Insurance set forth in the Declarations to this Policy. Upon exhaustion of any Aggregate Sublimit of Insurance by such payments, We will have no further obligations or liability of any kind with respect to **Loss** subject to such Sublimit of Insurance.

All other terms and conditions remain unchanged.


Includes copyrighted material of Insurance Services Office, Inc., with its permission

**POLICYHOLDER DISCLOSURE**

**NOTICE OF TERRORISM INSURANCE COVERAGE**

You are hereby notified that the Terrorism Risk Insurance Act, as amended in 2019, defines an act of terrorism in Section 102(1) of the Act: The term "act of terrorism" means any act or acts that are certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

The portion of your annual premium that is attributable to coverage for acts of terrorism is _$2__, and does not include any charges for the portion of losses covered by the United States government under the Act.

I ACKNOWLEDGE THAT I HAVE BEEN NOTIFIED THAT UNDER THE TERRORISM RISK INSURANCE ACT, AS AMENDED, ANY LOSSES RESULTING FROM CERTIFIED ACTS OF TERRORISM UNDER MY POLICY COVERAGE MAY BE PARTIALLY REIMBURSED BY THE UNITED STATES GOVERNMENT AND MAY BE SUBJECT TO A $100 BILLION CAP THAT MAY REDUCE MY COVERAGE, AND I HAVE BEEN NOTIFIED OF THE PORTION OF MY PREMIUM ATTRIBUTABLE TO SUCH COVERAGE.

*Named Insured's consent to this Form provided electronically*

Policyholder/Applicant's Signature

Paul Schlieper

Print Name

Jan 20, 2023

Date


Includes copyrighted material of National Association of Insurance Commissioners, with its permission.

## POLICY DOCUMENTATION DELIVERY METHOD SELECTION FORM

Spinnaker Insurance Company is required by law to obtain Your consent to engage in electronic delivery of Your policy and related forms. You may:

- Select ONLY electronic delivery;
- Select ONLY paper delivery;
- Select BOTH electronic delivery and paper delivery; or
- Withdraw Your previous consent to receive electronic delivery.

Please indicate Your choice from the options below. Your selection applies to You and any other insureds entitled to receive copies of such forms under the policy.

☒ **ELECTRONIC DELIVERY ONLY**

I select electronic delivery of the form(s) indicated below. I acknowledge that I will not receive paper copies of these form(s), unless I notify Spinnaker Insurance Company or my agent/broker of my decision to entirely withdraw electronic consent or modify my selection to also include paper delivery.

☒ Policy

☒ Notices of Cancellation and Nonrenewal

☒ Other forms related to my policy

☐ **PAPER DELIVERY ONLY**

I select paper delivery of my policy and all related forms. I acknowledge that I will only receive paper copies of such forms.

☐ **BOTH ELECTRONIC DELIVERY AND PAPER DELIVERY**

I select the option to receive both electronic and paper delivery of my policy and all related forms.

☐ **WITHDRAWAL OF CONSENT OF ELECTRONIC DELIVERY**

I withdraw my consent to receive electronic delivery of my policy and/or related forms. In the future, I will only receive paper copies of such forms.

**DISCLOSURE**

If You elect to have Your insurance policy and related documents sent to You by electronic delivery, it is Your responsibility to update Your email address should it change at any time during the life of the policy. Further, Your election to have Your insurance policy and related documents transmitted to You electronically shall remain in effect until You notify:

Spinnaker Insurance Company
c/o *Boost Insurance Agency, Inc.*
*158 W. 27th Street, 10th Floor*
*New York, NY 10001*

in writing of Your withdrawal of such consent.

Paul Schlieper

**Name of Individual to Receive Documents by Electronic Delivery**

pmschlieper@burns-wilcox.com

**E-mail Address of Individual to Receive Documents by Electronic Delivery**

Paul Schlieper

**First Named Insured**

Paul Schlieper

**Print Name of First Named Insured's Authorized Representative**

*Named Insured's consent to this Form provided electronically*

**Signature of First Named Insured's Authorized Representative**

Jan 20, 2023

**Date**

SPINNAKER
INSURANCE COMPANY

Rev. 06/2022

# FACTS WHAT SPINNAKER DOES WITH YOUR PERSONAL INFORMATION?

| | |
|---|---|
| **Why?** | Financial companies choose how they share your personal information. Federal law gives consumers the right to limit some but not all sharing. Federal law also requires us to tell you how we collect, share, and protect your personal information. Please read this notice carefully to understand what we do. |
| **What?** | The types of personal information we collect and share depend on the product or service you have with us. This information can include:<br>▪ Name and date of birth<br>▪ Property information and property records<br>▪ Checking account information and credit-based insurance scores |
| **How?** | All financial companies need to share customers' personal information to run their everyday business. In the section below, we list the reasons financial companies can share their customers' personal information; the reasons Spinnaker chooses to share; and whether you can limit this sharing. |

| Reasons we can share your personal information | Does Spinnaker share? | Can you limit this sharing? |
|---|---|---|
| **For our everyday business purposes —** such as to process your transactions, maintain your account(s), respond to court orders and legal investigations, or report to credit bureaus | Yes | No |
| **For our marketing purposes —** to offer our products and services to you | No | No |
| **For joint marketing with other financial companies** | No | No |
| **For our affiliates' everyday business purposes —** information about your transactions and experiences | Yes | No |
| **For our affiliates' everyday business purposes —** information about your creditworthiness | No | We don't share |
| **For our affiliates to market to you** | No | We don't share |
| **For nonaffiliates to market to you** | No | We don't share |

| | |
|---|---|
| **Questions?** | Call toll-free 1-800-747-3214. |

| Who we are | |
|---|---|
| **Who is providing this notice?** | Spinnaker Insurance Company and its insurance company subsidiaries |

| What we do | |
|---|---|
| **How does Spinnaker protect my personal information?** | To protect your personal information from unauthorized access and use, we maintain physical, electronic, and procedural safeguards that comply with federal law.<br>These measures include computer safeguards and secured files and buildings. |
| **How does Spinnaker collect my personal information?** | We collect your personal information, for example, when you:<br>▪ apply for insurance or pay insurance premiums<br>▪ provide account information or give us your contact information<br>▪ file an insurance claim<br>We also collect your personal information from others, such as credit bureaus, affiliates, or other companies. |
| **Why can't I limit all sharing?** | Federal law gives you the right to limit only<br>▪ sharing for affiliates' everyday business purposes – information about your creditworthiness<br>▪ affiliates from using your information to market to you<br>▪ sharing for nonaffiliates to market to you<br>State laws and individual companies may give you additional rights to limit sharing. See below for more on your rights under state law. |

| Definitions | |
|---|---|
| **Affiliates** | Companies related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ Our affiliates include financial companies such as companies that share the Spinnaker, Mainsail, Masthead, or Hippo brand. |
| **Nonaffiliates** | Companies not related by common ownership or control. They can be financial and nonfinancial companies.<br>▪ Spinnaker does not share with nonaffiliates so they can market to you. |
| **Joint marketing** | A formal agreement between nonaffiliated financial companies that together market financial products or services to you.<br>▪ Spinnaker doesn't jointly market. |

**Other Important Information**

We will also comply with more restrictive state laws to the extent they apply.

**California Residents**: We will not share your information with nonaffiliated third parties for their marketing purposes except with your express consent. California residents will also be provided an "Important Privacy Choices" notice explaining their rights under the California Financial Information Privacy Act.

**Nevada Residents**: Nevada law allows us to make marketing calls to our existing customers listed on the National Do Not Call Registry. This notice is provided to you pursuant to state law. If you prefer not to receive marketing calls from us, you may be placed on our internal Do Not Call List by calling 1-888-221-7742. If you would like more information about our practices, you may call 1-888-221-7742. You may also contact the Nevada Attorney General's office: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginfo@ag.nv.gov.

**Vermont Residents**: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

**AZ, CA, CT, GA, IL, ME, MA, MN, MT, NV, NJ, NC, OH, OR, or VA Residents.** You have the right to request access to, correction, and deletion of personal information that we have about you. Please contact us at compliance@spinnakerins.com or Spinnaker Insurance Company, 1 Pluckemin Way, Suite 102, Bedminster, NJ 07921 with a notarized letter and include your name, address, and your policy, contract, or account number, and describe the information you wish to access, delete, or correct.

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

cowbell®

## Social Engineering Checklist

Insured Name: Abraham Linc Corporation
Claim No:
Policy No:

In order to expedite our coverage assessment for this matter, please complete the following, attach the documents requested (if available), and return to your assigned Claims Manager via email:

1. Please provide a brief description of the incident: Email was received from a supplier and contact that we do business with asking for payments to be ACH'd to a new bank. There were several exchanges back and forth confirming the amounts and the bank account information.

2. If funds were transferred, what were the amount(s) and date(s) of the transfers(?) 5-4-23 $513,590.03 5-5-23 $28,317.24 5-9-23 $28,317.24

3. Was the transfer made by an employee of the Insured? Yes
   - If no, please provide detail regarding who completed the transfer.

4. Does the Insured have an established and documented verification procedure in place in order to authenticate payment instructions or change in payment instructions? Yes
   - If Yes:
     - Please outline the Insured's verification procedures in as much detail as possible. If available, please also provide a copy of internal verification procedures we always email with the contact and supplier(they manufacture in China) copies of past emails are attached
     - Were the above-outlined verification procedures followed in this instance? Please provide as much detail as possible regarding the verification procedures in this instance. there were several emails back and forth before the ACH's were sent

5. In conjunction with the fraudulent transfer incident, have there been any signs of suspicious activity within the Insured's environment? No
   - If yes, please elaborate:

6. Please complete the checklist below and provide copies of the documentation along with this form:
   - ☐ Copy of the bank statement(s) reflecting fraudulent transfer
   - ☒ Copy of the fraudulent communications/email thread resulting in the loss including copies of legitimate invoices(s) vs. spoofed invoice(s) relied upon to make the transfer

cowbell®

☐Copy of all correspondence with the issuing and receiving banks regarding investigation into the fraudulent payment
☐Copy of any bank investigative findings upon conclusion of bank's investigation (if available)
☒Copy of internal verification procedures
☒Copy of Police report and FBI complaint
☐Copy of any IT investigative reports.

If unable to provide any of the documents listed, please elaborate. We do not have the May bank statement yet. We have spoken to both our bank(Wesbanco Bank) and the receiving bank(Regions Bank) but do not yet have any fraud report or findings from them at this point. I am attacing the FBI Report we filed and have filed a report with the Bridgeport, WV police department but do not have a copy of their report yet. We met with our IT manager and ensured the violation of email was not on the Abraham Linc server.

**Frank Simmerman III**

---

**From:** Ginger Lamb <glamb@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:05 PM
**To:** Robert Marra
**Subject:** FW: Address update



**Ginger Lamb**
AP Accounting Clerk Supervisor
O: 304.848.7428
Save As Contact
AbrahamLinc
The Strongest Linc in Your Supply Chain

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Thursday, January 5, 2023 6:00 PM
**To:** Ginger Lamb <glamb@abrahamlinc.com>
**Subject:** Address update

Hi Ginger,

I am not sure I sent this to you or not. Our address is updated to below address, please change all of the future payments to this new address. Please ignore it if you already received our mass email and changed the address. I just noticed some of your invoices are due then realized it's maybe delayed due to the address issue. Thank you!!

330 King Street, Elk Grove Village
IL 60007

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

**Frank Simmerman III**

| | |
|---|---|
| **From:** | Abraham Linc Accounts Payable <ap@abrahamlinc.com> |
| **Sent:** | Thursday, May 11, 2023 5:05 PM |
| **To:** | Robert Marra |
| **Subject:** | FW: Re:FW: Fw:Confirmation of Balances and Transactions |

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Friday, March 24, 2023 12:40 PM
**To:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Cc:** Ginger Lamb <glamb@abrahamlinc.com>
**Subject:** Re:FW: Fw:Confirmation of Balances and Transactions

Hello Ginger,

Happy Friday! I am just trying to follow up to see are you able to help send out the emails and courier yet?

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

***Please Save a tree. Dont print this e-mail unless its really necessary.***

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "KRIS@BBLFLOOR.COM"<kris@bblfloor.com>;
**Date:** Wed, Mar 22, 2023 02:44 PM
**To:** "ap"<ap@abrahamlinc.com>;
**Subject:** Re:FW: Fw:Confirmation of Balances and Transactions

Hi Ginger,

Thank you so much. We still need your help on the following two things.

1, Send this signed scan copy to shacc@bdo.com.cn by email directly. Subject line: DDCC-Abraham Linc, The audit company want to receive it by email from your company.
2, Put the original signed papers in a Fedex document envelope, use the attached prepaid shipping label and drop it to any Fedex shipping box or location.(The commercial invoice need to be printed 3 copies along with the shipping envelope).

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439

Mob:86-13915078421
Email:kris@bblfloor.com

*Please Save a tree. Dont print this e-mail unless its really necessary.*

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Abraham Linc Accounts Payable"<ap@abrahamlinc.com>;
**Date:** Tue, Mar 21, 2023 02:13 PM
**To:** "KRIS@BBLFLOOR.COM"<kris@bblfloor.com>;
**Subject:** FW: Fw:Confirmation of Balances and Transactions

Please find requested confirmation attached.

***Ginger Lamb***

Accounts Payable
**ABRAHAMLINC**
**EMPLOYEE POWERED * CUSTOMER DRIVEN**
abrahamlinc.com
P: 304.842.6474 x 7428
F: 304.842.8703

**From:** AJ Warne <awarne@abrahamlinc.com>
**Sent:** Friday, March 10, 2023 1:25 PM
**To:** Robert Marra <rmarra@abrahamlinc.com>; Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Cc:** kris@bblfloor.com
**Subject:** FW: Fw:Confirmation of Balances and Transactions

Good Afternoon Robert and Ginger,

Could you please handle the following for Kris (copied)?

Thank you!



**AJ Warne**
Vice President of Sales and Marketing
C: 304.838.1437
Save As Contact

AbrahamLinc
The Strongest Linc in Your Supply Chain

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Wednesday, March 8, 2023 12:25 PM
**To:** AJ Warne <awarne@abrahamlinc.com>
**Cc:** 李宜涵 <liyihan@bblfloor.cn>
**Subject:** Fw:Confirmation of Balances and Transactions

Hi Aj,

Did you receive below email from zhang.xiaotian@bdo.com.cn?
They need you help to do two things:

1, signed this copy and email back to shacc@bdo.com.cn
2,Send the original copy to below address: ( We will try to send you a ups or fedex lable for it)

Address:Room 610, 6th Floor, East Nanjing Road, Huangpu, Shanghai

Contact Person:Confirmation Centre Tel:86-021-23282914 / 86-18916453795

Postcode:200002

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "李宜涵"<liyihan@bblfloor.cn>;
**Date:** Wed, Mar 8, 2023 02:16 AM
**To:** "KRIS@BBLFLOOR.COM"<kris@bblfloor.com>;
**Subject:** 转发：Confirmation of Balances and Transactions

----------------------------------------------------------------------

发件人：zhang.xiaotian@bdo.com.cn <zhang.xiaotian@bdo.com.cn>
发送时间：2023年3月8日(星期三) 15:35
收件人：awarne@abrahamlinc.com <awarne@abrahamlinc.com>
抄　送：李宜涵 <liyihan@bblfloor.cn>
主　题：Confirmation of Balances and Transactions

Dear Abraham Linc

BDO China SHU LUN PAN Certified Public Accountants LLP has been appointed auditors of DDCC Global Sourcing Inc for the year ended 2020、2021、2022.

In accordance with the requirements of the auditing standards BDO China has requested us to obtain your confirmation of the amounts shown in our records as owing from you and to you. The amounts included in the table below are extracted from our books and records. If this agrees with your records please confirm by signing below with your company chop under the column "balances and transactions agreed".

If there are any discrepancies, please list out the discrepancies and sign with your company chop under the column "balances and transactions disagreed". Please return the confirmation directly to BDO China at the address below.

This confirmation is for audit purposes only and is not a request for payment. If the above balances have been settled after the date stated in the table please still confirm at your earliest convenience.

For further information and request from us, please see the attached.

Address:Room 610, 6th Floor, East Nanjing Road, Huangpu, Shanghai

Contact Person:Confirmation Centre Tel:86-021-23282914 / 86-18916453795

Postcode:200002

Email:shacc@bdo.com.cn

**Frank Simmerman III**

| | |
|---|---|
| **From:** | Ginger Lamb <glamb@abrahamlinc.com> |
| **Sent:** | Thursday, May 11, 2023 5:04 PM |
| **To:** | Robert Marra |
| **Subject:** | FW: Re:FW: Scan from Abraham Linc 03/07/2023 08:04 |



**Ginger Lamb**
AP Accounting Clerk Supervisor
O: 304.848.7428
Save As Contact
AbrahamLinc
The Strongest Linc in Your Supply Chain

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Wednesday, March 8, 2023 10:53 AM
**To:** Dave Lambernedis <dave@abrahamlinc.com>
**Cc:** Ginger Lamb <glamb@abrahamlinc.com>
**Subject:** Re:FW: Scan from Abraham Linc 03/07/2023 08:04

Hi Dave,

Good morning. I looked back our history and confirmed those price are correct. We met Aj in your company on Aug 24th and we confirmed lower the price for Rocklock Plus new orders after. The two POs you mentioned in this email are orders before that, they are still using the previous price. Thanks.

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

*Please Save a tree. Dont print this e-mail unless its really necessary.*

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Dave Lambernedis"<dave@abrahamlinc.com>;
**Date:** Tue, Mar 7, 2023 07:00 AM
**To:** "KRIS@BBLFLOOR.COM"<kris@bblfloor.com>;
**Cc:** "Ginger Lamb"<glamb@abrahamlinc.com>;
**Subject:** FW: Scan from Abraham Linc 03/07/2023 08:04

Kris,

The attached invoices are billed incorrectly. Should be billed at .786.
Do you want me to short pay?

Thanks Dave

Dave Lambernedis
Purchasing Supervisor
O: 304.848.7404

Save As Contact

-----Original Message-----
From: Abraham Linc <abelinccopier@gmail.com>
Sent: Tuesday, March 7, 2023 11:05 AM
To: Dave Lambernedis <dave@abrahamlinc.com>
Subject: Scan from Abraham Linc 03/07/2023 08:04

Scanned from MFP13589808
Date:03/07/2023 08:04
Pages:2
Resolution:200x200 DPI
----------------------------------------
Scanned documents are attached

**Frank Simmerman III**

**From:** Ginger Lamb <glamb@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:04 PM
**To:** Robert Marra
**Subject:** FW: Re:FW: invoices
**Attachments:** 200006495.pdf; 200006504.pdf



**Ginger Lamb**
AP Accounting Clerk Supervisor
O: 304.848.7428
Save As Contact
AbrahamLinc
The Strongest Linc In Your Supply Chain

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Tuesday, March 1, 2022 3:34 PM
**To:** Ginger Lamb <glamb@abrahamlinc.com>
**Subject:** Re:FW: invoices

Hi Ginger,

Sorry for the late reply. I total missed your first email. Attached please find the two invoices with new number. Let me know if you have any questions. Thanks!

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------

**From:** "Ginger Lamb"<glamb@abrahamlinc.com>;
**Date:** Tue, Mar 1, 2022 02:27 PM
**To:** "KRIS@BBLFLOOR.COM"<kris@bblfloor.com>;
**Subject:** FW: invoices

Have you found out which invoice is which? I know they need are past due and would like to get them paid.

Thank you,

***Ginger Lamb***

Accounts Payable
ABRAHAMLINC
EMPLOYEE POWERED * CUSTOMER DRIVEN
abrahamlinc.com
P: 304.842.6474 x 7428
F: 304.842.8703

**From:** Ginger Lamb
**Sent:** Sunday, February 20, 2022 4:45 PM
**To:** Kris Yin <kris@bblfloor.com>
**Subject:** invoices
**Importance:** High

Hi Kris:

I have 2 invoices – both of them are 200006504. Both of them are $32,689.93. One is for PO 817941 and the other is PO 817944. Which one of these is actually 200006504? And would you please send the other invoice that corresponds to the other PO and is not that invoice?

Thank you,

***Ginger Lamb***

Accounts Payable
ABRAHAMLINC
EMPLOYEE POWERED * CUSTOMER DRIVEN
abrahamlinc.com
P: 304.842.6474 x 7428
F: 304.842.8703

**Frank Simmerman III**

**From:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:04 PM
**To:** Robert Marra
**Subject:** FW: Re:RE: Re:RE: Re:new claim 18058

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Monday, June 28, 2021 11:15 AM
**To:** Marci McElroy <marci@abrahamlinc.com>
**Cc:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Subject:** Re:RE: Re:RE: Re:new claim 18058

Hi Marci,

We just processed 2 credits to your AP including 5 claims we had lately. 3 damages plus 2 tiles claims. Please check it out.

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

*Please Save a tree. Dont print this e-mail unless its really necessary.*

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Marci McElroy"<marci@abrahamlinc.com>;
**Date:** Fri, Jun 11, 2021 02:36 PM
**To:** "Kris Yin"<kris@bblfloor.com>;
**Cc:** "awarne"<awarne@abrahamlinc.com>;
**Subject:** RE: Re:RE: Re:new claim 18058

Unfortunately that is the labor bill they submitted. If you need to adjust it please provide documentation of the adjustment with the credit.

**From:** Kris Yin [mailto:kris@bblfloor.com]
**Sent:** Friday, June 11, 2021 3:35 PM
**To:** Marci McElroy <marci@abrahamlinc.com>
**Cc:** AJ Warne <awarne@abrahamlinc.com>
**Subject:** Re:RE: Re:new claim 18058

Yes, besides the toilet they labor still about $5 per sqft, that's much higher than the market rate. And for the trip charge, i know you guys has been charging us on this, is this for inspector trip or what?

------------------

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
***Please Save a tree. Dont print this e-mail unless its really necessary.***
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.
*****************************************************

------------------ Original ------------------
**From:** "Marci McElroy"<marci@abrahamlinc.com>;
**Date:** Fri, Jun 11, 2021 02:25 PM
**To:** "Kris Yin"<kris@bblfloor.com>;
**Cc:** "AJ Warne"<awarne@abrahamlinc.com>;
**Subject:** RE: Re:new claim 18058

The only thing I can figure is the removal and replacement of the toilet.

**From:** Kris Yin [mailto:kris@bblfloor.com]
**Sent:** Friday, June 11, 2021 3:21 PM
**To:** Marci McElroy <marci@abrahamlinc.com>
**Cc:** AJ Warne <awarne@abrahamlinc.com>
**Subject:** Re:new claim 18058

Hi Marci,

Do you know why the labor fee per sqft is so high in this claim.

------------------

Best Regards,

Kris Yin

Jiangsu Beier Decoration Materials Co., Ltd.

Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.

US Mob: 1-773-704-0439

Mob:86-13915078421

Email:kris@bblfloor.com

***Please Save a tree. Dont print this e-mail unless its really necessary.***

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.
*****************************************************

------------------ Original ------------------

**From:** "Marci McElroy"<marci@abrahamlinc.com>;

**Date:** Fri, Jun 11, 2021 08:52 AM

**To:** "Kris Yin"<kris@bblfloor.com>;

**Cc:** "AJ Warne"<awarne@abrahamlinc.com>;

**Subject:** new claim 18058

Hello Kris, please review the new claim attached and advise on the credit ASAP.

Thanks and have a nice weekend.

*Marci McElroy*

Claims Administrator

ABRAHAMLINC

EMPLOYEE POWERED * CUSTOMER DRIVEN

abrahamlinc.com

P: 800.359.5260

F: 866.842.8703

**Frank Simmerman III**

| | |
|---|---|
| **From:** | Ginger Lamb <glamb@abrahamlinc.com> |
| **Sent:** | Thursday, May 11, 2023 5:03 PM |
| **To:** | Robert Marra |
| **Subject:** | FW: Net 90 days |




**Ginger Lamb**

AP Accounting Clerk Supervisor

O: 304.848.7428

Save As Contact

AbrahamLinc

The Strongest Linc in Your Supply Chain


**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Wednesday, December 16, 2020 5:42 PM
**To:** Ginger Lamb <glamb@abrahamlinc.com>
**Cc:** Dave Lambernedis <dave@abrahamlinc.com>; AJ Warne <awarne@abrahamlinc.com>; zhangmiaomiao <zhangmiaomiao@bblfloor.cn>
**Subject:** Net 90 days

Hi Ginger,

How are you doing. Per discussed with Aj we will start to send invoices to you base on containers loading date for all of the shipments we shipped out since December. Meanwhile the orders on water and shipped out before December will be remain the same as current Net 30 days upon the delivery date. So the below list is the invoices you are receiving base on Net 90 days we shipped out so far, so you can verify and track those orders. Let me know if you have any questions.

| Purchase order# | Invoice# | Due date |
|---|---|---|
| 814642-BRI | INVIL200003756 | 3/3/2021 |
| 814643-BRI | INVIL200003757 | 3/3/2021 |
| 814645-BRI | INVIL200003758 | 3/3/2021 |
| 814647-BRI | INVIL200003759 | 3/3/2021 |
| 814644-BRI | INVIL200003760 | 3/2/2021 |
| 814663-BRI | INVIL200003761 | 3/3/2021 |
| 814667-BRI | INVIL200003762 | 3/3/2021 |
| 814664-BRI | INVIL200003764 | 3/2/2021 |

| | | |
|---|---|---|
| 814665-BRI | INVIL200003765 | 3/2/2021 |
| 814666-BRI | INVIL200003767 | 3/3/2021 |
| 814668-BRI | INVIL200003768 | 3/3/2021 |
| 814669-BRI | INVIL200003769 | 3/3/2021 |
| 814870-BRI | INVIL200003770 | 3/2/2021 |
| 815019-BRI | INVIL200003771 | 3/3/2021 |
| 814871-BRI | INVIL200003772 | 3/3/2021 |
| 814869-BRI | INVIL200003773 | 3/3/2021 |
| 009166 Direct Ship | INVIL200003774 | 3/3/2021 |

Best Regards,

Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

**Frank Simmerman III**

| | |
|---|---|
| **From:** | Ginger Lamb <glamb@abrahamlinc.com> |
| **Sent:** | Thursday, May 11, 2023 5:03 PM |
| **To:** | Robert Marra |
| **Subject:** | FW: SAMPLE ORDERS COST UPDATE AND DETAILS |
| **Attachments:** | PL-VF19-319-117-118.pdf; PL-VF19-319-158 - details.pdf; 177851-UPDATE.pdf; 177936-Update.pdf; SAMPLES SHIPPED DETAILS 01162020.xlsx |



**Ginger Lamb**
AP Accounting Clerk Supervisor
O: 304.848.7428
Save As Contact
AbrahamLinc
The Strongest Linc In Your Supply Chain

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Thursday, January 16, 2020 5:34 PM
**To:** AJ Warne <awarne@abrahamlinc.com>
**Cc:** Dave Lambernedis <dave@abrahamlinc.com>; Ginger Lamb <glamb@abrahamlinc.com>
**Subject:** SAMPLE ORDERS COST UPDATE AND DETAILS

Hi Aj & Dave,

Attached please find the details for our two containers of the mass sample order. I know the way we did in the invoices were a little confusing so i am trying to put everything together. The both invoices (177851 & 177936) have been updated, please use those two as the confirmed copies for record and payment. I tried to put all of the details in those files.

1, Sample shipped details files including the 2 shipments and sample list,you can cross check the pcs quantity and SQFT quantity. It's also explain the support sample quantity and refund quantity details.
2, The two invoices are final versions including the SQFT details on each container, as well as the discount applied. The wood laminate rack cost also included in the invoice.
3, the two packing list are the original shipped pcs details from factory, which i already combine both in the excel sheet.

Let me know if you have any questions.

Best Regards,

Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

*Please Save a tree. Dont print this e-mail unless its really necessary.*

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

**Frank Simmerman III**

**From:** Ginger Lamb <glamb@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:03 PM
**To:** Robert Marra
**Subject:** FW: Re:invoice
**Attachments:** 176611.pdf



**Ginger Lamb**
AP Accounting Clerk Supervisor
O: 304.848.7428
Save As Contact
AbrahamLinc
The Strongest Linc in Your Supply Chain

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Wednesday, August 7, 2019 9:52 AM
**To:** Ginger Lamb <glamb@abrahamlinc.com>
**Subject:** Re:invoice

Good morning Ginger,

Attached please find this missed invoice. Thank you!

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Ginger Lamb"<glamb@abrahamlinc.com>;
**Date:** Wed, Aug 7, 2019 05:54 AM
**To:** "Kris Yin"<kris@bblfloor.com>;
**Subject:** invoice

Good morning Kris:

I show we received product for PO 809007, however I do not have an invoice for that PO. Would you please send it to me at your earliest convenience?

Thank you!

***Ginger Lamb***

Accounts Payable
**ABRAHAMLINC**
**EMPLOYEE POWERED * CUSTOMER DRIVEN**
abrahamlinc.com
P: 304.842.6474 x 7428
F: 304.842.8703

**Frank Simmerman III**

**From:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:02 PM
**To:** Robert Marra
**Subject:** FW: Re:statement

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Wednesday, April 11, 2018 10:16 AM
**To:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Subject:** Re:statement

Hi Ginger,

Just sent the statement to you from January to today. Hope that help. Please do let me know if there is any difference with your records. Thank you!!

---

Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

*Please Save a tree. Dont print this e-mail unless its really necessary.*

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Abraham Linc Accounts Payable"<ap@abrahamlinc.com>;
**Date:** Wed, Apr 11, 2018 06:42 AM
**To:** "kris@bblfloor.com"<kris@bblfloor.com>;
**Subject:** statement

Good morning Kris:

Would you please send me a statement of outstanding invoices? Since we are ordering so much, I want to touch base to ensure that I'm not missing any invoices.

Thank you!

***Ginger Lamb***

Accounts Payable
**ABRAHAMLINC**
**EMPLOYEE POWERED * CUSTOMER DRIVEN**
abrahamlinc.com

P: 304.842.6474 x 7428
F: 304.842.8703

**Frank Simmerman III**

**From:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:02 PM
**To:** Robert Marra
**Subject:** FW: Re:RE: Re:RE: Fw:Invoice 171918 from DDCC Global Sourcing Inc

**From:** Kris Yin <kris@bblfloor.com>
**Sent:** Tuesday, September 5, 2017 2:41 PM
**To:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Subject:** Re:RE: Re:RE: Fw:Invoice 171918 from DDCC Global Sourcing Inc

Hi Ginger,

Good afternoon. We received that check today with another check which you sent on Aug 31. So we are ok now. Thanks!!!

--------------------
Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Kris Yin"<kris@bblfloor.com>;
**Date:** Thu, Aug 31, 2017 01:46 PM
**To:** "Abraham Linc Accounts Payable"<ap@abrahamlinc.com>;
**Subject:** Re:RE: Re:RE: Fw:Invoice 171918 from DDCC Global Sourcing Inc

Thanks!!!

--------------------
Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com
*Please Save a tree. Dont print this e-mail unless its really necessary.*
CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly

prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you.

------------------ Original ------------------
**From:** "Abraham Linc Accounts Payable"<ap@abrahamlinc.com>;
**Date:** Thu, Aug 31, 2017 12:13 PM
**To:** "Kris Yin"<kris@bblfloor.com>;
**Subject:** RE: Re:RE: Fw:Invoice 171918 from DDCC Global Sourcing Inc

I pulled the copy of the check to see what address was used and that was the first check that I mailed to the new address. Hopefully, you will see it soon. Either way, I will touch base on Tuesday.

**From:** Kris Yin [mailto:kris@bblfloor.com]
**Sent:** Thursday, August 31, 2017 2:06 PM
**To:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Cc:** Dave Lambernedis <dave@abrahamlinc.com>
**Subject:** Re:RE: Fw:Invoice 171918 from DDCC Global Sourcing Inc

Hi Ginger,

Thanks for your feedback. All previous checks are just fine, i don't know what's going on with this one. Do you know it's went to our old address or the new address? We did update our address with post office one week ago,all the mails should be transferred to our new office address,but it's possible lost during this process.Just in case please note our new address: 1820 Brummel Ave,Elk Grove Village, IL 60007

Let' wait till next Tuesday to see what happen. Thank you!!

-------------------

Best Regards,

Kris Yin

Jiangsu Beier Decoration Materials Co., Ltd.

Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.

US Mob: 1-773-704-0439

Mob:86-13915078421

Email:kris@bblfloor.com

***Please Save a tree. Dont print this e-mail unless its really necessary.***

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you. ***************************************************************

------------------ Original ------------------

**From:** "Abraham Linc Accounts Payable"<ap@abrahamlinc.com>;

**Date:** Thu, Aug 31, 2017 11:58 AM

**To:** "Kris Yin"<kris@bblfloor.com>;

**Cc:** "Dave Lambernedis"<dave@abrahamlinc.com>;

**Subject:** RE: Fw:Invoice 171918 from DDCC Global Sourcing Inc

Hello Kris:

Check 9374 was created on 8/21/17 and mailed on 8/22/17. I checked with the bank and it has not been cashed. I hate to be premature in assuming it's lost in the mail, however it should not have taken this long to reach you. Would it be okay to give it till Tuesday? If it hasn't been received by then, we can stop payment and reissue a check or pay by wire or ACH.

Please advise.

***Ginger Lamb***

Accounts Payable

**ABRAHAMLINC**

**EMPLOYEE POWERED * CUSTOMER DRIVEN**

abrahamlinc.com

P: 304.842.6474 x 7428

F: 304.842.8703

**From:** Kris Yin [mailto:kris@bblfloor.com]
**Sent:** Thursday, August 31, 2017 1:12 PM
**To:** Abraham Linc Accounts Payable <ap@abrahamlinc.com>
**Cc:** Dave Lambernedis <dave@abrahamlinc.com>
**Subject:** Fw:Invoice 171918 from DDCC Global Sourcing Inc

Hello Dave,

This attached invoice is past due about one week, can you help us to look into it ? Thanks!

------------------

Best Regards,

Kris Yin

Jiangsu Beier Decoration Materials Co., Ltd.

Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.

US Mob: 1-773-704-0439

Mob:86-13915078421

Email:kris@bblfloor.com

***Please Save a tree. Dont print this e-mail unless its really necessary.***

CONFIDENTIALITY NOTICE: The information contained in this message may contain confidential and legally privileged information. It is only for the use of the intended recipient. If youre not the intended recipient then distribution or copying of this communication is strictly prohibited. If you have received this in error please inform the sender and destroy all copies.Thank you. ************************************************************

------------------ Original ------------------

**From:** "info"<info@ddccfloor.com>;

**Date:** Thu, Aug 31, 2017 11:10 AM

**To:** "kris"<kris@bblfloor.com>;

**Subject:** Invoice 171918 from DDCC Global Sourcing Inc

DDCC Global Sourcing Inc

**Invoice** *171918* *Due:08/23/2017*

Amount Due: $42,375.71

Dear Customer:

Your invoice-171918 for 42,375.71 is attached. Please remit payment at your earliest convenience.

Thank you for your business - we appreciate it very much.

Sincerely,
DDCC Global Sourcing Inc

7087313957
www.greentouchflooring.com

FEDERAL BUREAU OF INVESTIGATION

## Victim Information

| | |
|---|---|
| Name: | Robert A. Marra II |
| Are you reporting on behalf of a business? | |
| Business Name: | |
| Is the incident currently impacting business operations? | |
| Age: | Over 60 |
| Address: | 519 West Main Street |
| Address (continued): | |
| Suite/Apt./Mail Stop: | |
| City: | Bridgeport |
| County: | |
| Country: | United States of America |
| State: | West Virginia |
| Zip Code/Route: | 26330 |
| Phone Number: | 3048487427 |
| Email Address: | rmarra@abrahamlinc.com |
| Business IT POC, if applicable: | |
| Other Business POC, if applicable: | |

## Financial Transaction(s)

| | |
|---|---|
| Transaction Type: | WireTransfer |
| If other, please specify: | |
| Transaction Amount: | 513590.03 |
| Transaction Date: | 5/4/2023 |
| Was the money sent? | Yes |
| | |
| Victim Bank Name: | Wesbanco Bank |
| Victim Bank Address: | 1130 Johnson Avenue |
| Victim Bank Address (continued): | |

| | |
|---|---|
| Victim Bank Suite/Mail Stop: | |
| Victim Bank City: | Bridgeport |
| Victim Bank Country: | United States of America |
| Victim Bank State: | West Virginia |
| Victim Bank Zip Code/Route: | 26330 |
| Victim Name on Account: | Abraham Linc Corporation |
| Victim Account Number: | 712014436 |

| | |
|---|---|
| Recipient Bank Name: | Regions Bank |
| Recipient Bank Address: | 750 Nickajack Road |
| Recipient Bank Address (continued): | |
| Recipient Bank Suite/Mail Stop: | |
| Recipient Bank City: | Mableton |
| Recipient Bank Country: | United States of America |
| Recipient Bank State: | Georgia |
| Recipient Bank Zip Code/Route: | 30126 |
| Recipient Name on Account: | Sabrina Damore |
| Recipient Bank Routing Number: | 053012029 |
| Recipient Account Number: | 0337016911 |
| Recipient Bank SWIFT Code: | |

## Description of Incident

Provide a description of the incident and how you were victimized. Provide information not captured elsewhere in this complaint form.

Abraham Linc received an email from our supplier(same contact as normal) asking us to ACH monies to a new account number. Although we had previously mailed checks to their Chicago, IL address. The supplier has an office in Chicago but manufactures in China.

Most communications are done with them through email. Everything seemed legit and the funds were ACH'd to the supplier. The first one was done on 5-4-23 and 2 more were done on 5-5-23 and 5-9-23. We did not receive or hear anything from our bank(Wesbanco) or from Regions bank(receiving bank) until late on 5-10-23. By that time all monies were gone from the account.

## Information About The Subject(s) Who Victimized You

| | |
|---|---|
| Name: | Sabrina Damore |
| Business Name: | |
| Address: | |
| Address (continued): | |
| Suite/Apt./Mail Stop: | |
| City: | Mableton |
| Country: | United States of America |
| State: | Georgia |
| Zip Code/Route: | 30126 |
| Phone Number: | |
| Email Address: | |
| Website: | |
| IP Address: | |

## Other Information

If an email was used in this incident, please provide a copy of the entire email including full email headers.

From: kris Yin <kris@bblfloorcn.com>
Sent: Wednesday, May 3, 2023 9:42 AM
To: Ginger Lamb <glamb@abrahamlinc.com>
Cc: Abraham Linc Accounts Payable <ap@abrahamlinc.com>; 华洁 huajie<huajie@bblfloor.cn> <huajie@bblfloorcn.com>; 李宜涵 liyihan<liyihan@bblfloor.cn> <liyihan@bblfloorcn.com>
Subject: Re: Open Items 31:03

Hi Ginger

Your offer has been accepted by our management. Attached are supporting documents for your perusal showing our banking details for ACH payments only (Not wire transfers pls). Kindly process the payment for the products delivered at a 5% cash discount and advise

with proof of payment once done.

We thought it would be best to issue your company a single letter of authorization regarding the 5% discount as this would be less cumbersome compared to reissuing tens of invoices. Kindly advise ? I am currently traveling. "Li Yihan" in the copy, from our finance team will do the rest once payment is received.
Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0449
Mob:86-13915078421
Email:kris@bblfloor.com

On Wed, May 3, 2023 at 1:41 AM kris Yin <kris@bblfloorcn.com> wrote:
Hi Ginger,
This should work. i will discuss your offer internally and revert back to you
Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

On Wed, May 3, 2023 at 12:02 AM Ginger Lamb <glamb@abrahamlinc.com> wrote:
Kris:
Since we do not pay for product we do not have in our possession, we are prepared to pay immediately for all product we have received if a 5% cash discount applies. Please see attached spreadsheet. Product for the amounts in green have been delivered.
Also, we would pay immediately for product as it is delivered if a 5% cash discount applies.
Product for the amounts in yellow will be delivered by Friday.
Product for the amounts in blue should port around 5/15/23 and would be paid when it is delivered to our warehouse.
I would need the instructions to process electronic payments if this is acceptable to your company.
Please advise.

Ginger Lamb
AP Accounting Clerk Supervisor
O: 304.848.7428
Save As Contact
From: kris Yin <kris@bblfloorcn.com>
Sent: Tuesday, May 2, 2023 10:47 AM
To: Ginger Lamb <glamb@abrahamlinc.com>
Cc: Abraham Linc Accounts Payable <ap@abrahamlinc.com>; 华洁 huajie<huajie@bblfloor.cn> <huajie@bblfloorcn.com>; 李宜涵 liyihan<liyihan@bblfloor.cn> <liyihan@bblfloorcn.com>; AJ Warne <awarne@abrahamlinc.com>; Robert Marra <rmarra@abrahamlinc.com>
Subject: Re: Open Items 31:03
Hi Ginger,
The 5% applies to all outstanding invoices if the total balance for June is cleared. Yes
Best Regards,
Kris Yin
Jiangsu Beier Decoration Materials Co., Ltd.
Add:No.999,Chaoyang Road,Beier Industry Zone,Henglin Town,Changzhou City,Jiangsu,Province,213101,China.
US Mob: 1-773-704-0439
Mob:86-13915078421
Email:kris@bblfloor.com

On Tue, May 2, 2023 at 10:35 PM Ginger Lamb <glamb@abrahamlinc.com> wrote:
Kris:
I want to verify the 5% conditions. Would that be on the one invoice due May 3rd? Or is this on all invoices if our total balance is cleared? Also, I did not receive the ACH instructions. Would you please

Are there any other witnesses or victims to this incident?

Employees of Abraham Linc who were copied on the email

If you have reported this incident to other law enforcement or government agencies, please provide the name, phone number, email, date reported, report number, etc.

Bridgeport Police Department 304-842-8260
Cobb County GA Police Department 770-499-4725

Check here if this an update to a previously filed complaint: ☐

## Who Filed the Complaint

Were you the victim in the incident described above? Yes
Name:
Business Name:
Phone Number:
Email Address:

## Digital Signature

By digitally signing this document, I affirm that the information I provided is true and accurate to the best of my knowledge. I understand that providing false information could make me subject to fine, imprisonment, or both. (Title 18, U.S.Code, Section 1001)

Digital Signature: Robert A. Marra II
Thank you. Your complaint was submitted to the IC3. Please save or print a copy of your complaint before closing this window. ***This is the only time you will have to make a copy of your complaint.***

FAQs Disclaimer Privacy Notice About IC3

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

**ık Simmerman III**

| | |
|---|---|
| **ı:** | Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com> |
| **:** | Monday, May 15, 2023 11:08 AM |
| | Jenna Elkind |
| | Robert Marra; Adam Dyer |
| **ect:** | CL01-FLY-TXU1TZQEM-002 Abraham Linc Corporation SOCIAL ENGINEERING CHECKLIST WITH BACKUP |

a,

ıethod of verification utilized by the insured is their continual relationship they have with the vendor and ıunications completed by email and specifically Kris Yin, the same individual they have communicated with over the years.
Abraham Linc attached multiple email samples supporting this trusted communication. At no point did the fraudulent email exchange show different contact information (Email or telephone numbers) in the body of Mr. Yin's email. The ease of doing business with this client and the exchanges they have had over the years has always been legitimate. There were also offers to ACH or wire a payment in the past. There was no reason to question this verification with the request for the ACH based on the documents supplied by the bank and DDCC.

We appreciate your anticipated thorough review of all documents supplied and any further information needed to move this forward.

Thanks again.

Sheri

Blue Ridge
RISK PARTNERS

**Sheri O'Donoghue**
*Director of Claims*
3458 Ellicott Center Drive, Suite 205
Ellicott City, MD 21043
Tel: 443-574-1033
Email: Sheri.O'Donoghue@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com

Tell us how we did

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** Jenna Elkind <jenna@cowbellcyber.ai>
**Sent:** Monday, May 15, 2023 9:51 AM
**To:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Cc:** Robert Marra <rmarra@abrahamlinc.com>; Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** Re: CL01-FLY-TXU1TZQEM-002 Abraham Linc Corporation SOCIAL ENGINEERING CHECKLIST WITH BACKUP

You don't often get email from jenna@cowbellcyber.ai. Learn why this is important

Thank you, Sheri. I will review and provide a response as soon as possible. An initial reading of your below factual scenario, an apologies if I missed it, but I did not see the method of verification undertaken by the insured. Can you please provide a more detailed description of same.

Best,

**Jenna Elkind**
Claims Counsel

P: (201) 360-6985 | E: Jenna@cowbellcyber.ai
38 E 29th St, 10th Floor, New York, NY 10016

Cowbell Cyber Inc. is the parent of Cowbell Insurance Agency LLC, a licensed Property & Casualty (P&C) insurance producer and surplus lines broker in the State of California under License #0N04348

Addressing cyber threats
before they matter

On Mon, May 15, 2023 at 8:37 AM Sheri O'Donoghue <Sheri.O'Donoghue@blueridgeriskpartners.com> wrote:

Good Afternoon Jenna,

Attached please find the Social Engineering Checklist requested from our mutual insured, Abraham Linc Corporation along with a sample of emails supporting the type of exchange they have on a regular basis with Kris Yin at BBL/DDCC Global Sourcing Inc. and the accounting department. Mr. Marra and I spoke late Friday afternoon to provide an update on the investigation. He has been in communication with Abraham Linc's bank, Wesbanco and the receiving bank, Regions Bank. Both banks are attempting to recall the ACH's. Regions Bank is working with Chase Bank as Chase is the banking institution the funds were ultimately transferred. Their fraud departments are actively involved. Both the FBI and local police agencies were notified and attempting to secure warrants for the IP address used for this trickery.

Most importantly with respects to Cowbell's investigation, it's both Abraham Linc and our agencies contention coverage is owed under the policy.

Our client's recent exchange between whom they believed to be BBL/DDCC Global did not raise any red flags as there was always consistent dialogue, exchange of invoices and correspondence by means of email communication with the client on a regular basis. The monies requested were based on invoices the insured receives by email from the vendor as a matter of practice and when the fraudulent email communication began with the accounting department, the exchange establishing past due and paid invoices were not abnormal. The fraudulent letter sent to DDCC Global Sourcing, Inc by Regions Bank on 5/2/23 and letter from DDCC Global Sourcing to Abraham Linc outlining the reasons for the change in banking instructions did not rise to the level of concern as they have worked closely with the vendor over the years.

At the time of your initial discussion with Mr. Marra at Abraham Linc, you raised concern over coverage as to the verification process within the Cowbell social engineering policy language, specifically; "as a condition precedent to coverage, the Insured's established and documented verification procedure must have been followed before acting upon such instruction." While you believe the language may be straightforward we believe that the process to bind coverage with Cowbell was ambiguous as to Cowbell's predetermined position of what method of verification is accepted to honor coverage. It's our contention their good faith exchange with the vendor does not support a disclaimer of coverage for the loss they suffered.

The broker provided a quote for the Cowbell policy contingent on the responses to the insured technology security and the completion of the application . Abraham Linc provided these responses and completed the application to bind coverage (Attached). The insured responded to the Cyber Questions to initiate the quote and subsequently completed the application provided by Cowbell. The client completed the application and provided the yes and no responses based on the wording of the Cowbell application. 5.1. of the application/underwriting questions do not stipulate a specific required method in verification of the vendor supplier bank accounts before adding these to their accounts payable system. The client received both a letter from DDCC Global and Regent's Bank to authenticate the new routing information via email. 5.2 of the same application/underwriting questionnaire is at the very least non specific as to the type of authentication required for fund transfer requests. There is only 1 example provided. This is no more than an example and if it was a mandatory requirement on the application, it should be worded specifically to avoid any confusion and ambiguity. The client bound coverage based on the questions as they were posed.

We respectfully request after receipt of documentation to support the amount of loss, coverage is afforded for the purchased amount and released to Abraham Linc.

Additional updates on the status of the investigation with law enforcement and banking industries will be provided when more information becomes available.

Blue Ridge
RISK PARTNERS

**Sheri O'Donoghue**
*Director of Claims*
3458 Ellicott Center Drive, Suite 205
Ellicott City, MD 21043
Tel: 443-574-1033
Email: Sheri.O'Donoghue@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com

Tell us how we did

**From:** Robert Marra <rmarra@abrahamlinc.com>
**Sent:** Thursday, May 11, 2023 5:25 PM
**To:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Cc:** Robert Marra <rmarra@abrahamlinc.com>
**Subject:** SOCIAL ENGINEERING CHECKLIST WITH BACKUP

Please find the Social Engineering checklist as well as emails between Ginger Lamb(AP mgr at Abraham Linc) and Kris Yin(DDCC) that go all the way back to 2017.

The communication email thread has previously been sent to all parties but if you want me to send it in a separate email we can.

I have also attached the FBI report to this email.

Any other questions, please advise.

Thanks,



**Robert Marra**

CFO

O: 304.848.7427

Save As Contact

AbrahamLinc

The Strongest Linc in Your Supply Chain

**Frank Simmerman III**

**From:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Sent:** Thursday, May 25, 2023 7:14 AM
**To:** Jenna Elkind
**Cc:** Robert Marra
**Subject:** Status of Social Engineering claim CL01-FLY-TXU1TZQEM-002 Abraham Linc

Jenna,

Please provide an update on the social engineering review. Documents were sent on 5/18/23.

I am in and out of meetings until early afternoon and would like and update to both of us by then.

Thank you,
Sheri

Blue Ridge
RISK PARTNERS

**Sheri O'Donoghue**
*Director of Claims*
3458 Ellicott Center Drive, Suite 205
Ellicott City, MD 21043
Tel: 443-574-1033
Email: Sheri.O'Donoghue@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com

Tell us how we did

**From:** Sheri O'Donoghue
**Sent:** Monday, May 22, 2023 1:32 PM
**To:** Jenna Elkind <jenna@cowbellcyber.ai>
**Cc:** rmarra@abrahamlinc.com
**Subject:** CL01-FLY-TXU1TZQEM-002 Abraham Linc

Good Afternoon Jenna & Robert,

Checking in to see if the legal breach coach and forensic I.T. is lined up for the conference call with Robert.

My apologies if this took place already- last I heard it would be either Friday or today for the parties to get together. I did not need to be included, but want to make sure we are on track.

Also, please let me know when you expect to have documents reviewed to finalize social engineering portion of the loss. It remains our expectation the coverage limit of $100,000 will be released to the client.

Thank you,
Sheri

**Frank Simmerman III**

**From:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Sent:** Wednesday, July 5, 2023 3:57 PM
**To:** Robert Marra
**Cc:** Adam Dyer
**Subject:** Social Engineering claim

As Adam & I did previously, the broker laid out a detailed factual dispute to the insurance carrier with the reasonings their declination is not accepted and it's been escalated again.
Our update on 6/29 stated the carrier is making the review a priority. They are providing minimal answers to the status other than it is being reviewed. My experience is it has been escalated further up the ladder and multiple people are involved in the review at different layers to make the determination.

We will receive a final answer but unfortunately I can't tell you exactly when. We are frustrated by their delays as well but understand it's nothing compared to yours.

Sheri

Blue Ridge RISK PARTNERS

**Sheri O'Donoghue**
*Director of Claims*
3458 Ellicott Center Drive, Suite 205
Ellicott City, MD 21043
Tel: 443-574-1033
Email: Sheri.O'Donoghue@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com
***Tell us how we're doing***

**From:** Robert Marra <rmarra@abrahamlinc.com>
**Sent:** Wednesday, July 5, 2023 3:42 PM
**To:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Cc:** Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** RE: Social Engineering claim

Do we think they are ever going to give us a final answer?

What is their hold up?

**From:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Sent:** Wednesday, July 5, 2023 3:23 PM
**To:** Robert Marra <rmarra@abrahamlinc.com>
**Cc:** Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** Social Engineering claim

Robert,

I received our update today from the broker and still no word yet. We continue to do everything possible to get a position after their further review of our dispute of their initial declination.

Thanks,
Sheri

Blue Ridge RISK PARTNERS

**Sheri O'Donoghue**
*Director of Claims*
3458 Ellicott Center Drive, Suite 205
Ellicott City, MD 21043
Tel: 443-574-1033
Email: Sheri.O'Donoghue@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com
***Tell us how we're doing***

[illegible]

**From:** Sheri O'Donoghue
**Sent:** Monday, July 3, 2023 4:14 PM
**To:** Robert Marra <rmarra@abrahamlinc.com>
**Cc:** Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** Social Engineering claim

Robert,

We have not received an update from the carrier this afternoon on the outcome of their revisiting coverage. We are doing everything we can to obtain the update to resolve with coverage afforded and will continue to press for a response.

Thanks,
Sheri

**From:** Sheri O'Donoghue
**Sent:** Monday, July 3, 2023 10:09 AM
**To:** Robert Marra <rmarra@abrahamlinc.com>
**Subject:** Social Engineering claim

Robert,

We haven't received an update as of yet on the coverage review and have followed up again this morning. I will provide another update this afternoon to advise if I received an updated status.

Thanks,
Sheri

**From:** Sheri O'Donoghue
**Sent:** Thursday, June 29, 2023 1:33 PM
**To:** Robert Marra <rmarra@abrahamlinc.com>; Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** CYBER CARRIER

Robert,

We heard back from the claims director who is communicating with the carrier. The carrier said they are evaluating as a priority and will respond, but did not commit as to when. We are on top of them and hope to have a response by tomorrow. We will be in touch.

Thanks,
Sheri

**From:** Sheri O'Donoghue
**Sent:** Thursday, June 29, 2023 10:07 AM
**To:** Robert Marra <rmarra@abrahamlinc.com>; Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** CYBER CARRIER

Robert,

I received a email response to my phone call stating he is awaiting a response now and will update me as soon as he receives.

**From:** Sheri O'Donoghue
**Sent:** Thursday, June 29, 2023 9:53 AM
**To:** Robert Marra <rmarra@abrahamlinc.com>; Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** RE: CYBER CARRIER

Good Morning Robert,

I have a call out to the Director of Claims that Adam and I spoke with on June 21st to find out where he is with his discussions with Cowbell regarding their position on coverage.

I will provide an update as soon as I hear back from him.

Thanks,
Sheri

**From:** Robert Marra <rmarra@abrahamlinc.com>
**Sent:** Thursday, June 29, 2023 5:55 AM
**To:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>; Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Cc:** Robert Marra <rmarra@abrahamlinc.com>
**Subject:** CYBER CARRIER

Sheri & Adam,

Do we expect to hear something from Cowbell by tomorrow?

Please keep me posted.

Thanks,



**Robert Marra**

CFO

O: 304.848.7427

Save As Contact

AbrahamLinc

The Strongest Linc in Your Supply Chain

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

**k Simmerman III**

| | |
|---|---|
| : | Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com> |
| | Monday, July 17, 2023 8:53 AM |
| | Robert Marra; Sheri O'Donoghue |
| **ct:** | RE: CYBER |

morning Robert,

ısurer has notified us that they intend to uphold their coverage denial and will be sending you correspondence ıting that this week.

re sorry that you are dealing with this, as we do not agree with the insurer's position and have protested it to the full extent of our ability with the insurer. I am also contacting the WV Insurance Commissioner's office today to let them know of this situation and that we don't agree with the insurer's handling of your claim.

We placed your coverage through one of the largest and most credible insurance brokerages in the country, Burns & Wilcox, and they also do not agree with the insurer's position. They have also objected and asked for the insurer to reconsider to no avail.

Please let me know if you want me to come to your office to discuss, or set up a call to do so. Again, I apologize that you are dealing with this situation and will assist you in any way I am able to at this point.

Regards,

Blue Ridge
RISK PARTNERS

**Adam Dyer, CPCU**
*Chief Insurance & Acquisition Officer*
325 White Oaks Blvd
Bridgeport, WV 26330
Tel: 304-848-6448
Email: Adam.Dyer@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com
***Tell us how we're doing***

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party, without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** Robert Marra <rmarra@abrahamlinc.com>
**Sent:** Sunday, July 16, 2023 7:21 AM
**To:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Cc:** Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>; Robert Marra <rmarra@abrahamlinc.com>
**Subject:** RE: CYBER

Guys – how do we bring this to a closure so we can move on to the next step?

**From:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Sent:** Thursday, July 13, 2023 8:08 AM
**To:** Robert Marra <rmarra@abrahamlinc.com>
**Cc:** Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>
**Subject:** RE: CYBER

Robert,

I have no response yet from our request on Monday. I have requested again this morning.

Sheri O'Donoghue

Blue Ridge RISK PARTNERS

**Sheri O'Donoghue**
*Director of Claims*
3458 Ellicott Center Drive, Suite 205
Ellicott City, MD 21043
Tel: 443-574-1033
Email: Sheri.O'Donoghue@BlueRidgeRiskPartners.com
Web: www.blueridgeriskpartners.com
***Tell us how we're doing***

The content of this email is confidential and intended for the recipient specified in message only. It is strictly forbidden to share any part of this message with any third party without a written consent of the sender. If you received this message by mistake, please reply to this message and follow with its deletion, so that we can ensure such a mistake does not occur in the future.

**From:** Robert Marra <rmarra@abrahamlinc.com>
**Sent:** Thursday, July 13, 2023 7:52 AM
**To:** Sheri O'Donoghue <Sheri.O'Donoghue@BlueRidgeRiskPartners.com>
**Cc:** Adam Dyer <Adam.Dyer@BlueRidgeRiskPartners.com>; Robert Marra <rmarra@abrahamlinc.com>
**Subject:** CYBER

Sheri – any word? Do they not have to provide an answer by a certain date? Seems like they are just delaying the inevitable.

I will wait to hear back from you.

Thanks,



**Robert Marra**
CFO
O: 304.848.7427
Save As Contact

AbrahamLinc
The Strongest Linc In Your Supply Chain

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

cowbell®

July 21, 2023

**Jenna Elkind**
Cowbell Cyber, Inc.
Claims Counsel
Direct: (201) 360-6985
Jenna@cowbellcyber.ai

**Via Email**
Robert Marra
Abraham Linc Corporation
519 West Main Street
Bridgeport, WV 26330
rmarra@abrahamlinc.com

| | | |
|---|---|---|
| **Re:** | **Insured:** | Abraham Linc Corporation |
| | **Issue:** | Cyber Crime |
| | **Policy No:** | FLY-CB-TXU1TZQEM-002 |
| | **Policy Period:** | January 29, 2023 – January 29, 2024 |
| | **Claim No:** | CL01-FLY-TXU1TZQEM-002 |

Dear Mr. Marra,

Cowbell Cyber, Inc. ("Cowbell") is the claims administrator handling claims on behalf of Spinnaker Insurance Company ("Spinnaker" or the "Insurer") arising under Prime 100 Commercial Cyber Insurance Policy No. FLY-CB-TXU1TZQEM-002, effective January 29, 2023 to January 29, 2024 ("Policy") issued to Abraham Linc Corporation ("Abraham Linc" or "Insured"). As you are aware, I am the assigned adjuster handling this matter. Kindly address all future correspondence to me. The purpose of this letter is to advise you of our coverage position for this matter under the Policy, which is subject to a mutual reservation of rights.

For the reasons set forth below, **we advise that there is no coverage available for the recovery of the lost funds. However, certain coverage is afforded under Security Breach Expense for this matter.** We set forth below our understanding of this matter, as well as a detailed analysis of how we arrived at this decision. If you believe there are additional facts that could alter our analysis, please do not hesitate to provide such information to us for further consideration.

In considering the matter for coverage, we reviewed the Policy and the information available to date, including telephone calls and correspondence with you over the last month as we investigated coverage. No other policies were considered. To the extent you consider coverage is available under another policy, including any policy issued by any other program Insurer of Cowbell, then please submit notice pursuant to the notice provisions set out in that policy.

## SUMMARY

This matter was noticed to Cowbell on May 11, 2023, by Blue Ridge Risk Partners on behalf of the Insured via the Cowbell Cyber claims inbox. We understand that on or about May 3, 2023, the Insured received an email, purportedly from a long-standing supplier, BBL Floor, requesting an ACH payment. The email came from what appears to be a spoofed email of kris@bblfloorcn.com. All prior correspondence with this vendor came from an kris@bblfoor.com email domain. It does not appear that the spoof in the email domain was noticed and the Insured, apparently relying on their long standing relationship with the supplier, did not question or verify the request for an ACH payment, despite the fact that all prior payments were made via check (purportedly the Insured had offered to ACH or wire a payment in the past, however, the supplier had never agreed and therefore all prior payments were done via check).

We are advised that on or about May 4, 2003, May 5, 2023 and May 9, 2023, the Insured sent payment transactions for a total of $513,590.03 which were intended for BBL Floor, but instead went to a fraudulent bank account. The Insured reached out to their bank on or around May 10, 2023, but after an investigation, the receiving bank informed the funds were unrecoverable.

The Insured subsequently conducted a forensic investigation with the assistance of Cipriani & Werner as breach counsel and MoxFive for forensics, and the investigation concluded there were no indicators of compromise within the Insured's environment.

## THE POLICY

Spinnaker issued Prime 100 Cyber Risk Insurance Policy to the Insured with Policy No. FLY-CB-TXU1TZQEM-002 effective January 29, 2023, to January 29, 2024. The Policy is subject to a $2,000,000 Aggregate Limit of Liability, which is the maximum limit of the Insurer's liability for all Loss under all Coverage Sections combined, and various sublimit and deductible obligations depending upon the applicable Insuring Agreement(s). The Policy has the following coverages: (1) Security Breach Expense; (2) Extortion Threats; (3) Replacement or Restoration of Electronic Data; (4) Business Income and Extra Expense; (5) Security Breach Liability; (6) Computer and Funds Transfer Fraud via Endorsement; (7) Social Engineering via Endorsement; (8) Ransom Payments via Endorsement; (9) Hardware Replacement Costs via Endorsement; and (10) Website Media Content Liability via Endorsement (the "Insuring Agreements").

As is applicable here, we have reviewed this matter under the (1) Security Breach Expense Insuring Agreement, which is subject to sublimit of liability of $2,000,000 in excess of a $10,000.00 Deductible, as well as the (2) Social Engineering Insuring Agreement, which is subject to a sublimit of liability of $100,000 in excess of a $10,000 Deductible. We note that pursuant to Section III (4), in the event a **Loss** is covered under more than one Insuring Agreement, only the highest deductible applicable to the **Loss** shall be applied. As coverage is triggered only under the Security Breach Expense coverage section, a single deductible of $10,000.00 will apply for this matter.

## COVERAGE DISCUSSION

***Security Breach Expense Coverage Section***

Coverage under the applicable Insuring Agreements applies to **Loss** resulting directly from a **Cyber Incident, Extortion Threat, Security Breach**, or **Claim** which is **Discovered** during the Policy Period.

We draw your attention to the Security Breach Expense Insuring Agreement in Section I of the Policy which provides:

1. **Security Breach Expense**

We will pay for **Loss** resulting directly from a **Security Breach**, or **Cyber Incident Discovered** during the policy period.

Based on the information provided to date, it appears that the **Insured** may have experienced a **Cyber Incident** and **Security Breach** which was first discovered during the Policy Period. Specifically, the Insured had a potential email compromise which resulted in the fraudulent ACH transfer. As such, the Security Breach Insuring Agreement is satisfied and accordingly, Spinnaker will pay all **Loss** in excess of the applicable Deductible that the **Insured** incurs solely as a result of a covered **Cyber Incident** and **Security Breach.** As a result, Spinnaker shall have no obligation to provide coverage under the Policy for this **Cyber Incident** and **Security Breach** until it receives written confirmation that the $10,000 Deductible has been met and paid.

We next draw your attention to the applicable definitions of Loss which provide in relevant part:

**Security Breach Expense Loss** means:

**a. Forensics Expenses**

The costs incurred with Our approval to establish whether a **Security Breach** or **Cyber Incident** has occurred or is occurring.

If a **Security Breach** has occurred, the following costs are also included:

i. costs to investigate the cause, scope, and extent of a **Security Breach** and to identify any affected parties; and
ii. costs to determine any action necessary to remediate the conditions that led to or resulted from a **Security Breach** including, but not limited to, fees paid for legal and other professional advice on how to respond to the **Security Breach**.

**b. Notification Expenses**

Costs to notify all parties affected by a **Security Breach** including, but not limited to, notice to be transmitted through media:

i. as required by Privacy Regulations; or
ii. ii. Subject to Our prior approval, as appropriate on a voluntary basis.

As such, coverage will be provided for costs incurred by Cipriani & Werner and MoxFive forensics, subject to the applicable Deductible.

***Social Engineering Endorsement***

Coverage under the applicable Insuring Agreements applies to **Loss** resulting directly from a **Social Engineering Incident** which is **Discovered** during the Policy Period. We draw your attention to the **Social Engineering** Insuring Agreement:

Subject to the Social Engineering Coverage Limit and Deductible as set forth above, We will pay for **Social Engineering Loss** resulting directly from a **Social Engineering Incident** that is first **Discovered** during the Policy Period and reported in accordance with condition **14. Duties in the Event of a Claim or Loss** in **SECTION VI - CONDITIONS**.

The policy defines **Social Engineering Incident** as follows:

**c. Social Engineering Incident** means the intentional misleading of an **Insured** to transfer **Money** to a person, place or account beyond the **Named Insured's** control resulting directly from the **Named Insured's** employee's good faith reliance upon an instruction transmitted via email, purporting to be from:

**i.** a natural person or entity who exchanges, or is under contract to exchange, goods or services with the **Named Insured** for a fee (other than a financial institution, asset manager, broker-dealer, armored motor vehicle "named insured" or any similar entity); or

**ii.** an employee of the **Named Insured**;

but which contained a fraudulent and material misrepresentation and was sent by an imposter. As a condition precedent to coverage, the **Insured's** established and documented verification procedure must have been followed before acting upon such instruction.

Based on the information provided to date, we understand that on May 3, 2023, the Insured received a fraudulent email, purportedly from its supplier, BBL Floor, informing the Insured of a change to its payment instructions (previously always by check) to a ACH payments instead. Relying only on their long-standing relationship with the supplier, the Insured did not verify the new payment instructions. On or about May 4, 2003, May 5, 2023 and May 9, 2023, the Insured sent payment transactions for a total of $513,590.03 which were intended for BBL Floor, but instead went to a fraudulent bank account.

As noted above, the definition of **Social Engineering Incident** requires, as a condition precedent for coverage under the Social Engineering Endorsement, that the Insured must have followed its established and documented verification procedure before acting upon any payment instruction. Unfortunately, in light of these circumstances, it is our position that this condition precedent has not been satisfied, and therefore, this matter does not qualify as a **Social Engineering Incident** under the terms of the Policy. As such, the Social Engineering Insuring Agreement is not triggered, and it is Spinnaker's position that there is no coverage for this matter under the Social Engineering Insuring Agreement.

## CONCLUSION AND RESERVATION OF RIGHTS

In light of the foregoing, Cowbell, on behalf of Spinnaker, has determined that no coverage is afforded to Abraham Linc Corporation for the recovery of the lost funds. However, certain coverage is provided under the Security Breach Expense Coverage Section of the Policy for this matter, subject to a reservation of rights. Spinnaker's coverage position is based on the information and/or material facts provided to date. This letter is not, and should not be construed as, a waiver of any terms, conditions, exclusions, or other provisions of the Policy, or any other policies of insurance issued by Spinnaker, Cowbell, or any of its affiliates. Cowbell and Spinnaker continue to respectfully reserve all rights under the Policy, at law, and in equity, including, but not limited to the Cowbell and Spinnaker's right to rescind the Policy, to deny coverage in whole or in part, and/or to supplement this letter.

Furthermore, if you have any other insurance policies that may respond to the matter, we recommend that you report the matter to the issuing carrier(s) immediately if you have not already done so.

While we encourage you to contact us in the first instance with any questions you may have concerning this letter, you may be entitled to have this matter reviewed by the West Virginia Offices of the Insurance. Your inquiry should be directed to:

West Virginia Offices of the Insurance Commissioner
PO Box 50540
Charleston, WV 25305-0540
Toll free: (800) 435-7381
https://www.wvinsurance.gov/

If you would like to further discuss any aspect of this letter, please do not hesitate to contact me.

Sincerely,

**Jenna Elkind**

Cowbell Cyber, Inc.
Claims Counsel
Direct: (201) 360-6985
Jenna@cowbellcyber.ai

CC: Sheri.O'Donoghue@blueridgeriskpartners.com
Adam.Dyer@blueridgeriskpartners.com
Theresa@cowbellcyber.ai
benjamin.goldfien@sayatalabs.com
rvsforzo@burns-wilcox.com

# SUMMONS

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Spinnaker Insurance Company, 209 West Washington Street, Charleston, WV 25302

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ______________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ______________________

______________________________________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ______________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ______________________ | ______________________ |
|---|---|
| Date | Server's Signature |

# SUMMONS

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Spinnaker Insurance Company, 209 West Washington Street, Charleston, WV 25302

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ____________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ____________________ | ____________________ |
|---|---|
| Date | Server's Signature |

# SUMMONS

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Spinnaker Insurance Company, 209 West Washington Street, Charleston, WV 25302

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ______________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ______________________

______________________________________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ______________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ______________________ | ______________________ |
|---|---|
| Date | Server's Signature |

# SUMMONS

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Cowbell Cyber, Inc., P.O. Box 7775, # 44808, San Francisco, CA 94120

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

11/1/2023 3:35:54 PM — Date

/s/ Albert F. Marano — Clerk

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ______________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ______________

______________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ______________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

______________ Date

______________ Server's Signature

# SUMMONS

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Cowbell Cyber, Inc., P.O. Box 7775, # 44808, San Francisco, CA 94120

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ____________________

______________________________________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ____________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ____________________ | ____________________ |
|---|---|
| Date | Server's Signature |

# SUMMONS

E-FILED | 11/1/2023 3:35 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Cowbell Cyber, Inc., P.O. Box 7775, # 44808, San Francisco, CA 94120

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

11/1/2023 3:35:54 PM — Date

/s/ Albert F. Marano — Clerk

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ______________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ______________

______________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ______________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

______________ Date

______________ Server's Signature

E-FILED | 11/7/2023 1:14 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

# COVER SHEET

## GENERAL INFORMATION

IN THE CIRCUIT COURT OF HARRISON COUNTY WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

**First Plaintiff:** ☑ Business ☐ Individual ☐ Government ☐ Other

**First Defendant:** ☑ Business ☐ Individual ☐ Government ☐ Other

**Judge:** James A. Matish

## COMPLAINT INFORMATION

**Case Type:** Civil

**Complaint Type:** Contract

**Origin:** ☑ Initial Filing ☐ Appeal from Municipal Court ☐ Appeal from Magistrate Court

**Jury Trial Requested:** ☑ Yes ☐ No

**Case will be ready for trial by:** 12/16/2024

**Mediation Requested:** ☐ Yes ☑ No

**Substantial Hardship Requested:** ☐ Yes ☑ No

☐ Do you or any of your clients or witnesses in this case require special accommodations due to a disability?

- ☐ Wheelchair accessible hearing room and other facilities
- ☐ Interpreter or other auxiliary aid for the hearing impaired
- ☐ Reader or other auxiliary aid for the visually impaired
- ☐ Spokesperson or other auxiliary aid for the speech impaired
- ☐ Other:

☐ I am proceeding without an attorney

☑ I have an attorney: Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

# SERVED PARTIES

**Name:** Spinnaker Insurance Company
**Address:** 209 West Washington Street, Charleston WV 25302
**Days to Answer:** N/A **Type of Service:** No Service

---

**Name:** Cowbell Cyber, Inc.
**Address:** P.O. Box 7775, # 44808, San Francisco CA 94120
**Days to Answer:** N/A **Type of Service:** No Service

E-FILED | 11/7/2023 1:14 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

**IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA**

ABRAHAM LINC CORPORATION,
A West Virginia Corporation,

Plaintiff,

v.

Civil Action No.: CC-17-2023-C-247

The Honorable James A. Matish

SPINNAKER INSURANCE COMPANY,
An Illinois Stock Company, and
COWBELL CYBER, INC.,
A Delaware Corporation,

Defendants.

**FIRST AMENDED COMPLAINT**

Now comes the Plaintiff, Abraham Linc Corporation, ("Abraham Linc"), by and through its attorneys, Simmerman Law Office, PLLC, and for its First Amended Complaint states as follows:

**PARTIES**

1. Abraham Linc is a West Virginia corporation with a local office address of 519 West Main Street, Bridgeport, West Virginia, 26330. At all relevant times, Abraham Linc was engaged in the wholesale flooring business.

2. Defendant Spinnaker Insurance Company, ("Spinnaker"), is an Illinois based insurance company with a notice of process address of: Corporation Service Company, 209 West Washington Street, Charleston, West Virginia 25302. At all times relevant hereto, Spinnaker conducted insurance business throughout the State of West Virginia, including in Harrison County, West Virginia.

3. Defendant Cowbell Cyber, Inc., ("Cowbell"), is Delaware Corporation and a California based insurance claims administrator/adjuster entity which, at all relevant times,

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

handled/adjusted the claim at issue on behalf of Spinnaker under Prime 100 Commercial Cyber Insurance Policy No. FLY-CB-TXU1TZQEM-002, effective January 29, 2023 to January 29, 2024, ("the Policy"). Upon information and belief, Cowbell's principal office address is 6800 Koll Center Parkway, Suite 250, Pleasanton, California, 94566, and its mailing address is P.O. Box 7775, # 44808, San Francisco, California 94120.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the Defendants in accordance with W.Va. Code § 56-3-33 because the Defendants transacted business in this State; contracted to supply services or things in this State; and caused injury and/or tortious injury in this State.

5. Venue is appropriate in the Circuit Court of Harrison County because certain events giving rise to the causes of action occurred in Harrison County, West Virginia and because the Defendants transact business in and throughout Harrison County, West Virginia.

## COMMON ALLEGATIONS/BACKGROUND FACTS

6. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

7. This Complaint seeks damages and other relief against the Defendants for violations of the West Virginia Unfair Trade Practices Act relating to insurance companies and insurance claims adjustment, as well as for breach of the contractual and common law duties owed to Abraham Linc.

8. On October 26, 2022, Abraham Linc was advised that its cyber liability coverage was set to expire on 1/29/2023. See **Ex. 1**, Email from Blue Ridge Risk Partners, with Short Form Application (exhibits omitted as previously filed).

9. Accordingly, on October 28, 2022, Abraham Linc submitted a Cyber Liability Insurance Short Form Application to its insurance agent. See **Ex. 1**, Short Form Application.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

10. In its Cyber Liability Short Form Application, Abraham Linc plainly indicated that its employees do not complete social engineering training. See **Ex. 1**, Question 9. Phishing Controls.

11. Through its insurance agent, Blue Ridge Risk Partners, and insurance broker, Burns & Wilcox, Abraham Linc was ultimately able to procure a Cyber Insurance Policy through Spinnaker, with an effective date of January 29, 2023, the Policy. See **Ex. 2**, Cyber Insurance Policy – Abraham Linc Corporation.

12. The Policy contains a social engineering endorsement which provides for $100,000.00 in insurance coverage for social engineering losses, as defined in the Policy. See **Ex., 2**, pgs. 31-32, Social Engineering Endorsement.

13. Prior to Spinnaker issuing the Policy and binding insurance coverage for social engineering losses/cyber coverage, Spinnaker did not request that Abraham Linc create formal, written policies and procedures related to social engineering incidents, occurrences or transfer verification(s).

14. Prior to Spinnaker issuing the Policy and binding insurance coverage for social engineering losses, Spinnaker did not request that Abraham Linc complete additional training or social engineering updates.

15. At Abraham Linc, the historic, documented and established protocol related to ACH transfer verification(s) was to verify the transfer via email with known vendors/contacts – as many of Abraham Linc's vendors were in distant markets and time zones, such as China, and thus were unavailable to verify transfers by way of phone.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

16. Abraham Linc's established and documented procedure was wholly consistent with the Policy language and was never questioned by Spinnaker, or at any time prior to issuance of the Policy.

17. Within this context, beginning on or about April 20, 2023, a known and long-standing vendor of Abraham Linc's, BBL Flooring's, email accounts were hacked by a third party.

18. Stepping back, BBL Flooring is a flooring manufacture and a wholesale flooring company which manufactures and sells flooring product(s) to Abraham Linc whom Abraham Linc had a long-standing and established relationship with – which included numerous, prior verification(s) by email correspondence between Abraham Linc and BBL Flooring employees.

19. More specifically, in late April/early May, a later confirmed fictitious BBL Flooring employee posing as "Kris Yin" interacted with various Abraham Linc employees related to due and owing invoices. See **Ex. 3**, Social Engineering Checklist and Email Compilation, April/May 2023, with historic emails/documents.

20. "Kris Yin" appeared as a purported BBL Flooring employee, whom Abraham Linc has frequently worked with out of BBL Flooring's Changzou City, Jiangsu, Province, China office. Id.

21. To clarify, there is a real "Kris Yin" at BBL Flooring, with whom Abraham Linc had been transacting business and order confirmations/verifications via email since at least 2017.

22. Thus, consistent with Abraham Linc's practice and procedures, Abraham Linc followed its procedures and engaged in numerous email confirmations/verifications with "Kris Yin", which spanned several weeks in April/May of 2023.

23. After following Abraham Linc's long-standing vendor verification procedures, which involved numerous emails to the fictitious "Kris Yin" wherein amounts outstanding were

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

verified and discussed at length, Abraham Linc ultimately sent, via ACH Transfer, a substantial sum of money, which well exceeds the social engineering policy limit of $100,000.00, consistent with the directives sent to Abraham Linc by the fictitious "Kris Yin" on behalf of fake "BBL Flooring" letterhead.

24. Following this ACH Transfer, which in all contexts was an ordinary transaction in the context of Abraham Linc and BBL Flooring's working relationship, Abraham Linc later learned that BBL Flooring's internal system had been hacked.

25. Further, on or about May 11, 2023, Abraham Linc discovered that the account to which Abraham Linc's funds were sent via ACH Transfer was a scam/fake BBL Flooring account – as the bank account had actually only been in existence for two months, and was registered in the name of Sabrina Damore, not BBL Flooring.

26. After learning of the foregoing issues, Abraham Linc immediately attempted to work with its financial institution and Regions Bank (where the fictitious account was housed) to stop the ACH Transfer/to recoup funds – but the ACH Transfer could not be stopped.

27. After learning of the foregoing issues, Abraham Linc has also worked with various government authorities to attempt to stop the ACH Transfer/to recoup funds – but only de minimis funds have been recouped as of the filing of this litigation.

28. Additionally, on May 11, 2023, Abraham Linc contacted its insurance agent/broker and put them on notice of Abraham Linc's social engineering loss/claim under the Policy.

29. After tendering notice, Abraham Linc was advised by its insurance agent/broker that this is the very reason social engineering insurance/cyber insurance was procured, and that Abraham Linc would be paid $100,000.00 in insurance proceeds, the social engineering policy limit.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

30. Notwithstanding the clarity of the insurance agent/broker's representations, after the claim was tendered and without any investigation, on May 11, 2023, Spinnaker and Cowbell verbally advised that they were going to deny Abraham Linc's social engineering claim due to a lack of verification on the part of the insured.

31. On and following May 11, 2023, Abraham Linc provided all materials requested by the Defendants, and Abraham Linc also provided both historic and current emails which demonstrated proof of verification and that Abraham Linc has verified transactions in the same manner for not less than seven (7) years – without incident or concern.

32. Similarly, on and after May 11, 2023, the Policy agent/broker repeatedly told the Defendants that their coverage position was wrong and that it was their collective position that coverage is owed to Abraham Linc under the insuring agreement. See **Ex. 4**, Email compilation of communications between the insurance agent/broker and the Defendants.

33. For example, on May 15, 2023 and May 25, 2023, Sheri O'Donoghue, the Director of Claims at Blue Ridge Risk Partners stated via email as follows (see **Ex. 4**):

> **May 15, 2023**:
>
> Jenna,
>
> The method of verification utilized by the insured is their continual relationship they have with the vendor and communications completed by email and specifically Kris Yin, the same individual they have communicated with over the years.
>
> Abraham Linc attached multiple email samples supporting this trusted communication. At no point did the fraudulent email exchange show different contact information (Email or telephone numbers) in the body of Mr. Yin's email. The ease of doing business with this client and the exchanges they have had over the years has always been legitimate. There were also offers to ACH or wire a payment in the past. There was no reason to question this verification with the request for the ACH based on the documents supplied by the bank and DDCC.
>
> We appreciate your anticipated thorough review of all documents supplied and any further information needed to move this forward.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

Thanks again.

Sheri
**<u>May 22, 2023</u>**:

Good Afternoon Jenna & Robert,

Checking in to see if the legal breach coach and forensic I.T. is lined up for the conference call with Robert.

My apologies if this took place already- last I heard it would be either Friday or today for the parties to get together. I did not need to be included, but want to make sure we are on track.

Also, please let me know when you expect to have documents reviewed to finalize social engineering portion of the loss. **It remains our expectation the coverage limit of $100,000 will be released to the client.** (emphasis added).

Thank you,
Sheri

34. Following the May correspondence, the insurance agent/broker continued to advocate for coverage with the Defendants, making it clear to the Defendants that their coverage position was wrong, and that both the issuing insurance agent, Blue Ridge Risk Partners, and the insurance broker, Burns & Wilcox, disagreed with the position taken by the Defendants, as evidenced in, for example, in the email text below:

Good morning Robert,

The insurer has notified us that they intend to uphold their coverage denial and will be sending you correspondence indicating that this week.

**We are sorry that you are dealing with this, as we do not agree with the insurer's position and have protested it to the full extent of our ability with the insurer. I am also contacting the WV Insurance Commissioner's office today to let them know of this situation and that we don't agree with the insurer's handling of your claim.**[1]

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

[1] It is similarly telling that the insurance agent on the Policy directly contacted the WV Insurance Commissioner's office to report the conduct of the insurer/Defendants.

**We placed your coverage through one of the largest and most credible insurance brokerages in the country, Burns & Wilcox, and they also do not agree with the insurer's position. They have also objected and asked for the insurer to reconsider to no avail.**

Please let me know if you want me to come to your office to discuss, or set up a call to do so. Again, I apologize that you are dealing with this situation and will assist you in any way I am able to at this point. (emphasis added)

Regards,

Adam Dyer, Blue Ridge Risk Partners, See **Ex. 5**, 7/17/2023 Email.

35. Notwithstanding the clarity of both the insurance agent and the insurance broker's coverage position, which is an uncommon event in the insurance industry, the Defendants continued to fail to investigate or evaluate Abraham Linc's social engineering claim/insurance loss under the Policy.

36. The Defendants' omissions and failures are glaring, particularly as under West Virginia law, it is clear that "[a]ny person who shall solicit within this state an application for insurance shall, in any controversy between the insured or his or her beneficiary and the insurer issuing any policy upon such application, be regarded as the agent of the insurer and not the agent of the insured." W.Va. Code 33-12-22.

37. Thus here, in the context of the present coverage dispute, the Defendants' agents have plainly admitted that there is coverage such that Abraham Linc's social engineering loss claim is valid and should be paid.

38. Specifically, the actions, admissions and statements of Blue Ridge Risk Partners, the insurance agent which solicited and issued the policy at issue, and Burns & Wilcox, the insurance broker, bind coverage.

39. Notwithstanding the foregoing, and despite the Defendants' glaring misunderstanding of West Virginia statutory and common law, by letter dated July 21, 2023, the

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

Defendants fully denied coverage related to the social engineering loss/under the Policy. See **Ex. 6**, 7/21/2023 Denial Letter.

40. On information and belief, the Defendants' denial is contrary to Blue Ridge Risk Partners and Burns & Wilcox's prior express admissions, concessions and declarations, as well as contrary to the express language of the insuring agreement, West Virginia common and statutory law.

41. Additionally, the Policy contains a Computer and Funds Transfer Fraud endorsement specifically designed for the risk at hand which contains a $2,000,000.00 coverage limit.

42. Upon information and belief, a loss occurred within the definition of the Computer and Funds Transfer Fraud endorsement.

43. Upon information and belief, "loss" within the relevant section of the Computer and Funds Transfer Fraud endorsement specifically means: (1) your money, securities or other property fraudulently transferred, paid or delivered, or (2) money or securities fraudulently debited or deleted from your account at a financial institution.

44. Upon information and belief, the loss resulted directly from fraudulent entry(ies) of electronic data or computer system(s) into Abraham Linc's system/electronic data.

45. Upon information and belief, the definition of electronic data plainly includes information transmitted to or from computer software/systems/applications, including email systems which are plainly a common media form used with computers/electronically controlled equipment.

46. Upon information and belief, there is no exclusion which bars coverage under the Computer and Funds Transfer Fraud endorsement.

47. Upon information and belief, the Computer and Funds Transfer Fraud endorsement plainly provides for coverage when unauthorized persons or organizations fraudulently enter electronic data/computer systems (such as emails), causing a loss to the insured.

48. Upon information and belief, the Defendants summarily failed to investigate the loss in the context of the Computer and Funds Transfer Fraud endorsement.

49. Upon information and belief, the Defendants' failure to consider coverage under the Computer and Funds Transfer Fraud endorsement was intentional, as the Defendants had actual knowledge of the higher coverage limit of the Computer and Funds Transfer Fraud endorsement, thus the Defendants attempted to pigeonhole the loss, for coverage denial purposes, in the social engineering policy provisions, which possess a substantially lower coverage limit.

50. The Defendants' actions/omissions have forced Abraham Linc into unwanted and unnecessary litigation related to the Policy.

51. At this time, Abraham Linc expressly reserves the right to amend this Complaint and pursue other claims which may yet arise and/or to add additional parties, as Defendant Cowbell's internal business structure is not yet known.

**COUNT I: BAD FAITH – COMMON LAW AND STATUTORY (ALL DEFENDANTS)**

52. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

53. The Defendants, and their employees, agents and servants, were engaged/employed to adjust/investigate Abraham Linc's loss under the Policy.

54. At all times relevant hereto, Abraham Linc cooperated with the Defendants, and their employees, agents and servants.

55. The Defendants, and their agents, servants and/or employees, have negligently, willfully and intentionally breached the statutory and regulatory requirements governing insurance

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

companies and insurance adjusters doing business in West Virginia, as well as the insuring agreement.

56. At all times relevant hereto, the Defendants were subject to the laws of West Virginia, both the common law and certain statutory and regulatory laws, governing the insurance business in West Virginia, including but not limited to, those statutory sections and attendant regulations known as the West Virginia Unfair Trade Practices Act.

57. The Defendants had a legal obligation and duty to make a prompt, full and fair investigation of Abraham Linc's claim, and to effectuate a prompt, fair and equitable settlement of Abraham Linc's claim/insured loss.

58. Further, the Defendants had a duty of good faith and fair dealing in all transactions with Abraham Linc under the insuring agreement and within the insurer/insured relationship.

59. The Defendants knew or should have known that their conduct, actions and omissions were reckless, willful and malicious and would cause Abraham Linc to sustain and endure economic and emotional harm.

60. The Defendants' violations and unlawful acts include, but are not limited to, the following:

a. Refusing to pay claims without conducting a reasonable investigation based upon all available information and known facts;

b. Compelling Abraham Linc to institute litigation to recover amounts due under an insurance policy by making no offer or unfair offers of resolution or compromise;

c. Failing to promptly provide a commercially reasonable explanation of the basis for the insurer's position in relation to the facts where applicable law and facts support an insured's stated position;

d. Placing the financial interests of the insurer above those of the insured;

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

e. Disregarding the admissions of the Defendants' agents/brokers that the claim is covered, and that the social engineering/fraudulent funds transfer loss was plainly an insured risk; and

f. Other such violations of the law that may become known or identified as this matter progresses.

61. As a direct and proximate result of the conduct of the Defendants, Abraham Linc has sustained substantial compensable losses including specifically the benefits of its contractual relationship with the Defendants, certain consequential damages, and attorney fees and costs – as further set forth below.

62. Because the Defendants' actions/omissions were malicious, willful, wanton and/or in reckless disregard of Abraham Linc's rights, Abraham Linc is entitled to punitive damages.

**COUNT II: BREACH OF CONTRACT/BREACH OF THE CONTRACTUAL DUTY OF GOOD FAITH AND FAIR DEALING/DECLARATORY JUDGMENT (DEFENDANT SPINNAKER)**

63. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

64. Defendant Spinnaker owed, and owes, express contractual duties to Abraham Linc and a contractual duty of good faith and fair dealing.

65. Defendant Spinnaker has breached both the express language of the insuring agreement and the contractual duty of good faith and fair dealing.

66. To expand, Defendant Spinnaker, through its agents, servants and/or employees, knowing that Abraham Linc's claim is wholly valid, has refused the same in violation of the express language of the insuring agreement and West Virginia common law.

67. As a direct and proximate result of the conduct of Defendant Spinnaker, Abraham Linc has suffered compensable loss – specifically Abraham Linc has lost substantial benefits of the insuring agreement, for which Abraham Linc paid substantial insurance premiums.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

68. Because Defendant Spinnaker's actions/omissions were malicious, willful, wanton and/or in reckless disregard of Abraham Linc's rights, Abraham Linc is entitled to punitive damages.

69. Alternatively, Abraham Linc seeks a declaration from the Court that it is entitled to insurance coverage up to the extent of its losses under the social engineering and computer and funds transfer fraud provisions of the insuring agreement.

**COUNT III: CONSTRUCTIVE FRAUD**
**(ALL DEFENDANTS)**

70. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

71. The State of West Virginia has a substantial public policy prohibiting insurers from deceiving, oppressing, and/or taking unfair advantage of policy holders.

72. Such public policy is embodied within West Virginia case law, legislative enactments and insurance commissioner rules and regulations. Examples of such embodiments of this policy include, but are not limited to: W.Va. Code §33-1-1, *et seq.*, §33-11-1, *et seq.*, W.Va. Legislative Rule Insurance Commissioner, Series 14 Unfair Trade Practices, W.Va. Code §46(a)-6-104, *et seq.*, and the W.Va. Code §36-8-1, *et seq.*

73. As noted above, the Defendants have violated substantial public policies and provisions set forth in the W.Va. Legislative Rule Insurance Commissioner, Series 14 Unfair Trade Practices, W.Va. Code §46(a)-6-104, *et seq.*, and the W.Va. Code §36-8-1, *et seq.* and the common law of West Virginia.

74. These breaches and unlawful acts/omissions constitute breaches of legal and equitable duties which give rise to tort liability for constructive fraud.

75. Further, as a direct and proximate result of the conduct of the Defendants, Abraham Linc has suffered compensable loss – specifically the full benefits of its insuring agreement.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

76. Because the Defendants' actions/omissions were malicious, willful, wanton and/or in reckless disregard of Abraham Linc's rights, Abraham Linc is entitled to punitive damages.

**COUNT IV: REASONABLE EXPECTATIONS**
**(ALL DEFENDANTS)**

77. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

78. Abraham Linc had a reasonable expectation of coverage under the Policy.

79. Further, Abraham Linc had a reasonable expectation of coverage under the Policy because it relied upon the representations of the Defendants and their agents/employees that the Policy would provide coverage and pay in the event of a social engineering loss and/or a computer and funds transfer loss.

80. Abraham Linc, in reliance upon the representations of the Defendants and their agents, reasonably expected the Policy and claim to be correctly processed and policy proceeds to be paid for the social engineering loss and/or a computer and funds transfer fraud loss.

81. The Defendants have acted intentionally, with actual malice and/or gross negligence by failing to honor the Policy and pay the social engineering loss/computer and funds transfer fraud loss, consistent with the reasonable expectations of the insured and the Defendants' agents/broker(s).

82. Alternatively, the social engineering provisions and/or the computer and funds transfer fraud provisions of the Policy are ambiguous such that coverage plainly exists for the social engineering/computer and funds transfer fraud loss at hand.

83. Finally, as a direct and proximate result of the conduct of the Defendant, Abraham Linc has suffered compensable loss – specifically the full benefits of its insurance agreement.

**COUNT V: VICARIOUS LIABILITY**
**(ALL DEFENDANTS)**

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

84. Abraham Linc incorporates herein all preceding paragraphs of this Complaint.

85. Upon information and belief, the above-named Defendants are also liable to Abraham Linc based upon theories of vicarious liability, respondeat superior, master/servant, principle/agent and/or employer/employee based upon the acts of, including, but not limited to, Defendants' adjusters and agents/representatives.

**WHEREFORE** Abraham Linc hereby demands judgment against the Defendants, as follows:

(a) Compensatory, special and general damages for the damage(s) caused to Abraham Linc;

(b) All damages, compensatory or general, allowed by law under Hayseeds v. State Farm Fire and Casualty Company, and its progeny, including, but not limited to, all attorneys' fees and costs, all expenses incurred in this matter, and damages for aggravation and inconvenience in an amount to be determined by a jury, and/or alternatively a declaration that Abraham Linc is entitled to insurance coverage up to the extent of its losses under the social engineering and computer and funds transfer fraud provisions of the insuring agreement;

(c) All damages, general and compensatory, for aggravation, emotional distress, inconvenience, humiliation, expenses and attorneys' fees, and such other damages in an amount to be determined by a jury;

(d) Pre-judgment and post judgment interest;

(e) Punitive damages;

(f) Attorneys' fees and costs expended herein; and

(g) Such other further general and specific relief as may become apparent as this matter proceeds to trial.

**PLAINTIFF REQUESTS**
**A JURY TRIAL AS TO ALL COUNTS SO TRIABLE**

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

Respectfully submitted,

SIMMERMAN LAW OFFICE, PLLC

By:*/s/ Frank E. Simmerman, III*
Frank E. Simmerman, Jr.
(W. Va. Bar #3403)
Chad L. Taylor
(W. Va. Bar #10564)
Frank E. Simmerman, III
(W. Va. Bar #11589)

254 East Main Street
Clarksburg, WV 26301
Phone: (304) 623-4900

*Counsel for the Plaintiff Abraham Linc Corporation*

FILED | 11/13/2023 3:47 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305

FILED IN 15TH
CIRCUIT COURT
2023 NOV 13 P 2:14

**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

CIRCUIT COURT OF HARRISON COUNTY
301 WEST MAIN STREET
SUITE 301
Clarksburg, WV 26301-2967

**Control Number:** 315245

**Defendant:** SPINNAKER INSURANCE COMPANY
209 West Washington Street
Charleston, WV 25302 US

**Agent:** Corporation Service Company

**County:** Harrison

**Civil Action:** 23-C-247

**Certified Number:** 92148901125134100003865166

**Service Date:** 11/6/2023

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your authorized insurance company.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your authorized insurance company as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper,* ***not to the Secretary of State's office.***

Sincerely,

Mac Warner

Mac Warner
Secretary of State

# SUMMONS

[redacted]

---

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Spinnaker Insurance Company, 209 West Washington Street, Charleston, WV 25302

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

---

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

---

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ____________________

____________________________________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ____________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ____________________ | ____________________ |
|---|---|
| Date | Server's Signature |

FILED | 11/13/2023 3:47 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305

FILED IN 15TH
CIRCUIT COURT
2023 NOV 13 P 2: 14

**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

CIRCUIT COURT OF HARRISON COUNTY
301 WEST MAIN STREET
SUITE 301
Clarksburg, WV 26301-2967

**Control Number:** 315244

**Defendant:** COWBELL CYBER, INC.
PO BOX 7775
#44808
SAN FRANCISCO, CA 94120 US

**County:** Harrison

**Civil Action:** 23-C-247

**Certified Number:** 92148901125134100003865159

**Service Date:** 11/6/2023

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your unauthorized foreign corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your unauthorized foreign corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper,* ***not to the Secretary of State's office.***

Sincerely,

Mac Warner

Mac Warner
Secretary of State

# SUMMONS

[redacted]

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Cowbell Cyber, Inc., P.O. Box 7775, # 44808, San Francisco, CA 94120

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ____________________

____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ____________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ____________________ | ____________________ |
|---|---|
| Date | Server's Signature |

FILED | 11/13/2023 3:47 PM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305

FILED IN 15TH
CIRCUIT COURT

2023 NOV 13 P 2: 14

**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

CIRCUIT COURT OF HARRISON COUNTY
301 WEST MAIN STREET
SUITE 301
Clarksburg, WV 26301-2967

**Control Number:** 315244

**Defendant:** COWBELL CYBER, INC.
PO BOX 7775
#44808
SAN FRANCISCO, CA 94120 US

**County:** Harrison
**Civil Action:** 23-C-247
**Certified Number:** 92148901125134100003865159
**Service Date:** 11/6/2023

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your unauthorized foreign corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your unauthorized foreign corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper,* ***not to the Secretary of State's office***.

Sincerely,

Mac Warner

Mac Warner
Secretary of State

# SUMMONS

[redacted]

IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA

**Abraham Linc Corporation v. Spinnaker Insurance Company**

Service Type: Secretary of State - Certified - Including Copy Fee

NOTICE TO: Cowbell Cyber, Inc., P.O. Box 7775, # 44808, San Francisco, CA 94120

THE COMPLAINT WHICH IS ATTACHED TO THIS SUMMONS IS IMPORTANT AND YOU MUST TAKE IMMEDIATE ACTION TO PROTECT YOUR RIGHTS. YOU OR YOUR ATTORNEY ARE REQUIRED TO FILE THE ORIGINAL OF YOUR WRITTEN ANSWER, EITHER ADMITTING OR DENYING EACH ALLEGATION IN THE COMPLAINT WITH THE CLERK OF THIS COURT. A COPY OF YOUR ANSWER MUST BE MAILED OR HAND DELIVERED BY YOU OR YOUR ATTORNEY TO THE OPPOSING PARTY'S ATTORNEY:

Frank Simmerman, 254 E Main St, Clarksburg, WV 26301

THE ANSWER MUST BE MAILED WITHIN 30 DAYS AFTER THIS SUMMONS AND COMPLAINT WERE DELIVERED TO YOU OR A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY OR OTHER THINGS DEMANDED IN THE COMPLAINT.

SERVICE:

| 11/1/2023 3:35:54 PM | /s/ Albert F. Marano |
|---|---|
| Date | Clerk |

RETURN ON SERVICE:

☐ Return receipt of certified mail received in this office on ____________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to ____________________

____________________________________________

☐ I certify that I personally delivered a copy of the Summons and Complaint to the individual's dwelling place or usual place of abode to ____________________, a member of the individual's family who is above the age of sixteen (16) years and by advising such person of the purpose of the summons and complaint.

☐ Not Found in Bailiwick

| ____________________ | ____________________ |
|---|---|
| Date | Server's Signature |

E-FILED | 11/14/2023 8:54 AM
CC-17-2023-C-247
Harrison County Circuit Clerk
Albert F. Marano

**IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA**

ABRAHAM LINC CORPORATION,
A West Virginia Corporation,

Plaintiff,

v. Civil Action No.: CC-17-2023-C-247

The Honorable James A. Matish

SPINNAKER INSURANCE COMPANY,
An Illinois Stock Company, and
COWBELL CYBER, INC.,
A Delaware Corporation,

Defendants.

---

**PLAINTIFF'S NOTICE OF ISSUANCE OF SUBPOENA**

---

**PLEASE TAKE NOTICE** that, pursuant to Rule 45 of the West Virginia Rules of Civil Procedure, Plaintiff, by counsel, has issued and will caused the attached Civil Case Subpoena to be timely served upon Blue Ridge Risk Partners, LLC, to secure production of specified documents in the present case, with an anticipated production date of December 8, 2023. See Exhibit 1, Subpoena.

Respectfully submitted,

Frank E. Simmerman, Jr.
fes@simmermanlaw.com (W.Va. Bar No. 3403)
Chad L. Taylor
clt@simmermanlaw.com (W.Va. Bar No. 10564)
Frank E. Simmerman, III
trey@simmermanlaw.com (W.Va. Bar No. 11589)
SIMMERMAN LAW OFFICE, PLLC
254 East Main Street
Clarksburg, West Virginia, 26301
Phone No. (304) 623-4900
Fax No. (304) 623-4906

**IN THE CIRCUIT COURT OF HARRISON COUNTY, WEST VIRGINIA**

ABRAHAM LINC CORPORATION,
A West Virginia Corporation,

Plaintiff,

v. Civil Action No.: CC-17-2023-C-247

The Honorable James A. Matish

SPINNAKER INSURANCE COMPANY,
An Illinois Stock Company, and
COWBELL CYBER, INC.,
A Delaware Corporation,

Defendants.

**CIVIL CASE SUBPOENA**

TO: Blue Ridge Risk Partners, LLC, 325 White Oaks Boulevard, Bridgeport, WV 26330.

_X_ **YOU ARE COMMANDED** to produce and permit inspection of and copying of designated books, documents or tangible things in your possession, custody or control, as follows: See Exhibit A.

---

Place: Simmerman Law Office, PLLC, 254 East Main Street, Clarksburg, West Virginia 26301.

Date/Time: December 8, 2023, 2:00 p.m.

---

Issued by: Frank E. Simmerman, III (WVSB# 11589)
SIMMERMAN LAW OFFICE, PLLC
254 East Main Street
Clarksburg, West Virginia, 26301
Phone No. (304) 623-4900
Fax No. (304) 623-4906

Signature: [signature]

Date: 11-14-2023

---

**W. Va. R. Civ. P. 45(c).** ***Place of examination*** - A deponent may be required to attend an examination only in the county in which the deponent resides or is employed or transacts business in person, or at such other convenient place as is fixed by an order of court.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

EXHIBIT
1

**W. Va. R. Civ. P. 45(d).** ***Protection of persons subject to subpoenas.*** - (1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The Court on behalf of which the subpoena was issued may enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction, which may include, but is not limited to, lost earnings, and a reasonable attorney's fee. (2)(A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial. (B) Subject to paragraph (e)(2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of the subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy the materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party of an officer of a party from significant expense resulting from the inspection and copying commanded. (3)(A) On timely motion, the court by which a subpoena was issued shall quash or modify the subpoena if it (i) fails to allow reasonable time for compliance; (ii) requires a person to travel for a deposition to a place other than the county in which that person resides or is employed or transacts business in person or at a place fixed by order of the court; (iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or (iv) subjects a person to undue burden. (B) If a subpoena (i) requires disclosure of a trade secret or other confidential research development, or commercial information, or (ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not as the request of any party, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.

**W. Va. R. Civ. P. 45(e).** ***Duties in responding to subpoenas.*** - (1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand. (2) When information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

Simmerman Law Office, PLLC
254 E Main St.
Clarksburg, WV 26301

# EXHIBIT "A"

## I. Definitions

The following definitions apply to the document requests set forth below:

1. "You", "Your" or "Blue Ridge" shall mean Blue Ridge Risk Partners, LLC, as well as its agent(s), owner(s), stockholder(s), employee(s), attorney(s), affiliate(s), representative(s), officer(s), subsidiary/ies, parent company/ies, or others who are in possession of or who may have obtained information, documentation, or knowledge for or on behalf of Blue Ridge.

2. "Communication(s)" shall mean any disclosure, transfer, or exchange of information, by any means, and whether orally or by document, or whether face-to-face, by telephone, mail, email, fax, or personal delivery, including by or through any personal, private, public, or institutional accounts or services.

3. "Document(s)" is used in its customary broad sense and includes, without limitation, the following items, whether printed, recorded, filmed, or reproduced by any other mechanical process, or written or produced by hand, and whether an original, master, or copy: agreements, including preliminary and final drafts of any agreements and any items incorporated in said agreements by reference; books; records; logs; letters; accounts; notes; summaries; forecasts; appraisals; surveys; estimates; diaries; desk or personal calendars; work sheets; reports; Communications, including intra-company communications; correspondence; cablegrams; radiograms; internet and/or World Wide Web sites or pages, information stored and /or available for downloading or printing from an internet web page located on the World Wide Web and/or contained within the source code or metadata created in developing the Web sites or pages, or such similar devices or programs; telegrams; facsimiles; electronic mail ("email") messages; social media postings; information stored on computer disk or memory; telexes; memoranda, including

intra-company memoranda; summaries, notes, and records of personal conversations or interviews; price lists; ledgers; invoices; purchase orders; change orders; contracts; notices; drafts of any documents; business records; maps; charts; plans; drawings; blueprints; specifications; schedules; computer printouts; computer tapes; microfilm; microfiche; photographs; slides; negatives; motion pictures; video recordings; tapes or other voice recordings and transcriptions thereof; data compilations from which information can be obtained or translated, if necessary, by use of or through detection devices, into reasonably usable form; and any other "information-containing" paper, writing, or physical thing, including all copies of such documents, the contents of which differ in any respect from the original, in the actual or constructive possession, custody, or control of You or any of Your assignors, assignees, agents, owners, stockholders, affiliates, officers, subsidiaries, parent companies, servants, employees, representatives, attorneys, accountants, investment bankers, or advisors of any kind.

4. "Refer," "relate," "reflect," "regard," "refer to," "relate to," "relating to," "reflecting," and "referring to," (or any form thereof) shall mean directly or indirectly, in whole or in part, referring to, relating to, evidencing, connected with, in connection with, commenting upon, relevant to, impinging or impacting upon, affecting, responding to, showing, representing, supporting, contradicting, stating, embodying, containing, establishing, alluding to, discussing, inferring, mentioning, evaluating, recording, noting, analyzing, reflecting, or constituting.

5. "Produce" shall mean to attach, make available for inspection and/or copying, or authorize the requester's obtaining of any materials or documents requested to be produced.

## II. Documents

Please produce the following documents on the date and location requested on the attached Subpoena:

1. Produce all internal documents and communications which relate to or discuss the renewal/issuance of Abraham Linc Corporation's Prime 100 Commercial Cyber Insurance Policy, No. FLY-CB-TXU1TZQEM-002, effective January 29, 2023 to January 29, 2024, ("the Policy").

2. Produce all internal documents and communications which relate to or discuss the cyber loss suffered by Abraham Linc Corporation in 2023 and/or insurance coverage related to the cyber loss.

3. Produce all documents and communications exchanged with third parties which relate to or discuss the cyber loss suffered by Abraham Linc Corporation in 2023 and/or insurance coverage related to the cyber loss. Such third parties including, but not limited to: (1) Burns & Wilcox, or any employee or representative thereof; and/or (2) the West Virgina Insurance Commissioner's Office, or any employee or representative thereof.